**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE No. 9:14-cv-81323-DMM**

THE CITY OF LOS ANGELES, ACTING
THROUGH ITS FIRE AND POLICE
PENSION SYSTEM, ACTING BY ORDER
OF AND THROUGH ITS BOARD OF FIRE
AND POLICE PENSION
COMMISSIONERS, individually and on
behalf of all others similarly situated,

                    Plaintiff,

    vs.

BANKRATE, INC., EDWARD J.
DIMARIA, KENNETH S. ESTEROW,
THOMAS R. EVANS, APAX PARTNERS,
L.P., APAX PARTNERS LLP, APAX
PARTNERS EUROPE MANAGERS
LIMITED, APAX US VII GP, L.P., APAX US
VII GP, LTD., APAX EUROPE VII GP L.P.
INC., APAX EUROPE VII GP CO. LIMITED,
GOLDMAN SACHS & CO., BANK OF
AMERICA MERRILL LYNCH, RBC
CAPITAL MARKETS, LLC, STEPHENS,
INC., and GRANT THORNTON, LLP,

                  Defendants.

AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................................. 2

II.  JURISDICTION AND VENUE ......................................................................... 6

III.  PARTIES ........................................................................................................... 7

    A.  Lead Plaintiff .......................................................................................... 7

    B.  Defendants .............................................................................................. 7

IV.  CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ........................ 11

V.  EXCHANGE ACT VIOLATIONS .................................................................... 13

    A.  Exchange Act Defendants' False and Misleading Statements .............................. 13

    B.  The Truth Concerning the Exchange Act Defendants' Conduct Is Revealed .......................................................................................... 35

    C.  Post-Class Period Developments ............................................................ 38

    D.  Exchange Act Defendants' Accounting Violations .................................. 42

    E.  Summary of Scienter Allegations for Exchange Act Claims ...................... 50

    F.  Loss Causation for Exchange Act Claims ............................................... 54

    G.  The Fraud-on-the-Market Doctrine Applies ........................................... 59

    H.  The Statutory Safe Harbor and Bespeaks Caution Doctrine Are Inapplicable ................................................................................ 60

VI.  CAUSES OF ACTION UNDER THE EXCHANGE ACT ............................ 61

VII.  VIOLATIONS OF THE SECURITIES ACT .................................................. 67

    A.  Additional Defendants ........................................................................... 68

    B.  The March 2014 Offering ...................................................................... 71

VIII.  CAUSES OF ACTION UNDER THE SECURITIES ACT ........................... 74

IX.  PRAYER FOR RELIEF ................................................................................... 84

X.  JURY TRIAL DEMANDED ............................................................................ 84

Lead Plaintiff, the City of Los Angeles, Acting through its Fire and Police Pension System, Acting by Order of and through its Board of Fire and Police Pension Commissioners ("Lead Plaintiff" or the "City of Los Angeles") makes the following allegations against Defendants: (i) Bankrate, Inc. ("Bankrate" or the "Company"); (ii) Thomas R. Evans ("Evans"); (iii) Edward J. DiMaria ("DiMaria"); (iv) Kenneth S. Esterow ("Esterow"); and (v) the Apax Defendants (defined herein) (collectively, the "Exchange Act Defendants") for violations of Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired Bankrate common stock from October 27, 2011 through October 9, 2014 (the "Class Period"). Lead Plaintiff also asserts non-fraud-based allegations below against Defendants Bankrate, DiMaria, Esterow, the Apax Defendants (defined herein), Goldman Sachs & Co. ("Goldman"), Bank of America Merrill Lynch ("BoA"), RBC Capital Markets, LLC ("RBC"), Stephens, Inc. ("Stephens"), and Grant Thornton, LLP ("Grant Thornton") (collectively, the "Securities Act Defendants") for violations of Sections 11, 12(a)(2), and/or 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o on behalf of all Class members who purchased shares in a March 2014 secondary offering of 16,100,000 million shares of Bankrate common stock sold pursuant to, among other things, a March 4, 2014 prospectus supplement that was filed with the United States Securities and Exchange Commission ("SEC") on March 6, 2014 (the "March 2014 Offering"). The fraud-based Exchange Act allegations and strict-liability and negligence-based Securities Act allegations are separately presented because the latter cannot be said to sound in fraud.

Except as to allegations specifically pertaining to Lead Plaintiff and Lead Plaintiff's own

acts, the allegations herein are based upon a continuing investigation by Lead Plaintiff's counsel, which includes, but is not limited to, the review and analysis of: (i) Bankrate's public filings with the SEC; (ii) securities analysts' reports about Bankrate; (iii) transcripts of Bankrate's conference calls with securities analysts and investors; (iv) Bankrate's press releases; and (v) media reports concerning Bankrate. Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## I.      NATURE OF THE ACTION

1.      During the Class Period, the Exchange Act Defendants engaged in an undisclosed scheme to defraud investors by manipulating the Company's financial results for fiscal years 2011 ("FY11"), 2012 ("FY12") and 2013 ("FY13") to artificially inflate key financial metrics in order to meet market expectations. Specifically, the Exchange Act Defendants implemented and publicly reported false accounting entries to: (i) improperly recognize revenue; and (ii) reverse accrued expenses and allowances. Defendants employed these machinations to ensure that the Company's publicly reported financial indicators, including net income and earnings per share ("EPS"), appeared in line with or better than analysts' consensus expectations during the Class Period. If the Company had reported its true financial results during the Class Period, it would have failed to meet market expectations.

2.      By way of example, for FY12, the Exchange Act Defendants' accounting manipulations artificially increased Bankrate's reported: (i) Generally Accepted Accounting Principles or "GAAP" net income ("GAAP Net Income") by 6.5%; (ii) GAAP net income per diluted share ("GAAP EPS") by 6.9%; (iii) adjusted net income ("Adjusted Net Income") by 3.7%; and (iv) adjusted net income per diluted share ("Adjusted EPS") by 3.6%, as set forth below in ¶ 67.

3.      Not only were these accounting misstatements material to Bankrate's reported financial results, but also, without them, Bankrate would have missed consensus estimates for Adjusted Net Income and Adjusted EPS for the second quarter and first half of 2012.  Namely, absent the Exchange Act Defendants' material inflation of the Company's Adjusted Net Income and Adjusted EPS for the second quarter ended June 30, 2012 ("2Q12"), which came in slightly below or exactly in line with the street's expectations of $18.3 million in Adjusted Net Income and $0.18 in Adjusted EPS, Bankrate would have missed such expectations by $2 million, or 10.9%, and $0.02, or 11.1%, respectively, as set forth below in ¶ 56.

4.      Duping the market into believing that the Company was meeting market expectations enabled Defendants DiMaria and Evans to benefit financially from Bankrate's fraud.  For example, during the Class Period, Defendant DiMaria, Bankrate's then-Chief Financial Officer ("CFO"), cashed in on the Exchange Act Defendants' deception – ***selling more than 50% of his holdings*** of the Company's stock shortly after the Company issued materially false and misleading financial results.  As depicted in the table below, Defendant DiMaria suspiciously sold 125,000 shares of Bankrate common stock ***one day after*** the Company released its false results for the fourth quarter ended December 31, 2011 ("4Q11") and FY11 (together "4Q/FY11") for proceeds of $2.9 million, and sold another 107,177 shares of Bankrate common stock for proceeds of $2.1 million on August 9-13, 2012, ***just one week after*** the Company released false results for 2Q12.

| Date of Sale | Defendant | Number of Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|---|
| 02/08/2012 | DiMaria | 125,000 | $23.40 | $2,925,000 |
| 08/09/2012 | DiMaria | 79,848 | $19.3399 | $1,544,252.34 |
| 08/10/2012 | DiMaria | 26,729 | $19.0537 | $509,286.35 |
| 08/13/2012 | DiMaria | 600 | $19.149 | $11,489.40 |
| **TOTAL** | | **232,177** | | **$4,990,028.09** |

5.     As shown above, the proceeds from Defendant DiMaria's insider sales alone were approximately $5 million – more than 12.5 times Defendant DiMaria's FY12 base salary of $400,000.  Further, these sales were inconsistent with Defendant DiMaria's prior trading history, which included no other stock sales from June 16, 2011, the date of Bankrate's initial public offering ("IPO") until his termination from the Company for cause, as alleged herein.

6.     On September 15, 2014, the Company shocked investors when it issued a press release (the "September 15 Press Release") announcing that:  (i) the SEC had begun a non-public formal investigation of Bankrate's financial reporting for FY12 to determine "***whether accounting entries in these periods may have impacted the Company's reported results, including relative to market expectations***" (in other words, the investigation is centered on whether the Company manipulated its financial results to "meet-or-beat" market consensus estimates); and (ii) Defendant DiMaria had resigned from his position as CFO of the Company effective immediately but would remain with the Company as a senior vice president.

7.     The Company further revealed that the SEC was investigating specific accounting entries that related to improperly recognized revenue and reversals of accrued expenses or allowances in the first quarter ended March 31, 2012 ("1Q12") and 2Q12, totaling $2.4 million in income.  These improper entries materially inflated Bankrate's reported GAAP Net Income, Adjusted Net Income, GAAP EPS, and Adjusted EPS.

8.     The September 15 Press Release also disclosed that, in connection with the SEC's investigation and developments therein, the Company's Audit Committee had concluded that ***investors could no longer rely on the Company's publicly reported financial results for FY11, FY12, and FY13***.  In addition, the Company disclosed that its Audit Committee had retained outside counsel and a forensic auditor to perform a full internal review of these results.

Bankrate's current CEO, Defendant Esterow, subsequently confirmed at an investor conference that this review would encompass *all of the Company's results for FY11, FY12, and FY13*.

9.      The Company's revelations regarding:  (i) the SEC and internal investigations; (ii) the Audit Committee's conclusion that investors could no longer rely upon Bankrate's financial results for the three prior fiscal years; and (iii) the abrupt resignation of the Company's CFO and the chief arbiter of its financial results, Defendant DiMaria, had a material effect on Bankrate's stock price.  Specifically, on September 15, 2014, the price of Bankrate common stock declined by $1.90 per share, or 13.75%, from a close of $13.82 on the prior trading day, September 12, 2014, to close at $11.92 per share on extremely heavy trading volume.

10.     Analysts attributed the decline in Bankrate's stock price to the revelations in the September 15 Press Release.  For example, a September 15, 2014 SunTrust Robinson Humphrey, Inc. ("SunTrust") analyst report noted that, "[t]he market is apparently reacting to the risk that Bankrate's historical financials were fraudulently presented or otherwise misrepresented."  Additionally, Topeka Capital Markets Inc. ("Topeka") issued a report on September 16, 2014 downgrading Bankrate common stock from hold "to sell on [the] SEC investigation, unreliable financials, [and] CFO transition."  Topeka also noted, "*what concerns us is the implication that the SEC is looking to see whether these figures were used to manage market expectations*."[1]

11.     To make matters worse, less than a month later, on October 9, 2014, Bankrate filed a Form 8-K with the SEC (the "October 9 Form 8-K") disclosing that the prior day, the Company had *terminated DiMaria from his remaining role with the Company* <u>*for cause*</u> *because DiMaria had refused to participate in the ongoing SEC and internal investigations* of

---

[1] All emphasis is added unless otherwise noted.

Bankrate's financial results for FY11, FY12, and FY13.  Bankrate further disclosed that the U.S. Department of Justice ("DOJ") also had opened an investigation into the Company's financial reporting.

12.     In response to these new developments, through which the risk created by Bankrate's false financial reporting further materialized, the price of Bankrate common stock declined an additional $1.23 per share, or 11.20%, on very heavy trading volume.  According to one analyst, Stephens Inc. ("Stephens"), in a report issued on October 13, 2014, "[w]hile the SEC investigation was known, . . . the emergence of the DOJ review creates an additional layer of risk" because it "could open the door for more dire consequences for those involved."  The same report also noted "that *there were a fair amount of insider transactions in and around the time period (1H12) under review by the SEC*."  Tellingly, after the conduct alleged herein came to light, on or about December 9, 2014, Bankrate's Board of Directors adopted for the first time a detailed Insider Trading and Information Policy.

13.     As a result of the misconduct alleged herein, Plaintiff and the Class have suffered at least tens of millions of dollars in damages for which they now seek recovery.

## II.     JURISDICTION AND VENUE

14.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.   The Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.  This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1331.

15.     Venue is proper in the Southern District of Florida pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28

U.S.C. § 1391(b).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of materially false and misleading information, occurred in this District.  In addition, the Company is headquartered in North Palm Beach, Florida.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## III.   PARTIES

### A.    Lead Plaintiff

17.    Lead Plaintiff, the City of Los Angeles, is a public pension system that has been providing retirement benefits to all sworn (fire, police and certain port police) employees of the City of Los Angeles since 1899.  As of December 31, 2014, the City of Los Angeles managed approximately $18.6 billion in assets on behalf of more than 25,000 participants.  As reflected in the certification attached hereto as Exhibit A, the City of Los Angeles purchased Bankrate common stock during the Class Period and suffered damages as a result of the violations of the Exchange Act alleged herein.  The City of Los Angeles also purchased Bankrate common stock in the March 2014 Offering, as alleged below in ¶¶ 180, 187, 211, and suffered damages as a result of the violations of the Securities Act alleged herein.

### B.    Defendants

18.    Defendant Bankrate is a Delaware corporation with its headquarters located at 11760 U.S. Highway One, Suite 200, North Palm Beach, Florida.  According to its Class Period SEC filings, Bankrate is an online publisher of personal finance information.  Through its various websites, Bankrate claims to provide consumers with personal finance editorial content regarding banking, mortgages, insurance, credit cards, and other financial products and services.

7

The Company purportedly generates revenue by displaying advertisements on its websites and by selling consumer leads to third-party companies that offer financial products and services.

19.     During the Class Period, Ben Holding S.a.r.l ("Ben Holding") owned shares of Bankrate common stock.  Ben Holding is beneficially owned by the Apax VII Funds.  The general partners and/or controlling entities of the Apax VII Funds include:  (i) Defendant Apax US VII GP, L.P., a Cayman Islands exempted limited partnership; (ii) Defendant Apax Europe VII GP L.P. Inc., a Guernsey incorporated limited partnership; (iii) Defendant Apax US VII GP, Ltd., a Cayman Islands exempted limited company; (iv) Defendant Apax Europe VII GP Co. Limited, a Guernsey incorporated company; and (v) Defendant Apax Partners Europe Managers Limited ("Apax Partners Europe"), a company constituted under English company law (together, the "Apax VII Fund Defendants").  Defendant Apax Partners LLP, a UK-based private equity and venture capital firm headquartered in London, England, is the holding partnership for the worldwide Apax partnership, including Defendants Apax Partners, L.P., a U.S.-registered investment advisor headquartered in New York, New York, and Apax Partners Europe (collectively, "Apax Partners").  Apax Partners advises, manages, or controls the Apax VII Fund Defendants (collectively, the "Apax Defendants").  Through Ben Holding, the Apax Defendants indirectly beneficially owned:  (i) approximately 67,876,566 shares, or approximately 68% of Bankrate's common stock, between October 27, 2011 and December 12, 2011; (ii) 53,803,694 shares, or approximately 54% of Bankrate's common stock, between December 12, 2011 and March 10, 2014; and (iii) approximately 38% of Bankrate's common stock as of March 11, 2014.  Pursuant to the Fourth Amended and Restated Stockholders' Agreement (the "Stockholders' Agreement") attached as an exhibit to the Company's registration statement on Form S-1, as amended and filed with the SEC on June 16, 2011 in connection with Bankrate's

IPO, Ben Holding was entitled to nominate a majority of the total number of members comprising Bankrate's Board of Directors (the "Board") between October 27, 2011 and March 10, 2014, and 30% of the total number of members comprising Bankrate's Board from March 11, 2014 through the end of the Class Period. Accordingly, Bankrate's eight-member Board included four representatives of the Apax Defendants designated and elected by Ben Holding ("Apax Directors") between October 27, 2011 and February 9, 2013, and three Apax Directors between February 10, 2013 and December 12, 2014. In this regard, four Apax Directors signed Bankrate's annual reports on Form 10-K for FY11 filed with the SEC on March 12, 2012 (the "FY11 Form 10-K") and the Form 10-K for FY12 filed with the SEC on March 1, 2013 (the "FY12 Form 10-K"). Moreover, three Apax Directors signed Bankrate's annual report on Form 10-K for FY13 filed with the SEC on February 27, 2014 (the "FY13 Form 10-K") and the Company's shelf registration statement and accompanying prospectus on Form S-3 (File No. 333-194186), filed with the SEC on February 27, 2014 (the "February 27, 2014 Registration Statement"). In addition, an Apax Director served on Bankrate's Audit Committee from October 27, 2011 to June 27, 2012 and was thus charged with approving the Company's quarterly report on Form 10-Q for the period ended September 30, 2011 ("3Q11") filed with the SEC on November 10, 2011 ("3Q11 Form 10-Q") and the FY11 Form 10-K. Further pursuant to the Stockholders' Agreement, at all relevant times during the Class Period, the Apax Defendants were entitled to, *inter alia*: (i) request a public offering of the Company's securities ("Demand Registration"); (ii) review all offering documents and those incorporated by reference therein before they were filed with the SEC; and (iii) inspect "all financial and other records, pertinent corporate documents and properties of the Company" in connection with the offering.

9

20.     Defendant DiMaria was formerly the Company's CFO, serving in that role from 2006 until his resignation on September 14, 2014.  During the Class Period, Defendant DiMaria reviewed, approved, and signed Bankrate's filings with the SEC that contained materially false and misleading statements, including false certifications signed by him pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002 ("SOX"), as detailed herein.   Moreover, in connection with the March 2014 Offering, Defendant DiMaria reviewed, approved, and signed the February 27, 2014 Registration Statement and the March 4, 2014 Underwriting Agreement attached to the Company's Form 8-K filed with the SEC on March 10, 2014 (the "Underwriting Agreement").  Defendant DiMaria also participated in conference calls with securities analysts, during which Defendant DiMaria made additional false and misleading statements.  Defendant DiMaria participated in those conference calls from Bankrate's offices located in this District. After September 14, 2014, Defendant DiMaria remained at Bankrate as a senior vice president. Defendant DiMaria was terminated for cause on or about October 8, 2014 because he refused to cooperate in the SEC's investigation into the fraudulent accounting entries alleged herein.

21.     Defendant Evans was Bankrate's President and CEO from June 2004 until his resignation on December 31, 2013.  Defendant Evans also was a member of Bankrate's Board and the board of directors of Bankrate's predecessor entity from April 2004 until his resignation. Defendant Evans is domiciled in this District.   During the Class Period, Defendant Evans reviewed, approved, and signed Bankrate's filings with the SEC that contained materially false and misleading statements, including certifications signed by him pursuant to Sections 302 and 906 of SOX, as detailed herein.

22.     Defendant Esterow is the Company's President, CEO, and a Board member. Effective January 1, 2014, Defendant Esterow assumed the role of President and CEO of

Bankrate following the resignation of Defendant Evans on December 31, 2013.  During the Class Period, Defendant Esterow reviewed, approved, and signed Bankrate's filings with the SEC that contained false and misleading statements, as detailed herein.  Moreover, in connection with the March 2014 Offering, Defendant Esterow reviewed, approved, and signed the February 27, 2014 Registration Statement.

23.    Defendants DiMaria, Evans, and Esterow are referred to collectively herein as the "Individual Defendants."

24.    Defendants DiMaria and Evans are liable for making the materially false and misleading statements that are alleged herein.  In addition, each of the Individual Defendants and the Apax Defendants was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and Section 15 of the Securities Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  By reason of their control of Bankrate, the Individual Defendants and the Apax Defendants were able to and did, directly or indirectly, control the day-to-day conduct of Bankrate's business and are liable for any false and misleading statements alleged herein that are attributable to Bankrate.

## IV.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

25.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all other persons and entities that purchased Bankrate common stock during the Class Period, including shares of common stock sold in the March 2014 Offering, as alleged below in ¶ 177.  Excluded from the Class are Exchange Act and Securities Act Defendants (identified above in ¶¶ 18-22 and below in ¶¶ 179-84, respectively), members of those Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Exchange Act or Securities Act Defendant has a controlling interest, or which is related to or affiliated with any

11

Exchange Act or Securities Act Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

26.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  At the end of the Class Period, approximately 104.43 million shares of Bankrate common stock were outstanding and actively traded on the New York Stock Exchange ("NYSE").  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of Class members can be ascertained from the books and records of Bankrate and/or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

27.     Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and Lead Plaintiff intends to prosecute this action vigorously.

28.     Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all other Class members' claims arise from, and their losses were caused by, the same false and misleading representations and omissions made by, or chargeable to, the Exchange Act and/or Securities Act Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the interests of the Class.

29.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible

for Class members to seek individual redress for the wrongful conduct alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

a)     whether the federal securities laws were violated by the acts of the Exchange Act and Securities Act Defendants as alleged herein;

b)     whether the Exchange Act and Securities Act Defendants' respective statements issued during the Class Period were materially false and misleading; and

c)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## V.     EXCHANGE ACT VIOLATIONS

### A.     Exchange Act Defendants' False and Misleading Statements

<u>Bankrate's 3Q11 Financial Results</u>

31.     On October 27, 2011, Bankrate issued a press release announcing the Company's financial results for 3Q11 (the "October 27, 2011 Press Release").  The October 27, 2011 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on November 10, 2011 and signed by Defendant DiMaria.  Also on October 27, 2011, the Company hosted a conference call with analysts and investors to discuss its 3Q11 financial results (the "October 27, 2011 Conference Call").  The October 27, 2011 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS for 3Q11, as set forth below.  Defendant DiMaria reported the same results during the October 27, 2011 Conference Call.

|  | Three months ended September 30, 2011 | Nine months ended September 30, 2011 |
|---|---|---|
| GAAP Net Income | $7,132 | ($27,467) |
| GAAP EPS | $0.07 | ($0.30) |
| Adjusted Net Income | $17,712 | $42,583 |
| Adjusted EPS | $0.18 | $0.42 |

32.     On November 10, 2011, Bankrate filed with the SEC its 3Q11 Form 10-Q, which was signed by Defendant DiMaria, and attached certifications that were signed by Defendants DiMaria and Evans pursuant to Sections 302 and 906 of SOX, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  The 3Q11 Form 10-Q repeated the Exchange Act Defendants' representations in the October 27, 2011 Press Release and on the October 27, 2011 Conference Call by reporting the Company's GAAP Net Income and GAAP EPS for 3Q11 that are set forth above in ¶ 31.

33.     In response to Bankrate's 3Q11 financial results, analysts issued positive reports. For example, JPMorgan Securities LLC ("JPMorgan") issued a report on October 28, 2011 touting "strong" Adjusted EPS results "driven by accelerating growth across all verticals" and noting that it was "adjusting [its] estimates . . . to account for Bankrate's 3Q outperformance." RBC Capital Markets, LLC ("RBC Capital") issued a report on the same day describing the Company's 3Q11 results as "a strong beat-and-raise quarter."  Likewise, Stephens issued a report on October 28, 2011 noting that "Bankrate put up a significant beat top and bottom for 3Q11," and that "[d]espite expectations for a strong quarter, 3Q11 was far ahead of where [Stephens] viewed upside and helps set the stage for what [Stephens] expect[s] will be continued momentum going into 2012."

34.     On December 6, 2011, Bankrate completed a secondary public offering of 12,500,000 shares of common stock (the "December 2011 Offering").  The December 2011 Offering was made pursuant to the Company's registration statement on Form S-1, as amended (File No. 333-178132), filed with the SEC on December 6, 2011 (the "December 2011 Registration Statement") and accompanying prospectus on Form 424B1 filed with the SEC on December 7, 2011 (collectively, the "December 2011 Offering Documents").  The December 2011 Registration Statement was signed by Defendants Evans and DiMaria.  In the Company's financial statements included therein, the December 2011 Offering Documents repeated Defendants' representations reporting the Company's GAAP Net Income and GAAP EPS for 3Q11 that are set forth above in ¶ 31.

35.     On December 12, 2011, Defendant Evans sold 279,279 shares of Bankrate common stock at $16.80 per share in the December 2011 Offering for total proceeds of $4,691,887.20, or approximately 4.5 times Defendant Evans's total base salary and cash bonus of $1,031,500 as CEO for FY11.

36.     Each of the statements set forth above in ¶¶ 31-32, 34 addressing Bankrate's 3Q11 financial results was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY11 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY11.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's 3Q11 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."  Additionally, the Company has announced that both

the SEC and the DOJ are investigating the Exchange Act Defendants' use of accounting entries during FY11, including, specifically, accounting entries made in 3Q11 to "improperly impact the Company's reported results, including relative to market expectations at such time."

Bankrate's 4Q/FY11 Financial Results

37.     On February 6, 2012, Bankrate issued a press release announcing the Company's financial results for 4Q/FY11 (the "February 6, 2012 Press Release").  The February 6, 2012 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on February 7, 2012 and signed by Defendant DiMaria.  Also on February 6, 2012, the Company hosted a conference call with analysts and investors to discuss its 4Q/FY11 financial results (the "February 6, 2012 Conference Call").

38.     The February 6, 2012 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS for 4Q/FY11, as set forth below. Defendant DiMaria reported these same results during the February 6, 2012 Conference Call.

|  | Three months ended December 31, 2011 | Year ended December 31, 2011 |
| --- | --- | --- |
| GAAP Net Income | $14,045 | ($13,422) |
| GAAP EPS | $0.14 | ($0.14) |
| Adjusted Net Income | $19,096 | $61,680 |
| Adjusted EPS | $0.19 | $0.61 |

39.     On March 12, 2012, Bankrate filed with the SEC its FY11 Form 10-K, which was signed by Defendants DiMaria and Evans and attached certifications that were also signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  In the Company's financial statements contained therein, the FY11 Form 10-K repeated

the Exchange Act Defendants' representations in the February 6, 2012 Press Release and on the February 6, 2012 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for FY11 that are set forth above in ¶ 38.

40.    In response to Bankrate's 4Q/FY11 financial results, JPMorgan issued a February 6, 2012 report touting the Company's "strong quarter," and RBC Capital issued a February 7, 2012 report noting "strong results across the board."   In addition, Stephens issued a report on February 7, 2012 highlighting the Company's "sizable top- and bottom-line beat," including Bankrate's adjusted EPS beat of consensus estimates by $0.04.  Stephens also reported that it expected "2012 results to come in well ahead of guidance given strong momentum in the business currently."

41.    On February 8, 2012, Defendant DiMaria sold 125,000 shares of Bankrate common stock at $23.40 per share for total proceeds of $2,925,000.

42.    Each of the statements set forth above in ¶¶ 38-39 addressing Bankrate's 4Q/FY11 financial results was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY11 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY11.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's FY11 Form 10-K "fairly presents, in all material respects, the financial condition and results of operation of the Company."

43.    Additionally, the Company announced that both the SEC and the DOJ are investigating the Exchange Act Defendants' use of accounting entries during FY11, including,

specifically, accounting entries made in 3Q11 to "improperly impact the Company's reported results, including relative to market expectations at such time."

Bankrate's 1Q12 Financial Results

44.     On May 1, 2012, Bankrate issued a press release announcing the Company's financial results for 1Q12 (the "May 1, 2012 Press Release"). The May 1, 2012 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria. Also on May 1, 2012, the Company hosted a conference call with analysts and investors to discuss its 1Q12 financial results (the "May 1, 2012 Conference Call"). The May 1, 2012 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS for 1Q12, as set forth below. Defendant DiMaria reported these same results during the May 1, 2012 Conference Call.

|  | Three months ended March 31, 2012 |
| --- | --- |
| GAAP Net Income | $10,151 |
| GAAP EPS | $0.10 |
| Adjusted Net Income | $18,748 |
| Adjusted EPS | $0.18 |

45.     On May 14, 2012, Bankrate filed with the SEC its quarterly report on Form 10-Q for 1Q12 (the "1Q12 Form 10-Q"), which was signed by Defendant DiMaria and attached certifications that were signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report." In the financial statements contained therein, the 1Q12 Form 10-Q repeated the Exchange Act Defendants' representations in the May 1, 2012 Press Release

and on the May 1, 2012 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for 1Q12 that are set forth above in ¶ 44.

46.     In response to these results, Stephens issued a report on May 2, 2012 noting that Bankrate's GAAP and Adjusted EPS were in line with consensus estimates for these metrics.

47.     Each of the statements set forth above in ¶¶ 44-45 addressing Bankrate's financial results for 1Q12 was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY12 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY12.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's 1Q12 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."

48.     Additionally, the Company announced that both the SEC and the DOJ are investigating the Exchange Act Defendants' use of accounting entries during FY12 to "improperly impact the Company's reported results, including relative to market expectations at such time."  Specifically, with respect to 1Q12, the SEC and DOJ are investigating the reversal in 1Q12 of an allowance of $460,000 created in 3Q11.  The SEC and the DOJ also are investigating "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter [of 2012] and other periods in 2012."

Bankrate's 2Q12 Financial Results

49.     On July 31, 2012, Bankrate issued a press release announcing the Company's financial results for the second quarter ended June 30, 2012 ("2Q12") (the "July 31, 2012 Press Release").  The July 31, 2012 Press Release was attached to the Company's current report on

Form 8-K filed with the SEC on that same day.  Also on July 31, 2012, the Company hosted a conference call with analysts and investors to discuss its 2Q12 financial results (the "July 31, 2012 Conference Call").  The July 31, 2012 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS for 2Q12, as set forth below. Defendant DiMaria reported these same results during the July 31, 2012 Conference Call.

|  | Three months ended June 30, 2012 | Six months ended June 30, 2012 |
|---|---|---|
| GAAP Net Income | $16,276 | $26,427 |
| GAAP EPS | $0.16 | $0.26 |
| Adjusted Net Income | $18,180 | $36,929 |
| Adjusted EPS | $0.18 | $0.36 |

50.     On August 13, 2012, Bankrate filed with the SEC its quarterly report on Form 10-Q for 2Q12 (the "2Q12 Form 10-Q"), which was signed by Defendant DiMaria and attached certifications that were signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  In the financial statements contained therein, the 2Q12 Form 10-Q repeated the Exchange Act Defendants' representations in the July 31, 2012 Press Release and on the July 31, 2012 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for 2Q12 that are set forth above in ¶ 49.

51.     Several analysts issued reports following Bankrate's release of its 2Q12 financial results.  For example, on July 31, 2012, Canaccord Genuity ("Canaccord") issued a report noting that "Bankrate's reported results that were slightly below to in line with consensus but slightly above our estimates," and specifically highlighting the Company's Adjusted EPS result, which beat Canaccord's "estimate by a penny" and was "in line with consensus."  The following day,

JPMorgan issued a report noting that Bankrate's 2Q12 results "were generally in line with guidance." Stephens and SunTrust also issued reports on August 1, 2012 noting the Company's Adjusted EPS were "in line" with consensus estimates, and "[Adjusted] EPS of $0.18 were in line with our model and the Street," respectively.

52.     On August 9, 2012, Defendant DiMaria sold 79,848 shares of Bankrate common stock at $19.34 per share for total proceeds of $1,544,260.32. The following day, Defendant DiMaria sold an additional 26,729 shares of Bankrate common stock at $19.05 per share for total proceeds of $509,187.45. Subsequently, on August 13, 2012, Defendant DiMaria sold 600 shares of Bankrate common stock at $19.15 per share, for total proceeds of $11,490. Thus, over a three-day period, Defendant DiMaria obtained proceeds from his insider sales of Company stock of $2,064,937.77—more than *five times* the amount of DiMaria's entire FY12 base salary of $400,000.

53.     Each of the statements set forth above in ¶¶ 49-50 addressing Bankrate's 2Q12 financial results was materially false and misleading when made for at least the following reasons. On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY12 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor. On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY12. Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's 2Q12 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."

54.     Additionally, the Company announced that both the SEC and the DOJ are investigating the Exchange Act Defendants' use of accounting entries during FY12 to

"improperly impact the Company's reported results, including relative to market expectations at such time." The SEC and the DOJ are also investigating "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter [of 2012] and other periods in 2012." Specifically, with respect to three months ended June 30, 2012, the SEC and DOJ are investigating: (i) "three accruals of revenue totaling approximately $781,000 in the aggregate"; (ii) "two adjustments to reduce accrued expenses totaling approximately $850,000 in the aggregate"; and (iii) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012." Further, with respect to the six months ended June 30, 2012, the SEC and the DOJ are investigating the reversal of a $460,000 allowance in 1Q12.

55.     The inclusion of these accounting entries in the financial results for the three months ended June 30, 2012 and the six months ended June 30, 2012, allowed the Exchange Act Defendants to inflate Bankrate's reported GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS in these periods by $1.90 million and $2.40 million as follows:

| | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS |
|---|---|---|---|---|
| | | | | |
| *Three months ended June 30, 2012* | | | | |
| Reported Results | $16.3 million | $0.16 | $18.2 million | $0.18 |
| Revised Results[2] | $14.4 million | $0.14 | $16.3 million | $0.16 |
| **% Inflated** | **11.7%** | **12.5%** | **10.4%** | **11.1%** |
| | | | | |
| *Six months ended June 30, 2012* | | | | |
| Reported Results | $26.43 million | $0.26 | $36.90 million | $0.36 |
| Revised Results | $24.46 million | $0.24 | $34.54 million | $0.34 |
| **% Inflated** | **7.45%** | **7.69%** | **6.40%** | **5.56%** |

[2] As used herein, "Revised Results" means the impact of the reversal of the amounts of accrued revenue and reduction of accrued expense identified in the September 15 Press Release, including, *inter alia*, $460,000 in 1Q12, and $1.9 million in 2Q12 (the aggregate of $781,000, $850,000, and $225,000), on Bankrate's previously reported financial results. Where possible, the effect of Bankrate's tax expense for a given reporting period was factored into the calculation of Revised Results for GAAP Net Income and GAAP EPS.

56.     Without the inflated GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS accounting entries, moreover, the Company would have been unable to meet or beat analyst consensus expectations for Adjusted Net Income and Adjusted EPS for the three months ended June 30, 2012 and the six months ended June 30, 2012 as follows:

|  | **Adj. Net Income** | **Adj. EPS** |
|---|---|---|
|  |  |  |
| *Three months ended June 30, 2012* |  |  |
| Consensus Estimate | $18.3 million | $0.18 |
|  |  |  |
| Reported Results | $18.2 million | $0.18 |
| Beat or (Miss) | ($0.1 million) | - |
| % of Difference | (0.6%) | - |
|  |  |  |
| Revised Results | $16.3 million | $0.16 |
| **Beat or (Miss)** | **($2.0 million)** | **($0.02)** |
| **% of Difference** | **(10.9%)** | **(11.1%)** |
|  |  |  |
| *Six months ended June 30, 2012* |  |  |
| Consensus Estimate | $37.0 million | $0.36 |
|  |  |  |
| Reported Results | $36.9 million | $0.36 |
| Beat or (Miss) | ($0.1 million) | - |
| % of Difference | (0.3%) | - |
|  |  |  |
| Revised Results | $34.5 million | $0.34 |
| **Beat or (Miss)** | **($2.5 million)** | **($0.02)** |
| **% of Difference** | **(6.7%)** | **(5.0%)** |

Bankrate's 3Q12 Financial Results

57.     On November 1, 2012, Bankrate issued a press release announcing the Company's financial results for the third quarter ended September 30, 2012 ("3Q12") (the "November 1, 2012 Press Release").  The November 1, 2012 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day.  Also on November 1, 2012, the Company hosted a conference call with analysts and investors to discuss its 3Q12 financial results (the "November 1, 2012 Conference Call").  The November 1, 2012 Press

Release highlighted the Company's GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS for 3Q12, as set forth below.  Defendant DiMaria reported these same results during the November 1, 2012 Conference Call.

|  | Three months ended September 30, 2012 | Nine months ended September 30, 2012 |
|---|---|---|
| GAAP Net Income | $2,560 | $28,987 |
| GAAP EPS | $0.03 | $0.29 |
| Adjusted Net Income | $12,691 | $49,620 |
| Adjusted EPS | $0.13 | $0.49 |

58.     On November 14, 2012, Bankrate filed with the SEC its quarterly report on Form 10-Q for 3Q12 (the "3Q12 Form 10-Q"), which was signed by Defendant DiMaria and attached certifications that were signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  In the financial statements contained therein, the 3Q12 Form 10-Q repeated the Exchange Act Defendants' representations in the November 1, 2012 Press Release and on the November 1, 2012 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for 3Q12 that are set forth above in ¶ 57.

59.     Each of the statements set forth above in ¶¶ 57-58 addressing Bankrate's financial results for 3Q12 was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY12 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY12.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that

the Company's 3Q12 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."

60.     Additionally, the Company announced that both the SEC and the DOJ are investigating the Exchange Act Defendants' use of accounting entries during FY12 to "improperly impact the Company's reported results, including relative to market expectations at such time." The SEC and the DOJ also are investigating "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter [of 2012] and other periods in 2012." Specifically, with respect to nine months ended September 30, 2012, the SEC and DOJ are investigating: (i) the reversal of a $460,000 allowance in 1Q12; (ii) "three accruals of revenue totaling approximately $781,000 in the aggregate"; (iii) "two adjustments to reduce accrued expenses totaling approximately $850,000 in the aggregate"; and (iv) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012."

61.     The inclusion of these accounting entries in the financial results for the nine months ended September 30, 2012 allowed the Exchange Act Defendants to inflate Bankrate's reported GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS in these periods by $2.40 million as follows:

| | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS |
|---|---|---|---|---|
| | | | | |
| *Nine months ended September 30, 2012* | | | | |
| Reported Results | $29.0 million | $0.29 | $49.6 million | $0.49 |
| Revised Results | $26.6 million | $0.27 | $47.2 million | $0.47 |
| **% Inflated** | **6.5%** | **6.9%** | **4.8%** | **4.1%** |

62.     The November 1, 2012 Press Release, the November 1, 2012 Conference Call and the 3Q12 Form 10-Q also repeated the Exchange Act Defendants' representations concerning

Bankrate's 3Q11 results as set forth in ¶¶ 31-32, 34.  These statements were materially false and misleading for the reasons set forth in ¶ 36.

Bankrate's 4Q/FY12 Financial Results

63.    On February 12, 2013, Bankrate issued a press release announcing the Company's financial results for the fourth quarter ended December 31, 2012 ("4Q12") and FY12 (together, "4Q/FY12") (the "February 12, 2013 Press Release").  The February 12, 2013 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria.  Also on February 12, 2013, the Company hosted a conference call with analysts and investors to discuss its 4Q/FY12 financial results (the "February 12, 2013 Conference Call").  The February 12, 2013 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS for 4Q/FY12, as set forth below. Defendant DiMaria reported these same results during the February 12, 2012 Conference Call.

|  | Three months ended December 31, 2012 | Year ended December 31, 2012 |
| --- | --- | --- |
| GAAP Net Income | $344 | $29,331 |
| GAAP EPS | $0.00 | $0.29 |
| Adjusted Net Income | $5,798 | $56,030 |
| Adjusted EPS | $0.06 | $0.56 |

64.    On March 1, 2013, Bankrate filed with the SEC its annual report on Form 10-K for FY12 (the "FY12 Form 10-K"), which was signed by Defendants Evans and DiMaria and attached certifications that were also signed by Defendants Evans and DiMaria pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  In the financial statements contained therein, the FY12 Form 10-K repeated the Exchange Act Defendants' representations in the February 12, 2013

Press Release and on the February 12, 2013 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for FY12 that are set forth above in ¶ 63.

65.     Each of the foregoing statements set forth above in ¶¶ 63-64 addressing Bankrate's financial results for 4Q12 and FY12 was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY12 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY12.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's FY12 Form 10-K "fairly presents, in all material respects, the financial condition and results of operation of the Company."

66.     Additionally, the Company announced that both the SEC and the DOJ are investigating the Exchange Act Defendants' use of accounting entries during FY12 to "improperly impact the Company's reported results, including relative to market expectations at such time."  The SEC and the DOJ also are investigating "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter [of 2012] and other periods in 2012."  Specifically, with respect to FY12, the SEC and DOJ are investigating:  (i) the reversal of a $460,000 allowance in 1Q12; (ii) "three accruals of revenue totaling approximately $781,000 in the aggregate"; (iii) "two adjustments to reduce accrued expenses totaling approximately $850,000 in the aggregate"; and (iv) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012."

67.     The inclusion of these accounting entries in the financial results for FY12 allowed the Exchange Act Defendants to inflate Bankrate's reported GAAP Net Income, GAAP EPS, Adjusted Net Income, and Adjusted EPS in these periods by $2.4 million as follows:

|  | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS |
|---|---|---|---|---|
|  |  |  |  |  |
| *Fiscal Year 2012* |  |  |  |  |
| Reported Results | $29.3 million | $0.29 | $56.0 million | $0.56 |
| Revised Results | $26.9 million | $0.27 | $53.6 million | $0.54 |
| **% Inflated** | **6.5%** | **6.9%** | **3.7%** | **3.6%** |

68.     The February 12, 2013 Press Release, the February 12, 2013 Conference Call and the FY12 Form 10-K also repeated the Exchange Act Defendants' representations concerning Bankrate's 4Q11 and/or FY11 results, as set forth in ¶¶ 38-39.  These statements were materially false and misleading for the reasons set forth in ¶¶ 42-43.

Bankrate's 1Q13 Financial Results

69.     On April 30, 2013, Bankrate issued a press release announcing the Company's financial results for the first quarter ended March 31, 2013 ("1Q13") (the "April 30, 2013 Press Release").  The April 30, 2013 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria.  Also on April 30, 2013, the Company hosted a conference call with analysts and investors to discuss its 1Q13 financial results (the "April 30, 2013 Conference Call").  The April 30, 2013 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, and Adjusted EPS for 1Q13 compared to 1Q12, as set forth below.  Defendant DiMaria reported these same results during the April 30, 2013 Conference Call.

|  | Three months ended March 31, 2013 |
|---|---|
| GAAP Net Income | $2,183 |
| GAAP EPS | $0.02 |
| Adjusted Net Income | $12,158 |
| Adjusted EPS | $0.12 |

70.    On May 10, 2013, Bankrate filed with the SEC its quarterly report on Form 10-Q for 1Q13 (the "1Q13 Form 10-Q"), which was signed by Defendant DiMaria and attached certifications that were signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  In the financial statements contained therein, the 1Q13 Form 10-Q repeated the Exchange Act Defendants' representations in the April 30, 2013 Press Release and on the April 30, 2013 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for 1Q13 that are set forth above in ¶ 69.

71.    Each of the statements set forth above in ¶¶ 69-70 addressing Bankrate's financial results for 1Q13 was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY13 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY13.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's 1Q13 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."

72.    The May 10, 2013 Press Release, the May 10, 2013 Conference Call, and the 1Q13 Form 10-Q repeated the Exchange Act Defendants' representations concerning Bankrate's 1Q12 results, as set forth in ¶¶ 44-45.  These statements were materially false and misleading for the reasons set forth in ¶¶ 47-48.  Additionally, the May 10, 2013 Press Release, the May 10,

2013 Conference Call, and the 1Q13 Form 10-Q repeated Defendants' representations concerning Bankrate's 4Q12 results, as set forth in ¶ 63.  These statements were materially false and misleading for the reasons set forth in ¶¶ 65-67.

Bankrate's 2Q13 Financial Results

73.     On July 29, 2013, Bankrate issued a press release announcing the Company's financial results for the second quarter ended June 30, 2013 ("2Q13") (the "July 29, 2013 Press Release").  The July 29, 2013 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria.  Also on July 29, 2013, the Company hosted a conference call with analysts and investors to discuss its 2Q12 financial results (the "July 29, 2013 Conference Call").  The July 29, 2013 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, and Adjusted EPS for 2Q13, as set forth below.  Defendant DiMaria reported these same results during the July 29, 2013 Conference Call.

|  | Three months ended June 30, 2013 | Six months ended June 30, 2013 |
|---|---|---|
| GAAP Net Income | $(892) | $1,291 |
| GAAP EPS | $(0.01) | $0.01 |
| Adjusted Net Income | $10,316 | $22,474 |
| Adjusted EPS | $0.10 | $0.22 |

74.     On August 8, 2013, Bankrate filed with the SEC its quarterly report on Form 10-Q for 2Q13 (the "2Q13 Form 10-Q"), which was signed by Defendant DiMaria and attached certifications that were signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."  In the financial statements contained therein, the 2Q13 Form

10-Q repeated the Exchange Act Defendants' representations in the July 29, 2013 Press Release and on the July 29, 2013 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for 2Q13 that are set forth above in ¶ 73.

75.     Each of the statements set forth above in ¶¶ 73-74 addressing Bankrate's financial results for 2Q13 was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY13 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY13.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that the Company's 2Q13 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."

76.     The July 29, 2013 Press Release, the July 29, 2013 Conference Call, and the 2Q13 Form 10-Q also repeated the Exchange Act Defendants' representations concerning Bankrate's 2Q12 results, as set forth in ¶¶ 49-50.  These statements were materially false and misleading for the reasons set forth in ¶¶ 53-56.

Bankrate's 3Q13 Financial Results

77.     On October 30, 2013, Bankrate issued a press release announcing the Company's financial results for the quarter ended September 30, 2012 ("3Q13") (the "October 30, 2013 Press Release").  The October 30, 2013 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria.  Also on October 30, 2013, the Company hosted a conference call with analysts and investors to discuss its 3Q13 financial results (the "October 30, 2013 Conference Call").  The October 30, 2013 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, and Adjusted

31

EPS for 3Q13, as set forth below.  Defendant DiMaria reported these same results during the October 30, 2013 Conference Call.

|  | Three months ended September 30, 2013 | Nine months ended September 30, 2013 |
|---|---|---|
| GAAP Net Income | ($7,751) | ($6,460) |
| GAAP EPS | ($0.08) | ($0.06) |
| Adjusted Net Income | $13,515 | $35,988 |
| Adjusted EPS | $0.13 | $0.36 |

78.     On November 7, 2013, Bankrate filed with the SEC its quarterly report on Form 10-Q for 3Q13 (the "3Q13 Form 10-Q"), which was signed by Defendant DiMaria and attached certifications that were signed by Defendants DiMaria and Evans pursuant to SOX Sections 302 and 906, in which they attested in pertinent part that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."   In the financial statements contained therein, the 3Q13 Form 10-Q repeated the Exchange Act Defendants' representations in the October 30, 2013 Press Release and on the October 30, 2013 Conference Call reporting the Company's GAAP Net Income and GAAP EPS for 3Q13 that are set forth above in ¶ 77.

79.     Each of the statements set forth above in ¶¶ 77-78 addressing Bankrate's financial results for 3Q13 was materially false and misleading when made for at least the following reasons.  On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY13 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.  On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY13.  Thus, the Company has effectively revoked Defendants Evans's and DiMaria's SOX certifications that

the Company's 3Q13 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operation of the Company."

80.     The October 30, 2013 Press Release, the October 30, 2013 Conference Call, and the 3Q13 Form 10-Q also repeated Defendants' representations concerning Bankrate's 3Q12 results, as set forth in ¶¶ 57-58.  These statements were materially false and misleading for the reasons set forth in ¶¶ 59-61.

Bankrate's 4Q/FY13 Financial Results

81.     On February 13, 2014, Bankrate issued a press release announcing the Company's financial results for the fourth quarter ended December 31, 2013 ("4Q13") and FY13 (together, "4Q/FY13") (the "February 13, 2014 Press Release").  The February 13, 2014 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria.  Also on February 13, 2014, the Company hosted a conference call with analysts and investors to discuss its 4Q/FY13 financial results (the "February 13, 2014 Conference Call").  The February 13, 2014 Press Release highlighted the Company's GAAP Net Income, GAAP EPS, and Adjusted EPS for 4Q/FY13, as set forth below.  Defendant DiMaria reported these same results during the February 13, 2014 Conference Call.

| | Three months ended December 31, 2013 | Year ended December 31, 2013 |
| --- | --- | --- |
| GAAP Net Income | ($3,542) | ($10,002) |
| GAAP EPS | ($0.04) | ($0.10) |
| Adjusted Net Income | $16,873 | $52,862 |
| Adjusted EPS | $0.17 | $0.53 |

82.     On February 27, 2014, Bankrate filed with the SEC its FY13 Form 10-K, which was signed by Defendants Esterow and DiMaria and attached certifications that were also signed by Defendants Esterow and DiMaria pursuant to SOX Sections 302 and 906, in which these Defendants attested, in pertinent part, that "the financial statements, and other financial

information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report." In the financial statements contained therein, the FY13 Form 10-K repeated the Exchange Act Defendants' representations reporting the Company's GAAP Net Income and GAAP EPS for FY13 that are set forth above in ¶ 81.

83.    Each of the statements set forth above in ¶¶ 81-82 addressing Bankrate's financial results for 4Q/FY13 was materially false and misleading when made for at least the following reasons. On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY13 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor. On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY13. Thus, the Company has effectively has revoked Defendants Esterow's and DiMaria's SOX certifications that the Company's FY13 Form 10-K "fairly presents, in all material respects, the financial condition and results of operation of the Company."

84.    The February 13, 2014 Press Release and the February 13, 2014 Conference Call also repeated the Exchange Act Defendants' representations concerning Bankrate's 4Q/FY12 results, as set forth in ¶¶ 63-64. These statements were materially false and misleading for the reasons set forth in ¶¶ 65-67. Additionally, the February 13, 2014 Press Release and the February 13, 2014 Conference Call repeated the Exchange Act Defendants' representations concerning Bankrate's FY11 results, as set forth in ¶¶ 38-39 These statements were materially false and misleading for the reasons set forth in ¶¶ 42-43.

Bankrate's March 2014 Offering Documents

85.    In March 2014, the Company completed the March 2014 Offering of 16,100,000 shares of Bankrate common stock. The March 2014 Offering was made pursuant to the February

34

27, 2014 Registration Statement, the preliminary prospectus supplement on Form 424B7 filed with the SEC on the same day (the "February 27, 2014 Preliminary Prospectus Supplement"), and the prospectus supplement on Form 424B7 dated March 4, 2014 and filed with the SEC on March 6, 2014 (the "March 2014 Prospectus Supplement," and, together with the February 27, 2014 Preliminary Prospectus Supplement, the "March 2014 Offering Prospectus") (collectively, the "March 2014 Offering Documents").  The February 27, 2014 Registration Statement was signed by Defendants Esterow and DiMaria, as well as three Apax Directors.  The March 2014 Offering Documents incorporated by reference the Company's FY13 Form 10-K and the financial statements for FY11, FY12, and FY13 appearing therein, which repeated Defendants' representations reporting the Company's GAAP Net Income and GAAP EPS for FY11, FY12, and FY13 that are set forth above in ¶¶ 39, 64, and 82, respectively.  These representations were materially false and misleading when made for the reasons set forth above in ¶¶ 42-43, 65-67, and 83, respectively.

### B.   The Truth Concerning the Exchange Act Defendants' Conduct Is Revealed

86.   On September 15, 2014, the Company shocked investors when it issued a press release disclosing that the SEC had commenced a non-public formal investigation into Bankrate's financial reporting during FY12, the principal focus of which is the Company's financial reporting for 1Q12 and 2Q12 (defined above as the "September 15 Press Release").

87.   According to the September 15 Press Release, the SEC is investigating at least the following issues: (i) "three accruals of revenue totaling approximately $781,000 in the aggregate"; (ii) "two adjustments to reduce accrued expenses totaling approximately $850,000 in the aggregate"; (iii) "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter and other periods in 2012"; (iv) "an entry originally made in the third quarter of 2011 establishing an allowance of $460,000 for

anticipated customer credits in the Insurance business that was ultimately reversed in the first quarter of 2012"; and (v) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012."  The September 15 Press Release also reported that the SEC is investigating whether accounting entries during FY12 "*improperly impacted the Company's reported results, including relative to market expectations at such time*."

88.     With respect to the SEC investigation, the Company confirmed in the September 15 Press Release that it was "providing documents and information in response to the SEC's requests."

89.     The September 15 Press Release also disclosed that on September 14, 2014, "[i]n connection with" the SEC investigation and based on "developments" from that investigation, Bankrate's Audit Committee "*concluded that the Company's previously issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer be relied upon pending the conclusion of a full internal review of these matters.*"  As part of that effort, the September 15 Press Release reported that the Audit Committee had retained outside counsel and independent forensic accountants.

90.     The September 15 Press Release further announced that, effective immediately, Defendant DiMaria had resigned from his position as CFO, but would remain at Bankrate as a senior vice president.

91.     In response to the September 15 disclosures, the price of Bankrate common stock price declined by $1.90 per share, or 13.75%, from a close of $13.82 on the prior trading day, September 12, 2014, to close at $11.92 per share on September 15, 2014 on extremely heavy trading volume.

92.     Analysts attributed the approximately 13.75% decline in Bankrate's stock price on September 15, 2014 to the revelations in the September 15 Press Release.  For example:

- SunTrust's September 15, 2014 report noted that, "[t]he market is apparently reacting to the risk that Bankrate's historical financials were fraudulently presented or otherwise misrepresented."

- Topeka issued a report on September 16, 2014 downgrading Bankrate common stock from hold "to sell on [the] SEC investigation, unreliable financials, [and] CFO transition."  Topeka also noted that "what concerns us is the implication that the SEC is looking to see whether these figures were used to manage market expectations."

- TheStreet, in a September 15, 2014 article entitled "Why Bankrate (RATE) Stock Is Tanking Today", stated that "Bankrate (RATE) shares are down 15.7% to $11.65 on Monday after [Bankrate] revealed that the SEC was investigating its financial reporting from 2012."

- On September 16, 2014, Moody's Investors Service ("Moody's") placed Bankrate's ratings on review for downgrade pending the outcome of the Audit Committee's investigation, noting that "Moody's is concerned that these matters may indicate material weaknesses in the company's disclosures and internal controls, which could lead to further accounting discrepancies that are bigger in scope."

93.     On September 15, 2014, RBC Capital also expressed surprise regarding the Audit Committee's conclusion that three years of financial reporting could no longer be relied upon by investors.  Moreover, with respect to the resignation of Defendant DiMaria, while Topeka's September 16, 2014 report described Defendant DiMaria's resignation as "abrupt", SunTrust's September 15, 2014 report expressed hope that "a new CFO will improve disclosure and transparency while delivering a more credible dialogue with investors."

94.     Less than one month later, the Company filed the October 9 Form 8-K with the SEC after the markets closed that day.  In its October 9 Form 8-K, the Company announced that Bankrate had "***terminated Edward J. DiMaria's employment with the Company for cause, effective immediately, as a result of his notifying the Company and the [SEC] of his decision***

*not to cooperate in the previously announced investigation by the SEC.*"  The October 9 Form 8-K further announced that the DOJ was now investigating Bankrate concerning the same issues that the SEC had been investigating.

95.    In response to these new developments, the price of Bankrate's common stock declined from a closing price of $10.98 per share on October 9, 2014, to close at $9.75 per share on October 10, 2014, a $1.23 decline, or 11.20%, on very heavy trading volume.  Based on these revelations, Stephens issued an analyst report on October 13, 2014 downgrading Bankrate's common stock and noting that "[w]hile the SEC investigation was known, we believe the emergence of the DOJ review creates an additional layer of risk" because it "could open the door for more dire consequences for those involved."  The same report also noted "*that there were a fair amount of insider transactions in and around the time period (1H12) under review by the SEC*."

### C.    Post-Class Period Developments

96.    On November 6, 2014, the Company filed a current report on Form 8-K that attached a press release issued that same day announcing preliminary results for the quarter ended September 30, 2014 ("3Q14") (the "November 6, 2014 Form 8-K").  In the press release, the Company noted that "[d]ue to the impact" of (i) the SEC investigation, (ii) the Audit Committee's conclusion that the financial results for FY11, FY12 and FY13 no longer could be relied upon, and (iii) the Audit Committee's retention of outside counsel and a forensic accountant, "on the presentation of the Company's financial statements" for 3Q14, "the Company does not expect to timely file its Quarterly Report on Form 10-Q" for that period.

97.    Bankrate also attached to the November 6, 2014 Form 8-K a separate press release issued on the same date announcing that the Company was soliciting "credit agreement waiver and consents" from the holders of its 6.125% senior notes due 2018 to waive compliance

with certain covenants within the related agreements, which required the timely delivery to the trustee of the Company's results for both 3Q14 and the fiscal year ended December 31, 2014 ("FY14").   According to the Company's solicitation, in exchange for consideration equal to $1.25 per $1,000 principal amount of the outstanding notes held by anyone who timely consents, Bankrate would have until March 31, 2015 to deliver to the trustee its 3Q14 financial report. Further, if Bankrate fails to deliver its 3Q14 and FY14 financial results to the trustee by March 31, 2015, the noteholders who consented are entitled to an additional payment of $1.25 per $1,000 principal amount of the outstanding notes, which will be made on April 1, 2015, and, in exchange, the Company would have until May 15, 2015 to deliver the 3Q14 and FY14 financial reports.   Bankrate subsequently announced in a current report on Form 8-K filed with the SEC on November 18, 2014 that a majority of its senior noteholders had consented to these amendments.

98.    After the Company issued the November 6, 2014 Form 8-K, Defendant Esterow presented on behalf of Bankrate at RBC Capital Markets' Telecom Conference on November 10, 2014.   When asked about the SEC investigation, Defendant Esterow responded by noting that Bankrate "made two very significant announcements, one in September, one in October" and that "under the officers of the audit committee, a team of forensic accountants, a team of lawyers to the tune of some $3.5 million for the period," the Company had begun "reviewing all of [Bankrate's] financials for 2011, 2012 and 2013 with a goal to get to a point where we can bring our financials forward" to allow both Esterow and interim CFO, Steve Barnhart, to certify these results, as well as the Company's outside auditors to "certify them again, and get to a point where investors can rely on our financials."


99.     On November 12, 2014, the Company filed with the SEC its notification of late filing its 3Q Form 10-Q on Form 12b-25.  According to the Company's Form 12b-25, until the Audit Committee's "full internal review" of Bankrate's FY11, FY12 and FY13 financial results

> is complete, the Company will be unable to obtain and compile the financial data necessary to complete the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2014, particularly the comparative columnar data regarding periods ended September 30, 2013 and December 31, 2013, and comparisons to results from such periods, without unreasonable effort and expense.

100.     On December 9, 2014, Bankrate's Board, amidst the SEC's and the DOJ's continuing investigations, adopted an Insider Trading and Information Policy to promote the compliance of Company personnel with federal and state securities laws prohibiting insider trading.  Under the Insider Trading and Information Policy, the Board established "Insider Trading Compliance Officers" whose duties include:  (i) pre-clearing all transactions involving the Company's securities by all directors and executive officers, among other designated persons; (ii) declaring and informing Company personnel of blackout periods; (iii) implementing additional trading restrictions; (iv) circulating the Insider Trading and Information Policy to Company personnel; (v) coordinating compliance activities with respect to Rule 144 requirements; (vi) pre-clearing trade requests with the Company's external legal advisors; and (vii) answering questions from Company personnel regarding the Insider Trading and Information Policy or applicable securities laws generally.  Further, the Board implemented the following core trading and disclosure restrictions:  (i) trading or advising others to trade in the Company's securities while in possession of material nonpublic information regarding the Company; (ii) trading during a "blackout period"; (iii) trading or advising others to trade in another company's securities while in possession of material nonpublic information regarding that company that was obtained by virtue of being employed or having a relationship with

Bankrate; (iv) speculating in securities of the Company; (v) sharing material nonpublic information with other Company personnel whose jobs do not require them to possess the information; and (vi) trading without prior approval of an Insider Trading Compliance Officer if serving as a director or executive officer of the Company, among other designated persons. Finally, the Board reserved the right to determine, in its own discretion, whether a violation of the Insider Trading and Information Policy has occurred and to take appropriate disciplinary action – including termination of employment from the Company – without awaiting the filing or conclusion of a civil or criminal action against the alleged violator.

101.    On January 15, 2015, Defendant Esterow presented on behalf of Bankrate at the Needham Growth Conference.  Again, in response to questions concerning the ongoing SEC and DOJ investigations, Defendant Esterow answered that "in September we announced that the SEC was conducting an investigation of some transactions – accounting entries back from 2012, primarily the second quarter. . . *to evaluate whether the impact of those accounting entries, if not appropriate, they have had with respect to investor expectations at the time*."  Defendant Esterow further explained that "[a] few weeks later, we announced that our then-current CFO [who] had stepped down, or stepped aside, as CFO, *Ed DiMaria, was terminated for his decision not to cooperate with the investigation, and that the DOJ had informed us that they were looking for the same activities*."  Reiterating his previous comments, Defendant Esterow assured investors that "we have a team of forensic accountants, lawyers, the audit committee is commissioned to work[,]" the cost of which the Company expected to exceed $3.4 million, in order to "devote the resources we need to devote to make sure we get to financials that investors can rely on."

### D.  Exchange Act Defendants' Accounting Violations

102.    As discussed herein, the Exchange Act Defendants improperly recognized revenue and reversed accrued expenses and allowances during the Class Period in order to ensure that the Company's GAAP Net Income, Adjusted Net Income, GAAP EPS, and Adjusted EPS were as close as possible to, in line with, or better than, consensus expectations for a given reporting period.  In doing so, the Exchange Act Defendants materially misstated the Company's financial statements during the Class Period in violation of GAAP.

103.    GAAP includes those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  The Financial Accounting Standards Board ("FASB") has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which the SEC has adopted as the framework for financial reporting for all public filers.  In addition, the FASB has issued authoritative guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts to be used in the development of GAAP.

Characteristics of Financial Reporting

104.    A fundamental objective underlying GAAP is that financial reporting should present information to current and potential investors, creditors, and other users that is both useful to their rational decision-making and comprehensible to persons with a reasonable understanding of business and economic activities and an inclination to study the information with reasonable diligence.  *See* FASCON No. 1, *Objectives of Financial Reporting by Business Enterprises* ("FASCON 1"), para. 34.

105.    To this end, FASCON 1 provides that financial statements should include information about the Company's economic resources, its obligations, and the events that would change any of those resources or any claims to those resources.  *Id*., para. 40.

106.    In addition, FASCON 1 states in relevant part:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

*Id*., para. 42 (footnote omitted).

107.    A primary quality that renders accounting information useful to investors, creditors, and other users in their decision-making is its reliability.  To be reliable, information must have representational faithfulness, verifiability, and neutrality.  *See* FASCON No. 2, *Qualitative Characteristics of Accounting Information* ("FASCON 2"), paras. 58-59, 62.  In other words, reliability is: "[t]he quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent."  *Id*., Glossary of Terms.

108.    Accordingly, reliability implies "completeness" of information, such that "nothing material is left out of the information that may be necessary to ensure that it validly represents the underlying events and conditions."  *Id*., para. 79.

Matching Principle

109.    Critical to the inclusion of certain financial elements in the financial statements is their "recognition," which is "the process of formally recording or incorporating an item in the financial statements of an entity.  Thus, an asset, liability, revenue, expense, gain, or loss may be

recognized (recorded) or unrecognized (unrecorded)."  FASCON No. 6, *Elements of Financial Statements* ("FASCON 6"), para. 143.

110.    Under GAAP, recognized items are recorded pursuant to the "accrual accounting" method, as FASCON 6 further states in relevant part:

> Items that qualify under the definitions of elements of financial statements and that meet criteria for recognition and measurement (paragraph 23) are accounted for and included in financial statements by the use of accrual accounting procedures.  Accrual accounting and related concepts are therefore significant not only for defining elements of financial statements but also for understanding and considering other aspects of the conceptual framework for financial accounting and reporting.

*Id.*, para. 134.

111.    FASCON 6 also provides that the objective of accrual accounting is to reflect transactions within the financial reporting periods to which their component costs and associated revenues relate:

> Accrual accounting uses accrual, deferral, and allocation procedures whose goal is to relate revenues, expenses, gains, and losses to periods to reflect an entity's performance during a period instead of merely listing its cash receipts and outlays.  Thus, recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities--including matching of costs and revenues, allocation, and amortization--is the essence of using accrual accounting to measure performance of entities.  The goal of accrual accounting is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances, to the extent that those financial effects are recognizable and measurable.

*Id.*, para. 145.

112.    Thus, at the core of accrual accounting is its application of the "matching principle," which FASCON 6 describes in relevant part:

> Matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events.  In most entities, some transactions or events result simultaneously in both a revenue

and one or more expenses. The revenue and expense(s) are directly related to each other and require recognition at the same time.

*Id.*, para. 146.

Expense Recognition

113.    FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"),[3] requires the recognition of expenses as follows:

Expenses and losses are generally recognized when an entity's economic benefits are used up in delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations or when previously recognized assets are expected to provide reduced or no further benefits.

Consumption of economic benefits during a period may be recognized either directly or by relating it to revenues recognized during the period.

a.    Some expenses, such as cost of goods sold, are matched with revenues–they are recognized upon recognition of revenues that result directly and jointly from the same transactions or other events as the expenses.

b.    Many expenses, such as selling and administrative salaries, are recognized during the period in which cash is spent or liabilities are incurred for goods and services that are used up either simultaneously with acquisition or soon after.

c.    Some expenses, such as depreciation and insurance, are allocated by systematic and rational procedures to the periods during which the related assets are expected to provide benefits.

*Id.*, paras. 85-86 (footnote omitted).

114.    As discussed herein, the September 15 Press Release disclosed that the SEC is specifically investigating journal entries and/or adjustments to the Company's financial

---

[3] FASCON 5 is incorporated into ASC 605, *Revenue Recognition.*

statements that related to the recognition of expenses in proper accounting periods. Such adjustments included the following:

- "two adjustments to reduce accrued expenses totaling approximately $850,000 in the aggregate" that were "made during the close process for the second quarter of 2012";

- "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter and other periods in 2012";

- "an entry originally made in the third quarter of 2011 establishing an allowance of $460,000 for anticipated customer credits in the Insurance business that was ultimately reversed in June 2012"; and

- "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012."

115. The aforementioned adjustments to the Company's previously issued financial statements were both improper under GAAP and material to such financial statements in view of: (i) the accounting literature discussed herein; (ii) the investigations by the SEC, the DOJ, and by the Company internally; and (iii) Bankrate's Audit Committee's conclusion "that the Company's previously issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer relied upon pending the conclusion of a full internal review of these matters, which is ongoing."

116. As to the recording of reserves and allowances, which also represent expenses in an entity's financial statement when recorded and serve to offset the expected benefits wrapped up in assets, such as inventory or accounts receivable, GAAP provides as follows:

An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:

a. Information available before the financial statements are issued or are available to be indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.

46

b.   The amount of loss can be reasonably estimated.

ASC 450-20, *Loss Contingencies*.

117.   In view of ASC 450-20, it is accordingly improper under GAAP to eliminate allowances for future losses at a later date without sufficient basis and/or a supportable analysis demonstrating why such allowance or reserve is no longer needed.

118.   As discussed herein, the SEC, the DOJ, and the Company are investigating Bankrate's reversal in later periods of a number of expense accruals that are presumed to have been properly established during earlier periods.  Such reductions or removals of accruals were both improper under GAAP and material to such financial statements in view of:  (i) the accounting literature discussed herein; (ii) the investigations by the SEC, the DOJ, and by the Company internally; and (iii) Bankrate's Audit Committee's conclusion "that the Company's previously issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer be relied upon pending the conclusion of a full internal review of these matters, which is ongoing."

Revenue Recognition

119.   ASC 605, *Revenue Recognition*, incorporates FASCON 5, which states that in order for revenue to be recognized, it must be "earned" and "realized or realizable."  *Id*., para. 83.  Revenue is "realized" or "realizable" when assets related to the revenue-earning activity are readily convertible to known amounts of cash or claims to cash.  *Id*.  Revenue is considered "earned" from delivering or producing goods, rendering services, or performing other activities that constitute an entity's ongoing major or central operations "when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  *Id*.

120.   ASC 605 also references the SEC's Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* ("SAB 104"), which similarly provides:

> . . . [R]evenue generally is realized or realizable and earned when all of the
> following criteria are met:
>
> - Persuasive evidence of an arrangement exists,
>
> - Delivery has occurred or services have been rendered,
>
> - The seller's price to the buyer is fixed or determinable, and
>
> - Collectability is reasonably assured.

*Id.*, § A(1) (footnotes omitted).

121.    As discussed herein, the SEC, the DOJ, and the Company are investigating a

number of journal entries that Bankrate made to accrue and/or adjust amounts recorded as

revenue during the Class Period.  Those items include at least the following:

- "three accruals of revenue totaling approximately $781,000 in the
  aggregate" that were "made during the close process for the second
  quarter of 2012"; and

- "revenue and expense adjustments totaling $225,000 in May 2012 that
  were reversed in June 2012."

122.    These adjustments to revenue were both improper under GAAP and material to

Bankrate's financial statements in view of:  (i) the accounting literature discussed herein; (ii) the

investigations by the SEC, the DOJ, and by the Company internally; and (iii) Bankrate's Audit

Committee's conclusion "that the Company's previously issued financial statements for each of

fiscal years 2011, 2012 and 2013 should no longer be relied upon pending the conclusion of a

full internal review of these matters, which is ongoing."

Correction of an Error in Previously Issued Financial Statements

123.    As discussed herein, Bankrate stated the following in the September 15 Press

Release:

> In connection with the examination of the matters described
> [therein] and developments in the ongoing SEC investigation, on

48

> September 14, 2014, Bankrate's Audit Committee, which is comprised entirely of independent outside directors, concluded that the Company's previously issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer relied upon pending the conclusion of a full internal review of these matters, which is ongoing.

124.   The Audit Committee's decision to withdraw reliance upon the Company's financial statements for three fiscal years indicates an expectation that pending investigations at Bankrate would result in material misstatements to those previously issued financial statements. GAAP governing the circumstances under which an entity should or must correct and/or amend previously issued financial statements, reflected primarily in ASC 250, *Accounting Changes and Error Corrections*, supports such an inference.  Consistent with the matching principle discussed above, GAAP requires net income for the period to include all items of profit and loss recognized during the period.  *See, e.g.,* ASC 225, *Income Statement*.  Accordingly, such determination of income should include the timely and proper recognition of accruals of estimated losses from loss contingencies in financial statements, as set forth above.

125.   When errors in previously issued financial statements are identified, they must be assessed to determine whether the affected financial statements are materially misstated.  The materiality of a financial reporting item to the subject financial statements depends upon whether its correction would impact the decision-making of a user of such financial statements.  *See* FASCON 2, para. 125.  SAB No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* ("SAB 108") provides guidance regarding how to address and account for the impact of errors identified in previously issued financial statements, stating in pertinent part:  "Correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended.  Such correction may be made the next time the registrant files the prior year financial statements."  The

Associate Chief Accountant in the SEC's Office of the Chief Accountant advised with respect to the application of SAB 108 that, if the effect of a correction would not materially affect the previously issued financial statements, then those financial statements may still be relied upon, and the correction may be made in future filings (i.e., without requiring an amendment to prior filings).

126.   By contrast, Bankrate's Audit Committee determined that the Company's financial statements "for each of fiscal years 2011, 2012 and 2013 should no longer be relied upon."  Ultimately, GAAP requires prompt correction of previously issued financial statements that are found to be *materially* misstated.  Such corrective measures include an entity's need to determine the appropriate steps and timing for providing notice that the materially misstated financial statements should no longer be relied upon.  Thus, Bankrate's Audit Committee's decision to withdraw reliance upon the Company's financial statements for FY11, FY12, and FY13 indicates that it had identified or expects to identify material errors in these financial statements.

## E.   Summary of Scienter Allegations for Exchange Act Claims

127.   As alleged in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants Bankrate, Evans, and DiMaria knew or recklessly disregarded that the statements identified above were materially false and misleading when made.

128.   Defendants Bankrate, Evans and DiMaria acted with scienter in that they:  (i) knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance

or dissemination of such statements or documents as primary violators of the federal securities laws.   Defendants Bankrate, Evans and DiMaria, by virtue of their receipt of information reflecting the true facts regarding Bankrate's financial results, and their control over, and receipt or modification of Bankrate's materially false and misleading statements, actively participated in the fraudulent scheme alleged herein.

129.   Defendants Evans and DiMaria, because of their respective positions at Bankrate, controlled the contents of the Company's public statements during the Class Period.   Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their respective positions and access to material non-public information concerning the Company, each knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and incomplete.   As a result, Defendants Evans and DiMaria are responsible for the accuracy of Bankrate's corporate statements, and are therefore responsible and liable for the representations contained therein or omitted therefrom.

130.   Further supporting an inference of scienter with respect to Defendants Evans and DiMaria are their signed SOX certifications, as set forth in pertinent part above in ¶¶ 32, 39, 45, 50, 58, 64, 70, 74, 78, and 82, in which each attested that, *inter alia*, based upon his personal evaluation of the Company's disclosure controls and procedures designed by him or under his supervision to ensure that he and the other certifying officer were timely apprised of material information concerning the Company, he had concluded that such controls were effective.

131.     The circumstances surrounding Defendant DiMaria's abrupt resignation from the Company – including its close proximity to the Company's announcements regarding the SEC's and DOJ's respective investigations, as well as the basis for his termination – also support a strong inference of his scienter.

132.     Specifically, the September 15 Press Release concurrently announced that Defendant DiMaria had resigned as CFO, and that the SEC was conducting a non-public formal investigation into the Company's financial reporting during 2012.

133.     Furthermore, the October 9 Form 8-K disclosed that the Company had ***terminated Defendant DiMaria for cause***, and that the DOJ had launched an investigation into the same issues concerning Bankrate's financial reporting that were under investigation by the SEC.  The October 9 Form 8-K further revealed that the cause for Defendant DiMaria's termination was his ***refusal to cooperate with the SEC's investigation***, thus supporting the strong inference that Defendant DiMaria would implicate himself in the illicit scheme by cooperating because he knew that the financial statements at issue were materially false and misleading when he attested to their accuracy upon release to the market and when he made the suspiciously-timed insider stock trades, as set forth in ¶¶ 32, 39, 45, 50, 58, 64, 70, 74, 78, 82, 135-46.

134.     In addition, Defendants DiMaria and Evans had a motive to issue the Company's false financial statements alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales that were highly suspicious in both amount and timing.  Indeed, each of these Defendants sold substantial amounts of his shares shortly after the Company reported its materially false and misleading financial results designed to meet market expectations, as set forth in the following table:

| Date of Sale | Defendant | Number of Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|---|
| 02/08/2012 | DiMaria | 125,000 | $23.40 | $2,925,000 |
| 08/09/2012 | DiMaria | 79,848 | $19.3399 | $1,544,252.34 |
| 08/10/2012 | DiMaria | 26,729 | $19.0537 | $509,286.35 |
| 08/13/2012 | DiMaria | 600 | $19.149 | $11,489.40 |
| TOTAL |  | 232,177 |  | $4,990,028.09 |

| Date of Sale | Defendant | Number of Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|---|
| 12/12/2011 | Evans | 279,279 | $16.80 | $4,691,887.20 |

135.     The proceeds that Defendant DiMaria received from the sale of 232,117 shares of Bankrate common stock, nearly $5 million, was approximately 12.5 times the $400,000 base salary DiMaria earned as CFO in FY12.  Moreover, each of Defendant DiMaria's sales occurred within close proximity to the Company's issuance of the false financial statements alleged herein.  For example, Defendant DiMaria's sale of 125,000 shares of Bankrate common stock on February 8, 2012 took place just one day after the Company reported its materially false and misleading financial results for 4Q/FY11.  Similarly, Defendant DiMaria's sale of 79,848 shares, 26,729, and 600 shares of Bankrate common stock on August 9, 2012, August 10, 2012, and August 13, 2012, respectively, took place just one week after the Company reported its materially false and misleading financial results for 2Q12.  Finally, these sales were inconsistent with Defendant DiMaria's prior trading history, which included ***no other stock sales following the Company's IPO***.

136.     Likewise, the proceeds that Defendant Evans received from his sale of 279,279 shares of Bankrate common stock, nearly $4.7 million, was approximately 4.5 times Evans's total cash compensation—base salary and cash bonus equaling $1,031,500—as CEO in FY11.  Further, Defendant Evans sold these shares just one month after the Company issued its materially false and misleading financial results for 3Q11.  This sale was also inconsistent with

Defendant Evans's prior trading history, as it was the only sale that he did not make pursuant to a Section 10b5-1 trading plan.

137.    Finally, Defendants DiMaria's and Evans's violations of Bankrate's internal policies is further indicia of their scienter.   Specifically, the Company's Code of Business Conduct and Ethics applicable to all officers, directors and employees, which is available on Bankrate's website (www.bankrate.com) and incorporated by reference in the Company's annual proxy statements filed on Form DEF 14A with the SEC on April 30, 2012, April 30, 2013, and April 30, 2014, respectively, prohibits employees from engaging in insider trading based upon non-public information about the Company as follows:

> Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business.   All non-public information about the Company should be considered confidential information.   To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

138.    In addition, the Company's Code of Business Conduct and Ethics provides with respect to record-keeping:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions . . . .
>
> *         *         *
>
> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

## F.    Loss Causation for Exchange Act Claims

139.    As alleged herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Bankrate common stock and operated as a fraud or deceit upon Class Period purchasers of Bankrate common stock by

concealing the true facts concerning the use of accounting entries to inflate reported revenue and net income in order to manage market expectations.  As a direct result of the Exchange Act Defendants' misrepresentations and omissions of material fact alleged above in Section V.A, the price of Bankrate common stock was artificially inflated during the Class Period.  This artificial inflation was removed from the price of Bankrate common stock in direct response to the information revealed in the September 15 Press Release and in the October 9 Form 8-K.  As a result of their purchases of Bankrate common stock during the Class Period at artificially inflated prices, Lead Plaintiff and the Class suffered economic loss, i.e., damages under the federal securities laws.

140.   Specifically, the Company's September 15 Press Release announced that the SEC is investigating at least the following issues:   (i) "three accruals of revenue totaling approximately $781,000 in the aggregate"; (ii) "two adjustments to reduced accrued expenses totaling approximately $850,000 in the aggregate"; (iii) "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter and other periods in 2012"; (iv) "an entry originally made in the third quarter of 2011 establishing an allowance of $460,000 for anticipated customer credits in the Insurance business that was ultimately reversed in the first quarter of 2012"; and (v) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012."  The September 15 Press Release also reported that the SEC is investigating whether accounting entries during FY12 "*improperly impacted the Company's reported results, including relative to market expectations at such time*."

141.   The Company's September 15 Press Release further disclosed that "[i]n connection with" the SEC investigation and based on "developments" from that investigation,

Bankrate's Audit Committee "*concluded that the Company's previously issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer be relied upon pending the conclusion of a full internal review of these matters.*"  Moreover, according to the September 15 Press Release, effective immediately, Defendant DiMaria had resigned from his position as CFO but would remain at Bankrate as a senior vice president.

142.   As a direct result of the previously misrepresented and concealed information partially revealed in the September 15 Press Release, the price of Bankrate's common stock declined by $1.90 per share, or 13.75%, from a close of $13.82 on the prior trading day, September 12, 2014, to close at $11.92 per share on September 15, 2014, on extremely heavy trading volume.

143.   Numerous analysts issued reports expressing surprise over the information revealed in the September 15 Press Release.  For example:

- SunTrust's September 15, 2014 report noted that, "[t]he market is apparently reacting to the risk that Bankrate's historical financials were fraudulently presented or otherwise misrepresented."

- Topeka issued a report on September 16, 2014 downgrading Bankrate common stock from hold "to sell on [the] SEC investigation, unreliable financials, [and] CFO transition."  Topeka also noted that "what concerns us is the implication that the SEC is looking to see whether these figures were used to manage market expectations."

144.   Less than one month later, the Company filed the October 9 Form 8-K with the SEC after the markets closed that day.  In its October 9 Form 8-K, the Company announced that it had "*terminated Edward J. DiMaria's employment with the Company for cause, effective immediately, as a result of his notifying the Company and the [SEC] of his decision not to cooperate in the previously announced investigation by the SEC.*"  The October 9 Form 8-K

further announced that the DOJ was now investigating Bankrate concerning the same issues that the SEC had been investigating.

145.    In response to the information disclosed in the October 9 Form 8-K, through which the risks created by the Exchange Act Defendants' materially false and misleading statements during the Class Period further materialized, the price of Bankrate's common stock declined by an additional 11.20%, from a closing price of $10.98 per share on October 9, 2014, to $9.75 per share on October 10, 2014, a $1.23 decline on very heavy trading volume.  Based on these revelations, Stephens issued an analyst report on October 13, 2014 downgrading Bankrate's common stock and noting that "[w]hile the SEC investigation was known, we believe the emergence of the DOJ review creates an additional layer of risk" because it "could open the door for more dire consequences for those involved."

146.    The material misrepresentations and omissions detailed above had the effect of creating and maintaining artificially inflated prices for Bankrate common stock throughout the Class Period.  Lead Plaintiff and other Class members purchased or otherwise acquired Bankrate common stock at prices that were artificially inflated by the Exchange Act Defendants' misrepresentations and omissions of material fact alleged herein.  Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Bankrate common stock served to maintain the price of Bankrate common stock at an artificially inflated level.

147.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Throughout the Class Period, the Exchange Act Defendants made materially false and misleading statements and omissions of material fact concerning, among other things:  (i) the

reliability and accuracy of Bankrate's quarterly and annual financial statements; (ii) the Company's revenue recognition; and (iii) the Company's expense accruals.  Had the Exchange Act Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Bankrate common stock, or would not have purchased or otherwise acquired their shares at the artificially inflated prices that they paid.  It was entirely foreseeable to the Exchange Act Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Bankrate common stock.  It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by the Exchange Act Defendants' material misstatements and omissions, would cause the price of Bankrate common stock to decline, as the inflation caused by the Exchange Act Defendants' earlier materially false and misleading statements and omissions of material fact was removed from the stock price.

148.    Accordingly, the Exchange Act Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Bankrate common stock during the Class Period.

149.    The economic loss, i.e., damages, suffered by Lead Plaintiff and other Class members directly resulted from the Exchange Act Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock, and the subsequent significant decline in the value of Company's common stock when the truth was revealed and/or the risks previously concealed by the Exchange Act Defendants' material misstatements and omissions materialized.

150.    As a result of the previously misrepresented and concealed material information and risks disclosed on September 15, 2014 and on October 9, 2014, and the corresponding substantial declines in the price of Bankrate common stock when the market learned of this information, Lead Plaintiff and other Class members have suffered economic loss.

### G.    The Fraud-on-the-Market Doctrine Applies

151.    At all relevant times, the market for Bankrate common stock was open and efficient for the following reasons, among others:

a)    Bankrate common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market;

b)    As a registered and regulated issuer of securities, Bankrate filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c)    Bankrate regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)    Bankrate was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

e)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Bankrate common stock; and

f)    Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Bankrate stock between the time that the Exchange Act Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Bankrate stock was artificially inflated by the Exchange Act Defendants' misrepresentations and omissions.

152.    As a result of the foregoing, the market for Bankrate common stock promptly digested current information regarding Bankrate from all publicly available sources, and the prices of Bankrate common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Bankrate common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased Bankrate common stock relying upon the integrity of the market price of Bankrate common stock and other market information relating to Bankrate.

153.    Under these circumstances, all purchasers of Bankrate common stock during the Class Period suffered similar injuries through their purchases of Bankrate common stock at artificially inflated prices, and a presumption of reliance applies.

154.    Further, at all relevant times, Lead Plaintiff and the other members of the Class reasonably relied upon the Exchange Act Defendants to disclose material information as required by law in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Bankrate common stock at artificially inflated prices if the Exchange Act Defendants had disclosed all material information as required.  Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Lead Plaintiff and the other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

### H.    The Statutory Safe Harbor and Bespeaks Caution Doctrine Are Inapplicable

155.    The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine provided for forward-looking statements under certain circumstances do not apply to any of the materially false and misleading statements alleged in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, each was a historical statement or a statement

of purportedly current facts and conditions at the time each statement was made.  To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

156.   Alternatively, to the extent the statutory safe harbor does apply to any materially false and/or misleading statement alleged herein, the Exchange Act Defendants are liable for any such false and/or misleading statement because at the time such statement was made, the speaker actually knew that the statement was false, and/or the statement was authorized and/or approved by an executive officer of Bankrate who actually knew that such statement was false when made.

157.   Moreover, to the extent that the Company and the Individual Defendants issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because Bankrate and the Individual Defendants had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## VI.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Bankrate, Evans and DiMaria

158.   Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, is asserted by Lead

Plaintiff on behalf of itself and all other Class members against Defendants Bankrate, Evans, and DiMaria (collectively, the "Section 10(b) Defendants").

159.    During the Class Period, the Section 10(b) Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bankrate common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase Bankrate common stock at artificially inflated prices that did not reflect their true value.  In furtherance of their unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants took the actions set forth herein.

160.    While in possession of material adverse, non-public information, the Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange:  (i) employed devices, schemes, and artifices to defraud; (ii) made false and misleading statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Bankrate common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Section 10(b) Defendants are sued as primary participants in the wrongful conduct alleged herein.

161.    By virtue of their high-level positions at the Company during the Class Period, Defendant Evans and Defendant DiMaria were authorized to make public statements, and made public statements during the Class Period on Bankrate's behalf.  Defendant Evans and Defendant DiMaria were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

162.    In addition to the duties of full disclosure imposed on the Section 10(b) Defendants as a result of their making of affirmative statements and reports to the investing public, the Section 10(b) Defendants had a duty to disclose information required to update and/or correct their prior statements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Further, the Section 10(b) Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and Regulation S-K (17 C.F.R. § 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.  Defendant Evans and Defendant DiMaria also had duties under SOX to ensure that Bankrate's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

163.    The Section 10(b) Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them.  The

Section 10(b) Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Bankrate's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

164.     The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Bankrate's common stock during the Class Period.  In ignorance of the fact that the market prices of Bankrate's common stock were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by the Section 10(b) Defendants, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by the Section 10(b) Defendants but not disclosed in public statements by the Section 10(b) Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Bankrate's common stock during the Class Period at artificially inflated prices.  As the truth eventually emerged, the price of Bankrate's common stock substantially declined.

165.     At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth with respect to Bankrate's publicly reported financial results, which was concealed by the Section 10(b) Defendants, Lead Plaintiff and the other members of the Class would not have purchased Bankrate's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

166.     By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

167.     As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

<div align="center">

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act Against
the Individual Defendants and the Apax Defendants**

</div>

168.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Individual Defendants and the Apax Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Lead Plaintiff on behalf of itself and all other Class members.

169.     During the Class Period, each of the Individual Defendants was a senior executive officer and/or director of the Company, and the Apax Defendants were controlling shareholders of Bankrate.  As such, each of these Defendants was privy to confidential and proprietary information concerning Bankrate, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

170.     Defendant Esterow is the Company's CEO, a position he has held since January 1, 2014, and he is named in this Court as a control person of Bankrate for the materially false and misleading statements alleged herein from January 1, 2014 through the end of the Class Period. Defendant DiMaria was the Company's CFO from 2006 until September 15, 2014.  Defendant Evans was the Company's CEO from 2004 until December 31, 2013.

171.     The Apax Defendants were controlling shareholders of the Company from October 27, 2011 to March 10, 2014.  In addition, the Apax Defendants had the authority to, and

did, elect their representatives to Bankrate's Board during the Class Period.  Finally, the Apax Defendants were entitled to demand registration of Bankrate's securities and review all documents filed in connection therewith.

172.    By reason of the foregoing, the Individual Defendants and the Apax Defendants had regular access to non-public information about Bankrate's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

173.    The Individual Defendants and the Apax Defendants acted as controlling persons of Bankrate within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants and the Apax Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff alleges were materially false and misleading.  The Individual Defendants and the Apax Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

174.    In particular, the Individual Defendants and the Apax Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

175.    As set forth above, Defendant Bankrate violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of the Individual Defendants' and the Apax Defendants' status as controlling persons, and their respective participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants and the Apax Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' and the Apax Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## VII.    VIOLATIONS OF THE SECURITIES ACT

176.    As alleged below, the Company issued false financial statements for fiscal years 2011 ("FY11"), 2012 ("FY12"), and 2013 ("FY13") that were incorporated by reference into the Company's shelf registration statement and accompanying prospectus on Form S-3 (File No. 333-194186), filed with the SEC on February 27, 2014 (the "February 27, 2014 Registration Statement"), the preliminary prospectus supplement on Form 424B7 filed with the SEC on the same day (the "February 27, 2014 Preliminary Prospectus"), and the prospectus supplement on Form 424B7 dated March 4, 2014 and filed with the SEC on March 6, 2014 (the "March 2014 Prospectus Supplement," and, together with the February 27, 2014 Preliminary Prospectus, the "March 2014 Offering Prospectus") (collectively, the "March 2014 Offering Documents") issued in connection with the secondary public offering on March 5, 2014 (the "March 2014 Offering") of 16,100,000 million shares of Bankrate common stock at $18.25 per share to unsuspecting

investors.  The false financial statements incorporated by reference into the March 2014 Offering Documents imported untrue statements of material fact into the March 2014 Offering Documents, rendering them materially misleading and thus actionable under Sections 11, 12(a)(2) and 15 of the Securities Act.

177.     The claims in Counts III-IV are brought under Sections 11 and 15, respectively, of the Securities Act on behalf of all persons or entities who purchased Bankrate common stock issued pursuant or traceable to the February 27, 2014 Registration Statement in connection with the March 2014 Offering.  The claims in Counts V-VI are brought under Sections 12(a)(2) and 15 of the Securities Act on behalf of all persons and entities who purchased Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of Defendants – i.e., they do not allege, and do not sound in fraud – and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims.

### A.     Additional Defendants

178.     As specified in Counts III-VI below, Lead Plaintiff asserts claims under the Securities Act against the Defendants identified above in ¶¶ 18-22.  In addition, as specified in Counts III-VI below, Lead Plaintiff asserts certain of these non-fraud claims under the Securities Act against the Defendants identified below in ¶¶ 179-84.

Underwriter Defendants

179.     Defendant BoA was an underwriter of and seller in the March 2014 Offering.  As an underwriter of the March 2014 Offering, Defendant BoA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.  Defendant BoA sold 3,542,000 shares of Bankrate

common stock in the March 2014 Offering at the offering price of $18.25 per share pursuant to the Underwriting Agreement.

180.    Defendant Goldman was an underwriter of and seller in the March 2014 Offering. As an underwriter of the March 2014 Offering, Defendant Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.   Defendant Goldman sold 6,440,000 shares of Bankrate common stock in the March 2014 Offering at the offering price of $18.25 per share pursuant to the Underwriting Agreement, which Defendant Goldman signed as the representative underwriter on behalf of the other underwriters of the March 2014 Offering.   Lead Plaintiff purchased 190,819 shares of Bankrate common stock at the offering price of $18.25 per share in the March 2014 Offering from Defendant Goldman.   Lead Plaintiff purchased these 190,819 shares of Bankrate common stock on the March 5, 2014 offering date using its own funds.  Lead Plaintiff did not pay a commission to Defendant Goldman in connection with its purchase of 190,819 shares of Bankrate common stock in the March 2014 Offering.

181.    Defendant RBC was an underwriter of and seller in the March 2014 Offering.  As an underwriter of the March 2014 Offering, Defendant RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.  Defendant RBC sold 3,542,000 shares of Bankrate common stock at the offering price of $18.25 per share in the March 2014 Offering pursuant to the Underwriting Agreement.

182.    Defendant Stephens was an underwriter of and seller in the March 2014 Offering. As an underwriter of the March 2014 Offering, Defendant Stephens was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference

into the March 2014 Offering Documents. Defendant Stephens sold 2,576,000 shares of Bankrate common stock at the offering price of $18.25 per share in the March 2014 Offering pursuant to the Underwriting Agreement.

183.  Defendants BoA, Goldman, RBC, and Stephens are collectively referred to herein as the "Underwriter Defendants." Each of the Underwriter Defendants was a seller in the March 2014 Offering, and each Underwriter Defendant passed title to or other interest in the shares of Bankrate common stock that they sold, respectively, to Class members.

Auditor Defendant

184.  Defendant Grant Thornton served as Bankrate's independent registered public accountant at all relevant times throughout the Class Period. In the Company's February 27, 2014 Registration Statement, Defendant Grant Thornton consented to Bankrate's: (i) incorporation by reference into the March 2014 Offering Documents of its audit reports certifying the Company's financial statements for FY11, FY12, and FY13 and internal control over financial reporting for FY13 included in the Company's FY13 Form 10-K; and (ii) use of Grant Thornton's name with respect to the Company's representation in the March 2014 Offering Documents that the incorporation by reference of the Company's financial statements for FY11, FY12, and FY13 and management's assessment of internal control over financial reporting for FY13 included in the FY13 Form 10-K was done in reliance upon the aforementioned audit reports issued by Defendant Grant Thornton as an "expert" in accounting and auditing. As alleged herein, Defendant Grant Thornton is named as a Defendant in Count III based upon its role as Bankrate's independent registered public accountant which, with its consent, was named in the February 27, 2014 Registration Statement as having prepared or certified any part of that filing, or any report or evaluation used in connection therewith,

including the false financial statements for FY11, FY12, and FY13 that were incorporated by reference into the March 2014 Offering Documents.

**B.      The March 2014 Offering**

185.    In March 2014, Bankrate completed a secondary offering of its common stock (defined above as the "March 2014 Offering"). In connection with the March 2014 Offering, on February 27, 2014, Bankrate filed with the SEC a shelf registration statement and accompanying prospectus on Form S-3 (File No. 333-194186) (defined above as the "February 27, 2014 Registration Statement") and a preliminary prospectus supplement on Form 424b7 (defined above as the "February 27, 2014 Preliminary Prospectus Supplement"), pursuant to which the Company registered 14,000,000 shares of the Company's common stock for sale by Ben Holding, with an option to the Underwriter Defendants to purchase from Ben Holding an additional 2,100,000 shares, which the Underwriting Defendants subsequently exercised. Thereafter, on March 6, 2014, Bankrate filed with the SEC on Form 424b7 a prospectus supplement dated March 4, 2014 (defined above as the "March 2014 Prospectus Supplement," and, together with the February 27, 2014 Preliminary Prospectus Supplement, the "March 2014 Offering Prospectus"), valuing the 16,100,000 registered shares at $18.25 per share.

186.    The February 27, 2014 Registration Statement was signed by Defendants Esterow and DiMaria, as well as three Apax Directors. Moreover, pursuant to the Stockholders' Agreement, the Apax Defendants were entitled to: (i) Demand Registration of Bankrate's common shares that were issued in the March 2014 Offering; (ii) review the March 2014 Offering Documents, including all documents incorporated by reference therein before they were filed with the SEC; and (iii) inspect "all financial and other records, pertinent corporate documents and properties of the Company" in connection with the March 2014 Offering. As set

forth below in ¶¶ 211-12, Bankrate and the Underwriter Defendants offered, sold, and/or solicited sales of the shares of Bankrate common stock in the March 2014 Offering.

187.  As set forth above at ¶¶ 179-83, the Underwriter Defendants acted as the underwriters of the March 2014 Offering.  Pursuant to the Underwriting Agreement, which Defendant Goldman signed on behalf of each of the Underwriter Defendants, Defendant Goldman sold 6,440,000 shares of Bankrate common stock in the March 2014 Offering.  Lead Plaintiff used its own funds to purchase from Defendant Goldman 190,819 shares of Bankrate common stock in the March 2014 Offering on the March 5, 2014 offering date at the offering price of $18.25 per share and pursuant to the March 2014 Offering Prospectus.  Lead Plaintiff did not pay a commission to Defendant Goldman in connection with its purchase of 190,819 shares of Bankrate common stock in the March 2014 Offering

188.  As further set forth above at ¶ 184, Defendant Grant Thornton served as the Company's registered public accountant at all relevant times during the Class Period.  In connection with the March 2014 Offering, Defendant Grant Thornton consented to the Company's incorporation by reference into the March 2014 Offering Documents of Grant Thornton's independent auditor's reports issued with respect to the Company's FY13 Form 10-K, which certified that the Company's financial statements for FY11, FY12, and FY13 "present fairly, in all material respects . . . the results of [the Company's] operations . . . in accordance with accounting principles generally accepted in the United States  . . ." and expressed an unqualified audit opinion on the Company's internal control over financial reporting for FY13. Defendant Grant Thornton further consented to Bankrate's use of Grant Thornton's name under the caption "Experts" in the February 27, 2014 Registration Statement in connection with the Company's representation that it had incorporated by reference the financial statements for

FY11, FY12, and FY13 and management's assessment of internal control over financial reporting for FY13 contained in the FY13 Form 10-K in reliance upon the aforementioned reports.

189.    The March 2014 Offering Documents contained untrue statements and omissions of material facts with respect to the Company's financial statements for FY11, FY12, and FY13 that were reported in the FY13 Form 10-K, which was incorporated by reference therein. Specifically, the March 2014 Offering Documents imported Defendants' untrue statements and omissions of material facts regarding the Company's GAAP Net Income and GAAP EPS for FY11, FY12, and FY13 as follows:

|  | Year ended December 31, 2011 | Year ended December 31, 2012 | Year ended December 31, 2013 |
|---|---|---|---|
| GAAP Net Income | ($13,422) | $29,331 | ($10,002) |
| GAAP EPS | ($0.14) | $0.29 | ($0.10) |

190.    These representations were untrue when made for at least the following reasons. On September 15, 2014, Bankrate's Audit Committee announced that the Company's financial results for FY11, FY12, and FY13 should no longer be relied upon by investors and are the subject of a full review by outside counsel and a forensic auditor.   On November 10, 2014, Defendant Esterow confirmed that this review encompassed all financial statements issued for FY11, FY12, and FY13.

191.    Bankrate's September 15 announcement also reported that the SEC had begun an investigation into Bankrate's financial reporting for FY12 to determine "whether accounting entries in these periods may have impacted the Company's reported results, including relative to market expectations at such time."  Then, on October 9, 2014, Bankrate announced that the DOJ had begun an investigation into Bankrate's financial reporting as well.  Specifically, with respect

to FY12, the SEC and DOJ are investigating:  (i) "the timing and classification of additional entries relating to certain expenses, expenses accruals and credits in the second quarter [of 2012] and other periods in 2012"; (ii) the reversal of a $460,000 allowance in 1Q12; (iii) "three accruals of revenue totaling approximately $781,000 in the aggregate"; (iv) "two adjustments to reduce accrued expenses totaling approximately $850,000 in the aggregate"; and (v) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012."  The inclusion of these accounting entries in the financial results for FY12, which were incorporated into the March 2014 Offering Documents, caused Bankrate's reported GAAP Net Income of $29.3 million and GAAP EPS of $0.29 to be inflated by 6.5% and 6.9%, respectively.

192.    Additionally, Lead Plaintiff incorporates by reference ¶¶ 104-127, which set forth in detail allegations concerning the relevant accounting violations.

## VIII.   CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III

#### For Violations of Section 11 of the Securities Act
#### Against Defendants Bankrate, Esterow, DiMaria, Grant Thornton, and the Underwriter Defendants

193.    Lead Plaintiff repeats and realleges the allegations above at ¶¶ 176-92 as if fully set forth herein.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence and/or strict liability.

194.    This claim is brought against the Company, Defendant Esterow, Defendant DiMaria, Defendant Grant Thornton, and the Underwriter Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all other Class members who purchased shares of Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement that the Company issued in connection with the March 2014 Offering.

195.    The February 27, 2014 Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above in ¶¶ 189-92.

196.    Bankrate was the issuer of the common stock pursuant to the February 27, 2014 Registration Statement.  As the issuer of the common stock, Bankrate is strictly liable to the members of the Class who purchased Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement, which contained the untrue statements and omissions of material fact alleged herein.

197.    Defendants Esterow and DiMaria signed the February 27, 2014 Registration Statement.  Defendants Esterow and DiMaria acted negligently and are therefore liable to the members of the Class who purchased  shares of Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement.

198.    The Underwriter Defendants were the underwriters of the March 2014 Offering. The Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased shares of Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement.

199.    Defendant Grant Thornton was Bankrate's independent registered public accountant at all relevant times throughout the Class Period.  In connection with the March 2014 Offering, Defendant Grant Thornton consented to:  (i) Bankrate's incorporation by reference into the February 27, 2014 Registration Statement of the independent auditor's reports that Defendant Grant Thornton issued with respect to the Company's financial statements and internal control over financial reporting included in the FY13 Form 10-K; and (ii) the use of its name under the caption "Experts" with respect to Bankrate's representation in the February 27, 2014

75

Registration Statement that the Company had incorporated by reference the financial statements and management's assessment of the effectiveness of internal control over financial reporting in reliance upon the aforementioned reports.

200.    Lead Plaintiff and other members of the Class purchased Bankrate common stock issued pursuant or traceable to the February 27, 2014 Registration Statement, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

201.    Lead Plaintiff and the other members of the Class who purchased the common stock pursuant or traceable to the February 27, 2014 Registration Statement suffered damages as a result of the untrue statements and omissions of material fact in the February 27, 2014 Registration Statement, as they either:  (i) sold these shares at prices below the March 2014 Offering price of $18.25 per share; or (ii) still held shares as of the filing date of this Complaint, when the price of Bankrate common stock was lower than the March 2014 Offering price of $18.25 per share.  This Complaint is the first complaint to allege that the Defendants named in this Count violated Section 11 of the Securities Act in connection with the March 2014 Offering.

202.    The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

203.    This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Lead Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based.  Less than three years have elapsed from the time that the shares of Bankrate common stock were sold

to Lead Plaintiff and to other Class members in the March 2014 Offering pursuant to the February 27, 2014 Registration Statement.

204.    By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

<u>**COUNT IV**</u>

<u>**For Violations of Section 15 of the Securities Act**</u>
<u>**Against Defendants Esterow, DiMaria, and the Apax Defendants**</u>

205.    Lead Plaintiff repeats and realleges the allegations above at ¶¶ 176-92 as if fully set forth herein.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

206.    This Count is asserted against Defendants Esterow, DiMaria, and the Apax Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all other members of the Class who purchased Bankrate common stock in the March 2014 Offering issued pursuant to the February 27, 2014 Registration Statement, and this Count is premised upon Bankrate's primary violation of Section 11 of the Securities Act alleged above in Count III.

207.    At all relevant times, the Defendants named in this Count were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Esterow, at the time of the filing of the March 2014 Offering Documents and the March 2014 Offering, served as CEO and President of Bankrate.  Defendant DiMaria was CFO of Bankrate at the time of the filing of the March 2014 Offering Documents.  The Apax Defendants were controlling shareholders of Bankrate, owning approximately 54% of Bankrate's common stock, and reviewed and approved the February 27, 2014 Registration Statement.

208.    Defendants Esterow, DiMaria, and the Apax Defendants, prior to and at the time of the March 2014 Offering, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Bankrate's business affairs, including the registration of its securities.   As officers and/or controlling shareholders of a publicly owned company, Defendants Esterow, DiMaria, and the Apax Defendants had a duty to disseminate accurate and truthful information with respect to Bankrate's business, financial condition and results of operations, including its proposed sale of common shares.   Defendants Esterow, DiMaria, and the Apax Defendants participated in the preparation and dissemination of the February 27, 2014 Registration Statement, and otherwise participated in the process necessary to conduct the March 2014 Offering.   Among other things, Defendant DiMaria signed the Underwriting Agreement on behalf of the Company.   In addition, Defendant DiMaria, Defendant Esterow, and three Apax Directors signed the February 27, 2014 Registration Statement.   Finally, under the Stockholders' Agreement, the Apax Defendants were entitled to: (i) Demand Registration of the Company's shares that were registered pursuant to the February 27, 2014 Registration Statement; (ii) review the March 2014 Offering Documents, including, among others, the February 27, 2014 Registration Statement, and all documents incorporated by reference therein before they were filed with the SEC; and (ii) inspect "all financial and other records, pertinent corporate documents and properties of the Company" in connection with the March 2014 Offering.   Because of their respective positions of control and authority as senior officers and/or controlling shareholders of Bankrate, Defendants Esterow, DiMaria, and the Apax Defendants were able to, and did, control the contents of the February 27, 2014 Registration Statement, which contained untrue statements and omissions of material fact.

209.     By reason of the aforementioned conduct, Defendants Esterow, DiMaria, and the

Apax Defendants are liable under Section 15 of the Securities Act jointly and severally with and

to the same extent as Bankrate is liable under Section 11 of the Securities Act, to Lead Plaintiff

and the other members of the Class who purchased Bankrate common stock in the March 2014

Offering pursuant or traceable to the February 27, 2014 Registration Statement.

## COUNT V

### For Violations of Section 12(a)(2) of the Securities Act
### Against Bankrate and the Underwriter Defendants

210.     Lead Plaintiff repeats and realleges the allegations above at ¶¶ 176-92, as if fully

set forth herein.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any

allegation that could be construed as alleging or sounding in fraud or intentional or reckless

misconduct.  This claim is based solely on negligence.

211.     This claim is brought against Bankrate and the Underwriter Defendants pursuant

to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77(a)(2), on behalf Lead Plaintiff and all

other members of the Class who purchased Bankrate common stock in the March 2014 Offering

pursuant to the March 2014 Offering Prospectus.  Lead Plaintiff used its own funds to purchase

from Defendant Goldman 190,819 shares of Bankrate common stock in the March 2014 Offering

on the March 5, 2014 offering date at the offering price of $18.25 per share and pursuant to the

March 2014 Offering Prospectus.   Lead Plaintiff did not pay a commission to Defendant

Goldman in connection with its purchase of 190,819 shares of Bankrate common stock in the

March 2014 Offering.

212.     Bankrate was an offeror, and/or a solicitor of sales of the 16,100,000 shares of

Bankrate common stock offered and sold in the March 2014 Offering pursuant to the March

2014 Offering Prospectus, which contained untrue statements of material fact or omitted to state

material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above in ¶¶ 189-92.  Specifically, Bankrate solicited purchases of Bankrate common shares to be sold by means of the March 2014 Offering Prospectus by, among other things:  (i) conducting the March 2014 Offering; (ii) announcing the proposed March 2014 Offering in a Company press release issued on February 27, 2014 (the "February 27, 2014 Press Release"); (iii) announcing the pricing of the March 2014 Offering in a Company press release issued on March 4, 2014 (the "March 4, 2014 Press Release"); (iv) actively drafting, revising, and/or submitting for approval the March 2014 Offering Prospectus, pursuant to which the March 2014 Offering was made to the investing public.  Moreover, in the Underwriting Agreement, Bankrate also agreed with each of the Underwriter Defendants to, among other things:  (i) prepare and file the March 2014 Offering Prospectus; (ii) prepare and file an amended prospectus or prospectus supplement to correct any misstatement or omission contained in the March 2014 Offering Prospectus; and (iii) with respect to the Company's shares being sold pursuant to the March 2014 Offering Prospectus, (a) take such action as necessary to qualify them for offering and sale under applicable securities laws, (b) pay required filing fees relating to them, and (c) use its best efforts to list them on the NYSE.

213.    The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the 16,100,000 shares of Bankrate common stock offered and sold in the March 2014 Offering pursuant to the March 2014 Offering Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above in ¶¶ 189-92.

214.   Lead Plaintiff and other members of the Class purchased shares of Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus, and did not know, or in the exercise of reasonable care could not have known, of the untrue statements and omissions of material fact contained therein.

215.   Members of the Class who purchased the shares of Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus are entitled to rescissory damages on any shares so purchased, but no longer held.  Members of the Class who purchased the shares of Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus, and who still hold any such shares, have sustained damages as a result of the untrue statements and omissions of material fact in the March 2014 Offering Prospectus, for which they hereby elect to rescind and tender all such shares of Bankrate common stock to the Defendants sued in this Count in return for the consideration paid for such shares, together with interest thereon pursuant to Section 12(a)(2) of the Securities Act.

216.   The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

217.   This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Lead Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based.  Less than three years have elapsed from the time that the shares of Bankrate common stock were sold to Lead Plaintiff and to other Class members in the March 2014 Offering pursuant to the March 2014 Offering Prospectus.

218.     By virtue of the foregoing, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.

## COUNT VI

### For Violations of Section 15 of the Securities Act
### Against Defendants Esterow, DiMaria, and the Apax Defendants

219.     Lead Plaintiff repeats and realleges the allegations above at ¶¶ 176-92 as if fully set forth herein.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

220.     This Count is asserted against Defendants Esterow, DiMaria, and the Apax Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all other members of the Class who purchased Bankrate common stock in the March 2014 Offering issued pursuant to the March 2014 Offering Prospectus, and this Count is premised upon Bankrate's primary violation of Section 12(a)(2) of the Securities Act.

221.     At all relevant times, the Defendants named in this Count were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Esterow, at the time of the filing of the March 2014 Offering Documents, served as CEO and President of Bankrate.  Defendant DiMaria was CFO of Bankrate at the time of the filing of the March 2014 Offering Documents.  The Apax Defendants were controlling shareholders of Bankrate, owning approximately 54% of Bankrate's common stock, and reviewed and approved the March 2014 Offering Prospectus.

222.     Defendants Esterow, DiMaria, and the Apax Defendants, prior to and at the time of the March 2014 Offering, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Bankrate's business affairs,

including the registration of its securities.  As officers and/or controlling shareholders of a publicly owned company, Defendants Esterow, DiMaria, and the Apax Defendants had a duty to disseminate accurate and truthful information with respect to Bankrate's business, financial condition and results of operations, including its proposed sale of common shares.  Defendants Esterow, DiMaria, and the Apax Defendants participated in the preparation and dissemination of the March 2014 Offering Prospectus, and otherwise participated in the process necessary to conduct the March 2014 Offering.  Among other things, Defendant DiMaria signed the Underwriting Agreement on behalf of the Company.  Defendant DiMaria also authorized the Company's issuance of the February 27, 2014 Press Release and the March 4, 2014 Press Release.  In addition, Defendant DiMaria, Defendant Esterow, and three Apax Directors signed the February 27, 2014 Registration Statement.  Finally, under the Stockholders' Agreement, the Apax Defendants were entitled to:  (i) Demand Registration of the Company's shares that were sold pursuant to the March 2014 Offering Prospectus; (ii) review the March 2014 Offering Documents, including, among others, the March 2014 Offering Prospectus and all documents incorporated by reference therein before they were filed with the SEC; and (ii) inspect "all financial and other records, pertinent corporate documents and properties of the Company" in connection with the March 2014 Offering.  Because of their respective positions of control and authority as senior officers and/or controlling shareholders of Bankrate, Defendants Esterow, DiMaria, and the Apax Defendants were able to, and did, control the contents of the March 2014 Offering Prospectus, which contained materially untrue information.

223.    By reason of the aforementioned conduct, Defendants Esterow, DiMaria, and the Apax Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Bankrate is liable under Section 12(a)(2) of the Securities Act, to Lead

Plaintiff and other members of the Class who purchased Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A.    Determining this action to be a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D.    Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.    Awarding such other and further relief as may be just and proper.

## X.    JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.


Dated: February 23, 2015                    Respectfully submitted,

                                            */s/ Lester Hooker*

                                            **SAXENA WHITE P.A.**
                                            Lester Hooker

(Florida Bar No. 32242)
Joseph E. White
(Florida Bar No. 0621064)
Boca Center, 5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
lhooker@saxenawhite.com
jwhite@saxenawhite.com

*Liaison Counsel for the Class*

**KESSLER TOPAZ
MELTZER & CHECK LLP**
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
jwhitman@ktmc.com
Kimberly A. Justice (admitted *pro hac vice*)
kjustice@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Jennifer Joost (*pro hac vice* to be submitted)
jjoost@ktmc.com
1 Sansome Street, Suite 1850
San Francisco, CA 94109
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff The City of Los Angeles,
Acting Through its Fire and Police Pension System,
Acting by Order of and Through its Board of
Fire and Police Pension Commissioners,
and Lead Counsel for the Class*

85

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

As to any Defendants named herein whose counsel has not yet entered appearances in this action, I further certify that a true and correct copy of the foregoing was served with the Summons issued to each such Defendants or, to the extent counsel on behalf of such Defendants has agreed to waive service of the Summons, via electronic mail on this same date.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 23, 2015.


*/s/ Lester Hooker*