**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE No. 9:14-cv-81323-DMM**

| | |
|---|---|
| THE CITY OF LOS ANGELES, ACTING THROUGH ITS FIRE AND POLICE PENSION SYSTEM, ACTING BY ORDER OF AND THROUGH ITS BOARD OF FIRE AND POLICE PENSION COMMISSIONERS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| vs. | |
| BANKRATE, INC., EDWARD J. DIMARIA, KENNETH S. ESTEROW, GOLDMAN SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., RBC CAPITAL MARKETS, LLC, and STEPHENS, INC., | |
| Defendants. | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 3

II.  JURISDICTION AND VENUE ......................................................................... 12

III. PARTIES ............................................................................................................ 13

    A.   Lead Plaintiff ............................................................................................ 13

    B.   Defendants ................................................................................................ 13

IV.  VIOLATIONS OF THE EXCHANGE ACT ..................................................... 15

    A.   Factual Background ................................................................................... 15

        1.   Bankrate's Business During the Class Period ................................ 15

        2.   The SEC Investigation and Resulting Findings ............................. 15

        3.   Bankrate's Creation of Fraudulent "Cushion" Accounts in 2011 ............ 17

        4.   The Exchange Act Defendants' Fraudulent Manipulation of Bankrate's 2012 Financial Results ............................................................... 19

        5.   The Exchange Act Defendants' Fraudulent Reduction of Expenses to Meet Market Expectations ...................................................... 24

        6.   DiMaria's and Lerner's Suspicious Stock Sales ........................... 27

        7.   The March 4, 2014 Offering .......................................................... 28

        8.   The Truth and Risks Concealed By the Exchange Act Defendants' Fraud Materializes ................................................................. 29

        9.   Bankrate's Restatement of its Financial Results ........................... 31

        10.  The SEC Orders and Complaint .................................................... 37

    B.   The Exchange Act Defendants' Materially False and Misleading Statements ..... 41

    C.   Summary of Scienter Allegations for Exchange Act Claims ................... 49

    D.   Exchange Act Defendants' Accounting Violations .................................. 60

    E.   Loss Causation for Exchange Act Claims ............................................... 83

    F.   The Fraud-on-the-Market Doctrine Applies ............................................ 94

    G.   The Statutory Safe Harbor and Bespeaks Caution Doctrine Are Inapplicable ..... 96

V.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ......................... 97

VI.  CAUSES OF ACTION UNDER THE EXCHANGE ACT ................................ 99

        COUNT I ................................................................................................. 99

        COUNT II ............................................................................................... 102

VII. VIOLATIONS OF THE SECURITIES ACT .................................................. 104

    A.   Additional Defendants ........................................................................... 104

     B.     The March 2014 Offering ................................................................... 106

VIII.  CAUSES OF ACTION UNDER THE SECURITIES ACT ........................................ 109

     COUNT III ............................................................................................... 109

     COUNT IV ............................................................................................... 111

     COUNT V ................................................................................................ 113

     COUNT VI ............................................................................................... 115

IX.    PRAYER FOR RELIEF ........................................................................................ 117

X.     JURY TRIAL DEMANDED ................................................................................. 118

Lead Plaintiff, the City of Los Angeles, Acting through its Fire and Police Pension System, Acting by Order of and through its Board of Fire and Police Pension Commissioners ("Lead Plaintiff" or the "City of Los Angeles") makes the following allegations against Defendants: (i) Bankrate, Inc. ("Bankrate" or the "Company"); and (ii) Edward J. DiMaria ("DiMaria") (collectively, the "Exchange Act Defendants") for violations of Sections 10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired Bankrate common stock from August 1, 2012 through October 9, 2014 (the "Class Period"). Lead Plaintiff also asserts negligence and/or strict liability claims against Defendants Bankrate, DiMaria, Kenneth S. Esterow ("Esterow"), Goldman Sachs & Co. ("Goldman"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), RBC Capital Markets, LLC ("RBC"), and Stephens, Inc. ("Stephens") for violations of Sections 11, 12(a)(2), and/or 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, on behalf of all Class members who purchased shares in a March 2014 secondary offering of 16,100,000 shares of Bankrate common stock sold pursuant to, among other things, a March 4, 2014 prospectus supplement that was filed with the United States Securities and Exchange Commission ("SEC") on March 6, 2014 (the "March 2014 Offering").

Except as to allegations specifically pertaining to Lead Plaintiff and Lead Plaintiff's own acts, the allegations herein are based upon a continuing investigation by Lead Plaintiff's counsel, which includes, but is not limited to, the review and analysis of: (i) Bankrate's public filings with the SEC; (ii) securities analysts' reports about Bankrate; (iii) transcripts of Bankrate's conference calls with securities analysts and investors; (iv) Bankrate's press releases; (v) media

reports concerning Bankrate; (vi) a Freedom of Information Act ("FOIA") request that Lead Plaintiff's counsel served upon the SEC pursuant to 5 U.S.C. §552, *et seq.*, which the SEC has designated as FOIA No. 15-06375-FOIA; and (vii) the SEC's findings from its investigation into Bankrate's historical financial reporting for fiscal years 2011 ("FY11"), 2012 ("FY12") and 2013 ("FY13"), as set forth in, *inter alia*; (a) the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Cease-and-Desist Order and Civil Penalty entered on September 8, 2015 in the matter captioned, *In re Bankrate, Inc.*, Administrative Proceeding File No. 3-16786 ("SEC Order"), to which Bankrate consented pursuant to an Offer of Settlement submitted to and accepted by the SEC; (b) the Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order entered on September 8, 2015 in the matter captioned, *In re Hyunjin Lerner, CPA*, Administrative Proceeding File No. 3-16787 ("Lerner Order" and, together with the SEC Order, "SEC Orders"), to which Bankrate's former vice president of finance during the Class Period, Hyunjin Lerner ("Lerner") consented pursuant to an Offer of Settlement submitted to and accepted by the SEC; and (c) the Complaint and Jury Demand filed in the United States District Court for the Southern District of New York on September 9, 2015 in the matter captioned *United States Securities and Exchange Commission v. DiMaria and Gamsey*, 15 civ. 07035 (S.D.N.Y.) ("SEC Complaint"), which asserts accounting fraud violations against Defendant DiMaria and Bankrate's former director of accounting and vice president, Matthew Gamsey ("Gamsey").

Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## I.   INTRODUCTION

1.      During the Class Period, the Exchange Act Defendants knowingly engaged in an undisclosed scheme to defraud investors in Bankrate common stock by manipulating the Company's financial results in 2012 to artificially inflate key financial metrics in order to meet market expectations.  Put simply, the Exchange Act Defendants intentionally cooked Bankrate's books and misrepresented and concealed their fraud from investors.

2.      The Exchange Act Defendants' deception of Class members has now been brought to light.  On September 15, 2014 the Company announced in a press release (the "September 15 Press Release") that the SEC was pursuing a non-public formal investigation into Bankrate's financial reporting in 2012 "with the principal focus on the quarters ending March 31, 2012 and June 30, 2012."  The SEC's investigation included reviewing numerous non-public Bankrate documents, many of which are discussed herein.

3.      Nearly a year later, on September 8, 2015, the SEC announced its findings of wrongdoing and fraud based upon the investigation announced in the September 15 Press Release, as set forth in the SEC Order and SEC Complaint.  As a result of these findings of wrongdoing and fraud:  (i) Bankrate has now paid the SEC a monetary penalty of $15 million, (iii) Bankrate restated nearly *three years* of materially misstated financial results, and (iii) the SEC has charged Bankrate with violating the very Exchange Act provisions based upon the same misconduct pursuant to which Lead Plaintiff brings its Exchange Act claims – Section 10(b) and Rule 10b-5 thereunder.

4.      From its investigation, the SEC discovered that the Exchange Act Defendants knowingly implemented a scheme to artificially inflate Bankrate's financial indicators in

publicly reported financial statements.  Defendants employed these machinations to ensure that the Company's publicly reported financial metrics, including net income reported under Generally Accepted Accounting Principles ("GAAP Net Income"), adjusted earnings per share ("Adjusted EPS"), and adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") appeared in line with or better than analysts' consensus expectations for the second quarter ended June 30, 2012 ("2Q12").

5.      The fraud had two components that were orchestrated by the highest ranking accounting officials at Bankrate – DiMaria, Gamsey, and Lerner.  **First**, DiMaria directed Bankrate personnel, including Lerner and Gamsey, to maintain secret "cookie jar" or "cushion" expense accounts that the Exchange Act Defendants could later dip into to manipulate, or in DiMaria's words, "tune" Bankrate's financial results.  ***Second***, DiMaria instructed Bankrate personnel during the Class Period to fraudulently recognize phantom revenue.  This process of fraudulently increasing revenues while reducing expenses enabled the Exchange Act Defendants to meet 2Q12 market expectations for critical Bankrate financial metrics, including Adjusted EBITDA and Adjusted EPS.

6.      While Bankrate issued materially misstated financial statements from 2011 – 2013 – which have since been restated – the fraud at the heart of this action occurred in 2012. For example, in June 2012, upon reviewing Bankrate's financial figures for May 2012, DiMaria embarked on a campaign to artificially inflate Bankrate's 2Q12 earnings.  It was at that time that DiMaria emailed Bankrate personnel, including Lerner and Gamsey, instructing them to increase Bankrate's May 2012 revenue and EBITDA to $40.5 million and $12.5 million, respectively, in part, by "book[ing] like $150 [thousand] in rev[enue] to EBITDA in May … [p]lus revers[ing] $75k in accruals."  DiMaria told the recipients of the emails to keep the matter "under the radar."

7.      In July 2012, upon learning that Bankrate's 2Q12 Adjusted EBITDA was $1 million below analyst consensus estimates of $37 million, DiMaria improperly directed Bankrate's Insurance and Credit Cards divisions to book additional phantom revenue of $300,000 and $500,000, respectively, in an effort to meet or exceed the market's expectations.

8.      Internal emails reviewed by the SEC show that Gamsey recognized that the directives were improper.  For example, he emailed Lerner on July 11, 2012:

> F[***] me – seriously – oyyyyyyyyyyyyyy
>
> You better make sure that the revenue/margin analytics are thoroughly explained so that we avoid questions on this sh[**]. Doesn't [DiMaria] realize that all this does is put us in a hole to start [the third quarter of 2012] since it will have to be reversed when the "estimate" is trued up? So in Q3 are we going to record even more when the numbers suck? I know you get it but I'm not sure [DiMaria] is thinking ahead for what it means.

9.      The documents reviewed by the SEC demonstrate that the Insurance division complied with DiMaria's improper demand and fraudulently booked the $300,000 of revenue to a **dormant** customer account.  To cover its tracks, Bankrate then sent a misleading and generic explanation for the revenue recognition to the Company's external auditor.

10.      The Credit Cards division, however, agreed to book only $176,000 of the $500,000 in phantom revenue that DiMaria demanded from it.  Upon learning of the Credit Cards division's pushback, DiMaria told Bankrate personnel that he was "going to rip [the] f[***]ing head off" of the Credit Cards division's chief executive officer ("CEO") and fire the Credit Cards division's accountants.

11.      To address the revenue shortfall created by the Credit Card division's refusal to book the full $500,000 in false revenues that DiMaria requested, Lerner, acting upon DiMaria's order, instructed personnel at Bankrate Core, the Company's mortgage information business, to fraudulently record $305,000 in additional revenue.  Bankrate Core complied with this request

by doubling the revenue attributable to two Core customers on a revenue spreadsheet that had legitimate revenue listed as $234,000 and $71,000.  After learning in September 2012 that the SEC had commenced an informal investigation into Bankrate's financial reporting, DiMaria tried to cover his tracks by attributing the $305,000 Bankrate Core revenue item to an alleged contractual dispute with an ***Insurance*** division customer – a dispute that was resolved in ***June 2012***.

12.     On the expense side of the ledger, DiMaria dipped into Bankrate's secret "cushion" accounts in an effort to show more earnings in Bankrate's 2Q12 financial results. Specifically, when DiMaria learned on July 13, 2012 that Bankrate's 2Q12 Adjusted EBITDA results were approximately $350,000 short of market expectations, even with improper revenue manipulations already undertaken, he emailed a Bankrate Core accountant with instructions to reduce by $400,000 one of those cushion accounts – a marketing accrual account for Search Engine Marketing ("SEM").

13.     Likewise, the SEC found that on July 6, 2012 – within a few hours of being told by DiMaria that 2Q12 Adjusted EBITDA needed to be $37 million – Lerner improperly instructed Bankrate Core personnel to reverse $99,000 in accounting fees associated with Bankrate's Sarbanes-Oxley Act of 2002 ("SOX") compliance provider.  Once Lerner realized, however, that such fees had not yet been recorded, and thus could not by reversed, he switched course and decided not to book the $99,000 in known accounting fees to 2Q12, but instead to book them improperly to the third quarter of 2012, ended September 30, 2012 ("3Q12").

14.     DiMaria was financially motivated to misstate Bankrate's 2012 Adjusted EBITDA because the Company's officer compensation package rewarded DiMaria if the

Company met certain Adjusted EBITDA targets.   Indeed, Bankrate's annual proxy statement

filed on Form DEF 14A with the SEC on April 30, 2012 ("2012 Proxy"), provides, in part,

> ***Incentive Cash Bonuses.***   Our named executive officers are
> expected to lead and grow our organization and as such we believe
> that a significant portion of our named executive officer's
> compensation should be tied to our overall performance. We
> maintain an incentive cash bonus program, the Management
> Incentive Program, which emphasizes pay-for-performance by
> providing our named executive officers with the opportunity to
> earn bonuses only ***if we achieve or exceed certain targets relating
> to our EBITDA***.[1]

15.     While DiMaria's fraudulent scheme did not increase EBITDA enough for him to

secure a Company bonus at the end of 2012, DiMaria did, in fact, cash in on his deception –

***selling more than a third of his holdings*** of the Company's stock at artificially inflated prices

shortly after the Company issued its materially false and misleading 2Q12 financial results.

Specifically, starting ***just one week after*** the Company released false results for 2Q12, DiMaria

suspiciously sold 107,177 shares of Bankrate common stock for proceeds of $2.1 million during

the period from August 9 through August 13, 2012.  The SEC determined that DiMaria's sale of

Bankrate stock shortly after authorizing and issuing Bankrate's false 2Q12 financial results, a

period during which Bankrate's stock price was artificially inflated as a result of Bankrate's

scheme to inflate its financial results to hit financial targets, was improper.

16.     Furthering his intentional falsification of Bankrate's financial results, DiMaria

blatantly lied to investors during the Class Period.  For example, as part of Bankrate's quarterly

report on Form 10-Q for 2Q12 (the "2Q12 Form 10-Q"), DiMaria certified that:

> Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the

---

[1] Unless otherwise noted, all emphasis is added to quoted statements herein.

circumstances under which such statements were made, not misleading with respect to the period covered by this report;

*Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report.*

17.     In truth, however, Bankrate's 2Q12 financial statements were replete with untrue statements of material fact – misstatements that were directed by DiMaria.  Furthermore, those misstated financial figures and false representations remained uncorrected and were repeated in the documents underlying the Company's March 2014 Offering of 16,100,000 shares of Bankrate common stock at $18.25 per share – an offering that yielded proceeds of more than $293 million from unsuspecting investors.

18.     The foreseeable risks associated with and relevant truth concerning the Exchange Act Defendants' concealed misconduct began to materialize when the Company issued the September 15 Press Release announcing, among other things, that:  (i) the Company's Audit Committee had concluded that investors could no longer rely upon the Company's publicly reported financial results for FY11, FY12, and FY13 during the time it would take Bankrate to conduct and complete a full internal review by outside counsel and a forensic auditor that Bankrate had retained; (ii) the SEC had begun a non-public formal investigation into Bankrate's financial reporting for FY12 to determine, among other things, "whether accounting entries in these periods may have impacted the Company's reported results, including relative to market expectations" (in other words, the SEC commenced an investigation into whether the Company manipulated its financial results to "meet-or-beat" market consensus estimates); and (iii) Defendant DiMaria had resigned from his position as chief financial officer ("CFO") of the Company, but would remain with the Company as a senior vice president.

19.     The Company's revelations regarding:  (i) the Audit Committee's conclusion that investors could no longer rely upon Bankrate's financial results for the three prior fiscal years; (ii) the SEC and internal investigations; and (iii) the abrupt resignation of the Company's CFO and the chief arbiter of its financial results, Defendant DiMaria, were foreseeable consequences of, and within the zone of risk created by the Exchange Act Defendants' falsification of Bankrate's financial results.   These disclosures concerning, and materialization of the risk concealed by, the Exchange Act Defendants' misconduct had a material effect on Bankrate's stock price.  Specifically, on September 15, 2014, the price of Bankrate common stock declined by $1.90 per share, or 13.75%, from a close of $13.82 on the prior trading day, September 12, 2014, to close at $11.92 per share on extremely heavy trading volume.

20.     Less than a month later, on October 9, 2014, Bankrate filed a current report on Form 8-K with the SEC (the "October 9 Form 8-K") disclosing that the prior day, the Company had terminated DiMaria from his remaining role with the Company for cause because DiMaria had refused to cooperate in the ongoing SEC and internal investigations of Bankrate's financial results for FY11, FY12, and FY13.  Bankrate further disclosed that the United States Department of Justice ("DOJ") also had opened an investigation into the same financial reporting issues that the SEC was investigating.

21.     As a direct result of these partial corrective disclosures and/or materializations of the risk concealed by the Exchange Act Defendants' fraud, the price of Bankrate common stock declined an additional $1.23 per share, or 11.20%, on very heavy trading volume.

22.     The partial corrective disclosures and/or materializations of the risk contained in the September 15 Press Release and the October 9 Form 8-K were confirmed by subsequent disclosures of actual wrongdoing and fraud after the close of the Class Period set forth in:  (i) the

Company's June 17, 2015 restatement of its financial statements for FY11, FY12, and FY13, the fiscal quarters within those years, and the fiscal quarters ended March 31, 2014 ("1Q14") and June 30, 2014 ("2Q14") (the "Restatement"); and (ii) the September 8, 2015 SEC Orders and SEC Complaint and related press release.

23.     Specifically, after the Bankrate Audit Committee completed its internal review of its FY11, FY12, and FY13 financial statements announced in the September 15 Press Release, the Company issued a press release on June 17, 2015 (the "June 17 Press Release") entitled "Bankrate Announces Results of its Internal Review and Full Year 2014 Financial Results." The June 17 Press Release, which also was attached as an exhibit to a Form 8-K filed with the SEC the same day, announced the Restatement, stating in part:

> As previously announced, Bankrate's Audit Committee, with the assistance of independent counsel and independent forensic accountants, conducted an internal review of years 2011, 2012 and 2013. During the course of that review, ***Bankrate's Audit Committee concluded that the accounting for certain historical business activities had been recorded in a manner that was not consistent with generally accepted accounting principles in the United States (GAAP)***.

24.     Also on June 17, 2015, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014 ("FY14") ("FY14 Form 10-K"), which was more than four months late and included the Restatement. The Restatement confirmed the existence and impact of Defendants' Class Period material misstatements on Bankrate's financial results and demonstrated that Bankrate's true financial results would have fallen short of analyst consensus estimates for at least 2Q12.

25.     The Company further admitted as part of the Restatement that Bankrate's internal controls, which Bankrate touted throughout the Class Period, suffered from material weaknesses that allowed "senior management," including Defendant DiMaria, to override such controls and

engage in the accounting improprieties alleged herein.  To address these material deficiencies, the FY14 Form 10-K states that Bankrate implemented various remediation efforts, including, among others, terminating DiMaria and other Bankrate personnel responsible for the misconduct.

26.     Moreover, on September 8, 2015, the SEC disclosed the results of its investigation.  ***First***, the Commission issued a press release entitled "***SEC Charges Bankrate and Former Executives With Accounting Fraud***" (the "September 8, 2015 Press Release"). Therein, the SEC announced, among other things, that:  (i) "Bankrate has agreed to pay $15 million to settle accounting fraud charges"; and (ii) "[t]hree former executives[,]" including Defendant DiMaria, "also are charged in the case that involves fraudulent manipulation of the company's financial results to meet analyst expectations."  According to the September 8, 2015 Press Release, the SEC determined that Defendant DiMaria, along with Gamsey and Lerner "engaged in a scheme to fabricate revenues and avoid booking certain expenses to meet analyst estimates[,]" and "Bankrate consequently overstated its second quarter 2012 net income."

27.     ***Second***, the SEC Complaint filed on September 8, 2015 sets forth facts that the SEC found in the course of its investigation, including, among other things, DiMaria's and Gamsey's direction of and involvement in the fraud alleged herein:

> DiMaria and Gamsey ***intentionally manipulated Bankrate's financial results for the second quarter of 2012 in order to meet or exceed analyst consensus estimates*** for Bankrate's key financial metrics.  As a result of this fraudulent scheme, Bankrate materially overstated its financial results for the second quarter of 2012.

28.     ***Third***, the SEC Orders express that the SEC found, *inter alia*, that (i) Bankrate and Lerner violated, among other statutes, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, (ii) Bankrate improperly recorded its revenue, expenses and accruals on its books, records and accounts during the Class Period, and (iii) Lerner willfully violated Section 13(b) of

11

the Exchange Act by, among other things, knowingly falsifying Bankrate's books and lying to Bankrate's external auditor.

29.     As a result of the violations set forth in the SEC Orders, the SEC levied sanctions against Bankrate and Lerner, ordering, among other things, that:  (i) Bankrate and Lerner "cease and desist from committing or causing any violations and any future violations" of Section 10(b); (ii) Bankrate pay a civil money penalty in the amount of $15,000,000; and (iii) Lerner pay a monetary fine, disgorge insider trading profits, and be prohibited from serving as an officer or director of certain corporate issuers for 5 years.

30.     The misconduct alleged herein artificially inflated the prices at which Lead Plaintiff and other Class members purchased Bankrate common stock during the Class Period, causing Lead Plaintiff and other Class members to suffer the damages for which they now seek recovery.

## II.     JURISDICTION AND VENUE

31.      The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.  This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1331.

32.     Venue is proper in the Southern District of Florida pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of materially false and misleading information, occurred in

this District.  In addition, at the time that this action was commenced, the Company was headquartered in North Palm Beach, Florida.

33.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange and market.

### III.     PARTIES

#### A.     Lead Plaintiff

34.     Lead Plaintiff, the City of Los Angeles, is a public pension system that has been providing retirement benefits to all sworn (fire, police and certain port police) employees of the City of Los Angeles since 1899.  As of December 31, 2014, the City of Los Angeles managed approximately $18.6 billion in assets on behalf of more than 25,000 participants.  As reflected in the certification attached hereto as Exhibit A, the City of Los Angeles purchased Bankrate common stock during the Class Period and suffered damages as a result of the violations alleged herein.  The City of Los Angeles also purchased Bankrate common stock in the March 2014 Offering, as alleged below in ¶¶ 286, 292, and 317, and suffered damages as a result of the violations alleged herein.

#### B.     Defendants

35.     Defendant Bankrate is a Delaware corporation with its headquarters located at 11760 U.S. Highway One, Suite 200, North Palm Beach, Florida at the time this action was commenced.  According to its Class Period SEC filings, Bankrate is an online publisher of personal finance information.  Through its various websites, Bankrate claims to provide consumers with personal finance editorial content regarding banking, mortgages, insurance, credit cards, and other financial products and services.  The Company purportedly generates

revenue by displaying advertisements on its websites and by selling consumer leads to third-party companies that offer financial products and services.

36.     Defendant DiMaria was formerly the Company's CFO, serving in that role from 2006 until his resignation on September 14, 2014.  During the Class Period, Defendant DiMaria reviewed, approved, and signed Bankrate's filings with the SEC that contained materially false and misleading statements, including false certifications signed by him pursuant to SOX Sections 302 and 906, as detailed herein.  Moreover, in connection with the March 2014 Offering, Defendant DiMaria reviewed, approved, and signed Bankrate's registration statement on Form S-3 filed with the SEC on February 27, 2014 (the "February 27, 2014 Registration Statement") and the March 4, 2014 Underwriting Agreement attached to the Company's Form 8-K filed with the SEC on March 10, 2014 (the "Underwriting Agreement").  Defendant DiMaria also participated in conference calls with securities analysts, during which Defendant DiMaria made additional false and misleading statements.  After September 14, 2014, Defendant DiMaria remained at Bankrate as a senior vice president until he was terminated for cause on or about October 8, 2014 for refusing to cooperate in the SEC's investigation into the matters announced in the September 15 Press Release.  On September 8, 2015, the SEC filed the SEC Complaint, in which it pursues claims against Defendant DiMaria for violating and aiding and abetting violations of the antifraud, lying-to-auditors, books-and-records, and reporting provisions of the federal securities laws by engaging in a scheme to intentionally manipulate Bankrate's financial results for 2Q12 in order to meet or exceed analyst consensus estimates for Bankrate's key financial metrics.

37.     Defendant Esterow is the Company's President, CEO, and a Board member. Effective January 1, 2014, Defendant Esterow assumed the role of President and CEO of

Bankrate.  In connection with the March 2014 Offering, Defendant Esterow reviewed, approved, and signed the February 27, 2014 Registration Statement.

## IV.     VIOLATIONS OF THE EXCHANGE ACT

### A.     Factual Background

#### 1.     Bankrate's Business During the Class Period

38.     Defendant Bankrate provides consumers with personal finance information across numerous categories, including, among others, mortgages, deposits, insurance, and credit cards. In addition, the Company aggregates information from more than 4,800 institutions on more than 300 financial products.  During the Class Period, Bankrate conducted its operations through three principal divisions:  (i) Bankrate Core, the Company's mortgage rate business; (ii) Bankrate Insurance, the Company's insurance quote and information business; and (iii) Bankrate Credit Cards, the Company's credit card information business.  Bankrate generates revenue through, among other means, the sale of customer leads gleaned from users of its websites in the insurance and credit cards categories, display and performance-based advertising, distribution arrangements, and syndication of editorial content and subscriptions.

39.     As detailed herein, the Exchange Act Defendants engaged in a fraudulent scheme that involved directing the various divisions within Bankrate to improperly and artificially inflate company revenues and reduce expenses in 2Q12.  The Exchange Act Defendants carried out the scheme to inflate Bankrate's key financial metrics in an effort to meet or beat market analysts' expectations.

#### 2.     The SEC Investigation and Resulting Findings

40.     The rules and regulations governing the conduct of the SEC authorize the Commission to, among other things, carry out investigations of publicly traded companies and their officers that the SEC believes are engaged in conduct that violates the federal securities

laws, including Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12(a)(2) and 15 of the Securities Act.

41.     The SEC generally describes how it conducts its investigations as follows:

> All SEC investigations are conducted privately. Facts are developed to the fullest extent possible through informal inquiry, interviewing witnesses, examining brokerage records, reviewing trading data, and other methods. With a formal order of investigation, the Division's staff may compel witnesses by subpoena to testify and produce books, records, and other relevant documents.

http://www.sec.gov/News/Article/Detail/Article/1356125787012.

42.     Following an investigation, SEC staff presents its findings to the Commission for its review.  The Commission can authorize the staff to file a case in federal court or to bring an administrative action.  In many cases, the Commission and the party charged decide to settle a matter without trial.  *Id.*

43.     The SEC commenced an informal investigation into the matters that are at the heart of this case by no later than September 2012, which Bankrate disclosed on September 15, 2014 had ripened into a "non-public formal investigation relating to the Company's financial reporting during 2012, with the principal focus on the quarters ending March 31, 2012 and June 30, 2012."  Based upon its investigation, the SEC found that "Bankrate's senior-most financial officials," including Defendant DiMaria, Gamsey, and Lerner, engaged in an undisclosed scheme to defraud investors by manipulating the Company's financial results in 2012 to artificially inflate key financial metrics in order to meet market expectations.  SEC Compl. ¶ 1; *see also* SEC Order ¶¶ 5-15; 20-29.

44.     Specifically, as the SEC confirmed in the SEC Orders and in the SEC Complaint, the Exchange Act Defendants engineered and publicly reported false accounting entries to improperly:  (i) recognize revenue; and (ii) reverse accrued expenses and allowances.  *See* SEC

Order at ¶¶ 5-15; *see also* SEC Compl. ¶¶ 3-5, 7, 25-29, 43-47, 65-69.   The Exchange Act Defendants employed these machinations to ensure that the Company's publicly reported financial indicators, including Adjusted EBITDA and Adjusted EPS, appeared in line with or better than analysts' consensus expectations for 2Q12.   *See* SEC Order ¶¶ 5-6, 20-21, 26; *see also* SEC Compl. ¶¶ 1, 3, 7, 24-26, 47, 56-57, 61-72, 65.   As a result, the Company's 2Q12 and FY12 financial results were materially misstated.   *See* SEC Order ¶ 28; *see also* SEC Compl. ¶¶ 8, 71-77.

45.     The SEC based its findings in the SEC Orders and the allegations in the SEC Complaint, in part, on non-public Company documents and other evidence it reviewed during its formal investigation.   The relevant documents and portions thereof are cited and quoted herein. Furthermore, and as noted herein, many of Lead Plaintiffs factual allegations are based on the factual allegations in the SEC Complaint and the findings from the SEC Orders.   Accordingly, the SEC Complaint and SEC Orders are attached hereto as Exhibit B, C, and D.

### 3.     Bankrate's Creation of Fraudulent "Cushion" Accounts in 2011

46.     The SEC found that beginning in 2011, Bankrate maintained "cushion accounts," which were dubbed "Ed's Cushion" (in reference to DiMaria) by Lerner.   SEC Compl. ¶¶ 2, 20; *see also* SEC Order ¶¶ 24.   According to the SEC, DiMaria:   (i) used these cushion accounts to fraudulently manipulate or "tune" Bankrate's financial numbers; and (ii) directed that certain unsupported accounting entries be kept hidden from view or, as DiMaria put it, "under the radar."   SEC Compl. ¶¶ 2, 21, 24; *see also* SEC Order ¶ 24.   Specifically, the SEC found that from at least 2Q11, Bankrate improperly carried over-accrued expense accounts or "cushion accounts" on its financial records, which DiMaria would use at times to adjust Bankrate's financial metrics to meet financial goals.   *See* SEC Order ¶ 24; SEC Compl. ¶¶ 2, 20-21, 60.

47.     An "accrued" expense account is a balance sheet account that an entity uses to record expenses that it has incurred, but for which it has not yet paid or been invoiced during the accounting period.  Bankrate's practice of carrying "over-accrued" expense accounts on the Company's books involved fraudulently recording expenses that exceeded their actual amount for the accounting period in which they were incurred without making the required adjusting entries in subsequent periods when the actual amount became known.  This practice created a "cookie jar" of expense accruals into which DiMaria could selectively and improperly dip to reduce Bankrate's expenses in order to falsify Bankrate's financial results in particular reporting periods.

48.     Indeed, emails from July 2011 between DiMaria and Lerner show that DiMaria was using one such cushion account to fraudulently manipulate Bankrate's publicly issued financial metrics.  For example, in one email, DiMaria asked Lerner to "review the final Balance sheet and the cushion anal[ysis] … I may want to tune our numbers …." SEC Compl. ¶ 21.  As detailed herein, the Exchange Act Defendants did in fact "tune" and/or fraudulently misstate Bankrate's 2012 financial results, among others.

49.     The Exchange Act Defendants' fraudulent use of "Ed's Cushion" accounts continued into 2012.  According to the SEC, in the first fiscal quarter ended March 31, 2012 ("1Q12"), DiMaria authorized that Bankrate's audit fees be booked to an improper account, which had the effect of increasing Bankrate's Adjusted EBITDA.  In this regard, DiMaria instructed Lerner to "Charge ALL [the auditor's] BILLS TO ACCRUED DEAL COST – I DON'T CARE IF THEY COMPLAIN, WE CAN SAY IT WAS A MISTAKE."  According to Company documents reviewed by the SEC, Lerner forwarded this email to Gamsey noting it was "[a]nother Ed [DiMaria] special."  SEC Compl. ¶ 22.

50.     According to the SEC, Bankrate reversed the charges to the cushion account after learning that the SEC was informally investigating the Company.  Specifically, in September 2012, Bankrate properly recorded the accounting fees that had been improperly booked as deal costs.   The SEC further found that in response to Bankrate's auditor's question about the adjustment, Gamsey advised Bankrate's auditor that the accounting fees had mistakenly been booked as deal costs – the precise excuse that DiMaria had suggested to him – when he knew that the booking was intentional and had been ordered by DiMaria.  SEC Compl. ¶ 23.

### 4.     The Exchange Act Defendants' Fraudulent Manipulation of Bankrate's 2012 Financial Results

51.     As alleged above, the Exchange Act Defendants and other senior finance executives used DiMaria's "cushion" accounts and other fraudulent accounting machinations to artificially inflate the Company's 2Q12 financial results in an effort to meet market expectations for Bankrate.

52.     According to the SEC, after reviewing Bankrate's May 2012 financial results, in June 2012, DiMaria emailed Lerner and others questioning how Bankrate's revenue and EBITDA could "drop by so much?????," and instructing them that "I want [the results] to be $40.5 [million] and $12.5 [million, respectively]."  SEC Compl. ¶ 24.

53.     Several days later, DiMaria sent a follow-up email to Lerner and others ordering them to "book like $150 [thousand] in rev[enue] to EBITDA in May … [p]lus reverse $75k in accruals."   According to the SEC, "DiMaria did not offer any proper basis for these adjustments."   Rather, DiMaria explained in his email that "these adjustments were necessary because he had told the Chairman of the Board of Bankrate that the company would achieve certain financial targets, and Bankrate's then-current financial results were below those target

figures. DiMaria instructed the recipients of his email to 'keep it under the radar.'"  SEC Compl. ¶ 24.

54.    According to the SEC, DiMaria reviewed disappointing preliminary 2Q12 financial results for Bankrate Core and Credit Cards following the close of the quarter on June 30, 2012.  As a result, on July 6, 2012, DiMaria informed Lerner that he wanted Bankrate's Adjusted EBITDA to be $37 million for the quarter, and that the preliminary 2Q12 results were "going in the wrong direction."  SEC Compl. ¶ 25; *see also* SEC Order ¶ 5.

55.    On July 7, 2012, DiMaria and Gamsey, as well as others on the accounting team, received the first version of Bankrate's 2Q12 consolidated financial results.  The results showed that Adjusted EBITDA for 2Q12 was $36,144,000 – below DiMaria's July 6th demand for $37 million and analyst consensus estimates of $37.2 million.  *See* SEC Order ¶ 6; SEC Compl. ¶ 26.

56.    The SEC also discovered that on July 11, 2012, after learning that Bankrate's preliminary financial results for 2Q12 fell short of analyst estimates, DiMaria, through Lerner, improperly directed two Bankrate divisions, Insurance and Credit Cards, to book additional revenue of $300,000 and $500,000, respectively, without support or analysis, in an effort to meet or exceed market expectations.  *See* SEC Order ¶¶ 7; SEC Compl. ¶¶ 3, 27.

57.    According to documents reviewed by the SEC, within a few minutes of sending the email instructions to the Insurance and Credit Cards divisions to fraudulently book additional revenue, Lerner forwarded the emails to Gamsey and others.  *See* SEC Order ¶ 8; SEC Compl. ¶¶ 3, 28.

58.    Company emails show that Gamsey reacted negatively to DiMaria's demand, recognizing that the fraudulent accounting would eventually have to be reversed and encouraging

Lerner to explain the entries in a way that would "avoid questions." Specifically, in a series of emails to Lerner, Gamsey stated:

> F[***] me – seriously – oyyyyyyyyyyyyyy
>
> You better make sure that the revenue/margin analytics are thoroughly explained so that we avoid questions on this sh[**]. Doesn't [DiMaria] realize that all this does is put us in a hole to start [the third quarter of 2012] since it will have to be reversed when the "estimate" is trued up? So in Q3 are we going to record even more when the numbers suck? I know you get it but I'm not sure [DiMaria] is thinking ahead for what it means.

SEC Compl. ¶¶ 3, 27; *see also* SEC Order ¶ 8.

59.     The documents reviewed by the SEC demonstrate that the Insurance division complied with DiMaria's improper demand and fraudulently booked the $300,000 of revenue. *See* SEC Order ¶ 9; SEC Compl. ¶¶ 4, 29. Specifically, Company documents demonstrate that on July 11, 2012 – without any support or analysis – the Insurance division immediately recorded the $300,000 of additional revenue directed by DiMaria, improperly booking the revenue to a dormant customer account. *See id*.

60.     On July 16, 2012, five days after Bankrate improperly recorded the revenue, Bankrate's external auditor asked Gamsey for an explanation of the $300,000 as part of its review of Bankrate's accounts receivable. Gamsey then emailed Lerner, stating "[b]etter start figuring out an explanation for these." SEC Compl. ¶ 29; *see also* SEC Order ¶ 9.

61.     As noted above, at the same time that DiMaria directed the Insurance division to book $300,000 in additional revenue, he also directed Bankrate's Credit Cards division, through Gamsey, to book $500,000 in additional revenue in an effort to meet market expectations.

62.     Upon receiving DiMaria's directive that the Credit Cards division book fraudulent revenue, Gamsey sent an email to Lerner noting that Gamsey had spoken to DiMaria and "[DiMaria] said there may be some additional good guy adjustments coming and I f[***]ing

21

knew that he was going to do something like this."  Gamsey cautioned Lerner: "We need to be very careful how this gets reflected or be able to have some basis for the estimate to show [the external auditor] if they happen to figure it out."  SEC Compl. ¶ 43.

63.     According to the SEC, the accountants in the Credit Cards division initially refused to follow DiMaria's order to book the $500,000 of unsupported revenue.  Infuriated, DiMaria told other Bankrate personnel that he was "going to rip [the Credit Cards CEO's] f[***]ing head off" and fire the Credit Cards accountants if they "f[***] up the accounting." SEC Order ¶ 14; SEC Compl. ¶ 44.

64.     The SEC also found that after meeting resistance from the Credit Cards division, DiMaria emailed Lerner, attempting to justify the $500,000 in revenue as a "true up for reporting issues."  Upon learning of DiMaria's purported justification, Gamsey internally rejected it, emailing Lerner:  "Haha – what reporting issues? All the issuers have reported and I'm sure if we did an analysis there has never been a 'reporting issue' of 500k – maybe 50k. [DiMaria] is treading on very thin ice here[.]"  SEC Compl. ¶ 45.

65.     The SEC determined that Credit Cards accounting personnel eventually concluded that "it could possibl[y] expect to get in June" an additional $176,000 in revenue and, in partially yielding to DiMaria's demand, improperly recorded this amount in 2Q12.  SEC Compl. ¶ 46; *see also* SEC Order ¶ 15.  As alleged herein, the $176,000 that Bankrate reported as revenue in 2Q12 was not properly recognized under GAAP.  Indeed, the Company admitted the impropriety when the amount was reversed as part of the Restatement.

66.     The SEC further found that on July 12, 2012, upon learning that the Credit Cards division had only booked $176,000 of the $500,000 in additional revenue he had directed to be booked, DiMaria charged Lerner to book the difference in the Bankrate Core division, again

demanding that Bankrate fraudulently record revenue in an attempt to meet market expectations. *See* SEC Order ¶ 15; SEC Compl. ¶ 47.

67.     According to the SEC, approximately thirty-five minutes after receiving DiMaria's directive, Lerner instructed the Bankrate Core accounting personnel to book $305,000 in additional revenue.  Following this instruction, Bankrate Core fraudulently doubled the revenue attributable to two Core customers on a revenue spreadsheet that had legitimate revenue listed as $234,000 and $71,000.  This improper manipulation allowed Bankrate to improperly recognize an additional $305,000 in revenue – a fact that, according to the SEC, became known to DiMaria and Gamsey.  *See* SEC Order ¶ 15; SEC Compl. ¶¶ 5, 47.

68.     Bankrate's internal treatment of the Bankrate Core revenue entries further demonstrates the Exchange Act Defendants' fraudulent intent.  As the SEC found, by adding this fabricated revenue directly to Bankrate's revenue spreadsheet rather than by means of a manual journal entry, the Company avoided questions that its external auditor typically asked concerning its post-quarter manual journal entries.  The SEC also determined that the manner of booking the $305,000 circumvented Bankrate's accounting controls, as the revenue spreadsheet had already been approved for entry into the general ledger and did not require additional approvals.  *See* SEC Order ¶ 16; SEC Compl. ¶ 48.

69.     According to the SEC, in approximately September 2012, after learning of the Commission's informal investigation in this matter, DiMaria attributed the $305,000 Bankrate Core revenue item to an alleged contractual dispute with an ***Insurance*** division customer.  The identified customer was not one of the customers to whom the revenue was initially attributed. The SEC further found that Bankrate then transferred the $305,000 of previously unexplained revenue from the Bankrate Core division's books to the Insurance division's books, and DiMaria

sent an invoice to the Insurance division customer claiming it owed the additional amounts needed for DiMaria to complete this falsification of revenues.  *See* SEC Order ¶ 17; SEC Compl. ¶¶ 5, 49.

70.     The SEC discovered, however, that DiMaria's September 2012 attribution of the $305,000 in revenue was fraudulent, as the purported contractual dispute with the Insurance division customer **had been resolved by June 2012**.  In fact, the SEC's investigation showed that by August 2012, Bankrate had confirmed with the customer that the only outstanding money owed by the customer was for June and July 2012 invoices.  The SEC concluded that none of the $305,000 in revenue baselessly booked to Bankrate Core, and later attributed to a purported Insurance division customer dispute, was properly recognized under GAAP.  *See* SEC Order ¶¶ 18-19; SEC Compl. ¶¶ 5, 50.

5.     **The Exchange Act Defendants' Fraudulent Reduction of Expenses to Meet Market Expectations**

71.     The SEC found that on July 13, 2012, the day after Bankrate improperly recorded $305,000 of additional revenue on Bankrate Core's books, DiMaria and Gamsey received a revised version of Bankrate's consolidated financial results for 2Q12 that showed Adjusted EBITDA of $36,656,000.  *See* SEC Order ¶ 20; SEC Compl.  ¶ 56.  While the improper revenue recognition helped to increase Adjusted EBITDA from the initial 2Q12 results that DiMaria and Gamsey received on July 7, 2012, the $36,656,000 in Adjusted EBITDA still fell short of DiMaria's $37 million mandate issued one week earlier.

72.     Accordingly, and as discovered by the SEC, DiMaria embarked on a campaign to reduce the over-accrued expenses maintained in Bankrate's "cushion" accounts so as to show more income in Bankrate's 2Q12 financial results.  *See* SEC Order ¶ 24; SEC Compl. ¶¶ 7, 60.

73.     The SEC found that shortly after his receipt of the revised EBITDA results, DiMaria emailed a Bankrate Core accountant with instructions to reduce a marketing accrual account for SEM by $400,000.  According to the SEC, reducing the SEM accrual (a balance sheet account) led to a corresponding reduction in the SEM expense (an income statement account), thereby artificially increasing Bankrate's quarterly earnings.  *See* SEC Order ¶ 21; SEC Compl. ¶¶ 7, 57.

74.     According to the SEC, DiMaria's email instruction to the Bankrate Core accountant did not reference or contain any support for the accounting entry.  The SEC also found, based on its investigation, that the manual journal entry executing DiMaria's instruction to reduce the SEM marketing accrual by $400,000 did not have any legitimate support.  *See* SEC Order ¶ 22; SEC Compl. ¶ 58.

75.     In fact, the SEC found that:  (i) Bankrate had been using the SEM accrual account as one of its "cushion" or "cookie jar reserve" accounts described above, since at least early 2011; and (ii) Bankrate's use of the SEM account as a "cushion" account was inappropriate because, *inter alia*, GAAP requires over-accrued expenses to be written off in the period in which the over-accrual becomes known and precludes the reduction of an accrual in order to meet a financial metric, such as, in this particular instance, Bankrate's 2Q12 Adjusted EBITDA. *See* SEC Order ¶ 24; SEC Compl. ¶¶ 7, 60.

76.     The SEC's investigation also revealed that upon learning of this $400,000 reduction in the SEM accrual, Gamsey questioned Lerner as to whether there was any basis for DiMaria's reduction in the SEM accrual, or whether DiMaria demanded this entry in lieu of demanding additional fraudulent revenue entries like those referenced above.  *See* SEC Order ¶ 23; SEC Compl. ¶ 59.

77. According to the SEC's findings, after Bankrate improperly recognized this $400,000 reduction in the SEM accrual, DiMaria and Gamsey received a revised version of Bankrate's 2Q12 financial results reflecting Adjusted EBITDA of $37,056,000. The manipulated Adjusted EBITDA exceeded the $37 million demanded by DiMaria in order to meet or exceed analyst estimates. *See* SEC Order ¶ 25; SEC Compl. ¶ 62.

78. The SEC further found, as detailed herein, that the $400,000 reduction of the SEM accrual violated GAAP and was reversed as part of Bankrate's Restatement. *See* SEC Order ¶ 24; SEC Compl. ¶¶ 7, 63. As detailed herein, that reversal, like the rest of the restated financial numbers, is an admission that the accrual reduction was a material misstatement during the Class Period.

79. In addition to improperly reducing over-accrued expense accounts, the Exchange Act Defendants employed other fraudulent means to boost 2Q12 earnings through the artificial reduction of Bankrate's 2Q12 expenses. For example, the SEC found that on July 6, 2012 – within a few hours of being told by DiMaria that 2Q12 Adjusted EBITDA needed to be $37 million – Lerner instructed Bankrate Core to reverse $99,000 in 2Q12 accounting fees associated with Bankrate's SOX compliance provider. The SEC determined that this instruction was made without any basis. *See* SEC Order ¶ 26; SEC Compl. ¶ 65.

80. According to the SEC, after realizing that accounting fees incurred in 2Q12 had not yet been recorded (and thus could not be reversed), Lerner chose not to record the proper amount of fees in 2Q12, but instead to record those fees in 3Q12. As a result, the SEC found that Bankrate improperly failed to book at least $99,000 in known accounting fees that were incurred during 2Q12. *See* SEC Order ¶ 27; SEC Compl. ¶¶ 7, 66.

81.     The SEC's investigation revealed that, as a result of the fraudulent accounting, on July 9, 2012, Lerner advised Gamsey that Bankrate was under-accrued for SOX compliance accounting expenses in 2Q12 and would need to "catch up" by booking those expenses in the 3Q12. *See* SEC Compl. ¶ 67.

82.     The Restatement included recognizing this $99,000 expense in 2Q12, confirming that the failure to properly book the expense during the Class Period, among other accounting machinations, rendered the 2Q12 financial results materially misleading upon issuance. *See* SEC Compl. ¶ 68.

### 6.     DiMaria's and Lerner's Suspicious Stock Sales

83.     DiMaria financially benefited by duping the market into believing that the Company was meeting market expectations.   Indeed, DiMaria cashed in on his deception – ***selling more than a third of his holdings*** of the Company's stock shortly after the Company issued its materially false and misleading 2Q12 financial results.  As depicted in the table below, Defendant DiMaria suspiciously sold 107,177 shares of Bankrate common stock for proceeds exceeding $2 million on August 9-13, 2012, commencing ***just one week after*** the Company released false financial results for 2Q12.

| Date of Sale | Defendant | Number of Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|---|
| 08/09/2012 | DiMaria | 79,848 | $19.3399 | $1,544,252.34 |
| 08/10/2012 | DiMaria | 26,729 | $19.0537 | $509,286.35 |
| 08/13/2012 | DiMaria | 600 | $19.149 | $11,489.40 |
| **TOTAL** | | **107,177** | | **$2,065,028.09** |

84.     As shown above, the proceeds from Defendant DiMaria's insider sales alone exceeded $2 million – more than 5 times Defendant DiMaria's FY12 base salary of $400,000. The SEC determined that DiMaria's sale of Bankrate stock in the two-week period following the announcement of Bankrate's 2Q12 financial results, a period during which Bankrate's stock

price was artificially inflated as a result of Bankrate's scheme to inflate its financial results to hit financial targets, was improper.  *See* SEC Order ¶ 29; SEC Compl. ¶¶ 9, 81.  Specifically, the SEC found that the proceeds DiMaria received from these sales of Bankrate common stock were "inflated by hundreds of thousands of dollars as a result of the Defendants' improper accounting practices and false statements that DiMaria made concerning Bankrate's financial condition." SEC Compl. ¶ 82.

85.    The SEC also found that Lerner improperly sold Bankrate stock during a one-week period following the announcement of Bankrate's 2Q12 financial results in an effort to take advantage of the fraud alleged herein.  Specifically, the SEC found that "[a]t the time Lerner sold Bankrate stock on August 6, 2012, he was in possession of material, nonpublic information concerning Bankrate's reported second quarter financial results (i.e., that Bankrate had overstated its financial results as a result of the improper accounting entries described herein). As a result of these stock sales, Lerner improperly benefited by as much as $30,045."  Lerner Order ¶ 32.

86.    The SEC ordered Lerner to, among other things, disgorge $30,045 in connection with the foregoing insider sales and pay a $150,000 penalty to the SEC.  *See* Lerner Order § IV.F.

### 7.    The March 4, 2014 Offering

87.    As alleged above, in March 2014, long before investors knew of the SEC's investigation or any aspect or risk associated with the fraud alleged herein, the Company completed an offering of 16,100,000 shares of Bankrate common stock at $18.25 per share.

88.    The March 2014 Offering was made pursuant to:  (i) the February 27, 2014 Registration Statement, signed by Defendant Esterow and Defendant DiMaria; (ii) the preliminary prospectus supplement on Form 424B7 filed with the SEC on the same day (the

28

"February 27, 2014 Preliminary Prospectus Supplement"); and (iii) the prospectus supplement on Form 424B7 dated March 4, 2014 and filed with the SEC on March 6, 2014 (the "March 2014 Prospectus Supplement," and, together with the February 27, 2014 Preliminary Prospectus Supplement, the "March 2014 Offering Prospectus") (collectively, the "March 2014 Offering Documents").

89.    Unbeknownst to investors, however, the March 2014 Offering Documents contained untrue statements and omissions of material fact with respect to, *inter alia*, the Company's financial statements for FY12 and the quarterly financial data for 1Q12, 2Q12, 3Q12 because the Company's annual report on FY13 Form 10-K filed with the SEC on February 27, 2014 was incorporated by reference into the March 2014 Offering Documents and included the materially false and misleading 1Q12, 2Q12, 3Q12, and FY12 financial results.

### 8.    The Truth and Risks Concealed By the Exchange Act Defendants' Fraud Materializes

90.    The foreseeable risks associated with and relevant truth concerning the Exchange Act Defendants' concealed misconduct began to materialize on September 15, 2014, when the Company issued the September 15 Press Release announcing that:  (i) the Company's Audit Committee had concluded that investors could no longer rely upon the Company's publicly reported financial results for FY11, FY12, and FY13 during the time that it would take Bankrate to conduct and complete a full internal review by outside counsel and a forensic auditor that Bankrate had retained; (ii) the SEC had begun a non-public formal investigation of Bankrate's financial reporting for FY12, with a principal focus on 1Q12 and 2Q12, to determine "whether accounting entries in these periods may have impacted the Company's reported results, including relative to market expectations" (in other words, the SEC commenced an investigation into whether the Company manipulated its financial results to "meet-or-beat" market consensus

29

estimates); and (iii) Defendant DiMaria had resigned from his position as CFO of the Company, but would remain with the Company as a senior vice president.

91.     The Company's revelations regarding:  (i) the Audit Committee's conclusion that investors could no longer rely upon Bankrate's financial results for the three prior fiscal years; (ii) the SEC and internal investigations; and (iii) the abrupt resignation of the Company's CFO and the chief arbiter of its financial results, Defendant DiMaria, were foreseeable consequences of, and within the zone of risk created by, the Exchange Act Defendants' falsification of Bankrate's financial results.  These disclosures concerning, and materialization of the risk concealed by, the Exchange Act Defendants' misconduct, had a material effect on Bankrate's stock price.  Specifically, on September 15, 2014, the price of Bankrate common stock declined by $1.90 per share, or 13.75%, from a close of $13.82 on the prior trading day, September 12, 2014, to close at $11.92 per share on extremely heavy trading volume.

92.     Less than a month later, on October 9, 2014, Bankrate filed the October 9 Form 8-K with the SEC, in which the Company disclosed that it had *terminated* DiMaria from his remaining role with the Company for cause on October 8, 2014 because DiMaria had refused to cooperate in the ongoing SEC and internal investigations of Bankrate's financial results for FY11, FY12, and FY13.  Bankrate further disclosed that the DOJ also had opened an investigation into the same financial reporting issues that the SEC was investigating.

93.     As a direct result of these partial corrective disclosures and or materializations of the previously concealed risks contained in the October 9 Form 8-K, the price of Bankrate common stock declined an additional $1.23 per share, or 11.20%, on very heavy trading volume.

9.     **Bankrate's Restatement of its Financial Results**

94.     The SEC found that all of the improper accounting entries outlined above violated GAAP and constituted material misstatements.  These improper accounting entries were reversed as part of the Company's Restatement announced on June 17, 2015.

95.     Indeed, after its Audit Committee conducted an internal review of its FY11, FY12, and FY13 financial statements for approximately eight months following the end of the Class Period, the Company announced the Restatement in the June 17 Press Release.  As alleged above, the June 17 Press Release, which also was filed with the SEC as an exhibit to the Company's current report on Form 8-K with the same date, stated in part:

> As previously announced, Bankrate's Audit Committee, with the assistance of independent counsel and independent forensic accountants, conducted an internal review of years 2011, 2012 and 2013.   During the course of that review, ***Bankrate's Audit Committee concluded that the accounting for certain historical business activities had been recorded in a manner that was not consistent with generally accepted accounting principles in the United States (GAAP)***.

96.     Also on June 17, 2015, the Company filed with the SEC its FY14 Form 10-K, which was more than four months late and included restated financial results for each quarterly and fiscal-year period from 3Q11 through FY13.  In its audit opinion certifying the Company's FY14 results, Grant Thornton LLP, Bankrate's auditor, concluded that "the 2012 and 2013 financial statements have been restated to correct certain misstatements," each of which had previously been issued or incorporated by reference in Bankrate's SEC filings, including those incorporated by reference into the March 2014 Offering Documents.

97.     The Restatement confirmed the existence and impact of Defendants' Class Period "misstatements" on Bankrate's 2Q12 and FY12 financial results.  Further, and as alleged more fully below at ¶¶ 202-07, the Company's Restatement of the full year and quarterly 2012

financial results constitutes an admission that those results were materially misstated when issued during the Class Period.

98.    The Company also admitted in the FY14 Form 10-K that the Restatement included corrections to the following improper accounting entries, among others:  (i) "[c]ertain accruals of revenue related reserves were incorrectly recorded beginning in the quarter ended September 30, 2011 and continuing through the end of the quarter ended June 30, 2013"; (ii) "[a]ccruals for the management incentive plan ("MIP") expense were recorded incorrectly beginning in the quarter ended December 31, 2010 and continuing through the quarter ended June 30, 2012"; (iii) "reconciliations of the accrued cost of search engine marketing expenses were not properly prepared, causing these expenses to be accrued incorrectly" during the periods covered by the Restatement; (iv) "[s]ome service and maintenance costs were depreciated over periods that were longer than those supported by the underlying contracts" and "certain information technology expenses were incorrectly recorded as fixed assets" during the periods covered by the Restatement; and (v) "[c]ertain accruals and subsequent payments were incorrectly accounted for as consideration transferred and initially recognized as contingent liabilities in acquisition accounting related to the acquisition of certain entities."

99.    With respect to the Company's "control activities," Bankrate disclosed in the FY14 Form 10-K that its "internal controls over . . . accounting for revenue accruals, accounting for certain expenses and accounting for certain areas of income taxes did not operate effectively" during the Class Period because:  (i) "certain former members of management" deliberately overrode these controls; (ii) Bankrate "did not sufficiently monitor the accuracy of journal entries with respect to the accounting for revenues and associated costs, accounting for classification of expenses, accounting for compensation expense, certain accrued liability

reconciliations and accounting for income taxes"; and (iii) the Company did "not perform[]" "some account balance sheet reconciliations . . . with sufficient timeliness or precision to identify possible errors."

100.    According to the FY14 Form 10-K, to address these material deficiencies, Bankrate implemented various remediation efforts, including, among other actions, firing DiMaria, and ensuring that "certain other persons formerly involved in our financial reporting function have resigned or are no longer in that function."

101.    The Company further admitted that the Restatement was necessary as the material weakness in Bankrate's internal controls identified in the FY14 Form 10-K "resulted in misstatements in [Bankrate's] accounting for revenue, expenses, fixed assets, accounting for income taxes, and other items, and their aggregate impact resulted in a restatement of [the Company's] consolidated financial statements and related financial disclosures for the years ended December 31, 2013, 2012, and 2011."   Thus, Bankrate made clear that the material weakness as of December 31, 2014 was present and adversely affecting the Company at the start of the Class Period and that these internal control deficiencies led to the misstatements requiring the Restatement.

102.    Furthermore, Bankrate's admissions rendered false Defendant DiMaria's Class Period SOX Section 302 and 906 Certifications, which stated with respect to each of Bankrate's financial reports filed with the SEC that, based on his knowledge, *inter alia*:  (i) such report did not contain any material misstatements or omissions; and (ii) the financial statements contained therein fairly presented, in all material respects, the financial results of operations.

103.    The Restatement also confirmed that without the now-admitted accounting improprieties and the Exchange Act Defendants' deliberate decision to override the Company's internal controls, Bankrate would have reported results that fell below market expectations.

104.    For example, as set forth below, as a result of the Restatement, Bankrate's 1Q12 miss of analyst consensus estimates for Adjusted Net Income would have been 139.3% greater without the admitted accounting improprieties.  Likewise, as noted in the chart below, the Company's miss of analyst consensus estimates for Adjusted EPS, GAAP Net Income, GAAP EPS, and Adjusted EBITDA would have been 71.4%, 61.5%, 35.7%, and 154.3% greater, respectively, without utilization of improper accounting methods:

| **1Q12** | | | | | |
|---|---|---|---|---|---|
| | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS | Adj. EBITDA |
| | | | | | |
| Original Results | $10.2 million | $0.10 | $18.7 million | $0.18 | $37.8 million |
| Restated Results | $8.6 million | $0.09 | $17.0 million[2] | $0.17 | $35.3 million |
| % of Difference | (15.28%) | (10.0%) | (9.09%) | (5.56%) | (6.6%) |
| | | | | | |
| Analyst Consensus[3] | $12.7 million | $0.13 | $19.9 million | $0.19 | $39.4 million |
| Original Results | $10.2 million | $0.10 | $18.7 million | $0.18 | $37.8 million |
| Beat/(Miss)—Original | ($2.5 million) | ($0.03) | ($1.2 million) | ($0.01) | ($1.6 million) |
| % of Beat/(Miss) | (19.9%) | (21.9%) | (6.1%) | (7.2%) | (4.1%) |
| | | | | | |
| Analyst Consensus | $12.7 million | $0.13 | $19.9 million | $0.19 | $39.4 million |
| Restated Results | $8.6 million | $0.09 | $17.0 million | $0.17 | $35.3 million |
| Beat/(Miss)— | ($4.1 million) | ($0.04) | ($2.9 million) | ($0.02) | ($4.1 |

---

[2] This was calculated by utilizing the restated amounts of the various amounts Bankrate used to calculate Adjusted Net Income during this period.  If there was no restated amount, as was the case for amortization, Lead Plaintiff utilized the originally reported amount to calculate restated Adjusted Net Income.

[3] Analyst Consensus figures are based upon historical data from Bloomberg Finance L.P.

| | | | | | |
|---|---|---|---|---|---|
| Restated | | | | | million) |
| % of Beat/(Miss) | (32.3%) | (29%) | (14.60%) | (10.5%) | (10.4%) |
| | | | | | |
| % Difference (Orig. & Restated Beat/(Miss)) | (61.5%) | (35.7%) | (139.3%) | (71.4%) | (154.3%) |

105.  Without the accounting improprieties, moreover, in 2Q12, the Company would not have met consensus estimates for Adjusted EPS and Adjusted EBITDA and would have reported a 1,100% greater miss of consensus estimates for Adjusted EPS and a 743% greater miss of consensus estimates for Adjusted EBITDA:

| 2Q12 | | | | | |
|---|---|---|---|---|---|
| | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS | Adj. EBITDA |
| | | | | | |
| Original Results | $16.3 million | $0.16 | $18.2 million | $0.18 | $37.5 million |
| Restated Results | $15.5 million | $0.16 | $17.1 million | $0.17 | $35.3 million |
| % of Difference | (4.77%) | -- | (6.0%) | (5.6%) | (6.1%) |
| | | | | | |
| Analyst Consensus | $10.5 million | $0.10 | $18.3 million | $0.18 | $37.2 million |
| Original Results | $16.3 million | $0.16 | $18.2 million | $0.18 | $37.5 million |
| Beat/(Miss)—Original | $5.8 million | $0.06 | ($0.1 million) | -- | $0.3 million |
| % of Beat/(Miss) | 55.4% | 56.1% | (0.55%) | -- | .81% |
| | | | | | |
| Analyst Consensus | $10.5 million | $0.10 | $18.3 million | $0.18 | $37.2 million |
| Restated Results | $15.5 million | $0.16 | $17.1 million | $0.17 | $35.3 million |
| Beat/(Miss)—Restated | $5.0 million | $0.06 | ($1.2 million) | ($0.01) | ($1.9 million) |
| % of Beat/(Miss) | 48.0% | 56.1% | (6.6%) | (4.5%) | (5.2%) |
| | | | | | |
| % Difference (Orig. & Restated Beat/(Miss)) | (13.4%) | -- | (1,100%) | (4,500%) | (743.33%) |

106.    The combined effect of Defendants' admitted accounting improprieties on the Company's FY12 financial results was clear.  As noted in the chart below, by restating its results, Bankrate's miss of consensus estimates for GAAP Net Income and EPS grew by 143.8% and 153.9%, respectively.  Additionally, Bankrate's miss for Adjusted Net Income and EPS grew by 1,267.9% and 54.1%, respectively.  Finally, Bankrate's miss for Adjusted EBITDA grew by 47%.

| **FY12** | | | | | |
|---|---|---|---|---|---|
| | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS | Adj. EBITDA |
| | | | | | |
| Original Results | $29.3 million | $0.29 | $56.0 million | $0.56 | $123.1 million |
| Restated Results | $26.9 million | $0.27 | $52.8 million | $0.54 | $119.1 million |
| % of Difference | -8.2% | -6.9% | -5.8% | -3.6% | -3.3% |
| | | | | | |
| Analyst Consensus | $31 million | $0.30 | $60.5 million | $0.60 | $131.6 million |
| Original Results | $29.3 million | $0.29 | $56.0 million | $0.56 | $123.1 million |
| Beat/(Miss)— Original | ($1.7 million) | ($0.01) | ($4.4 million) | ($0.04) | ($8.5 million) |
| % of Beat/(Miss) | (5.4%) | (4.3%) | (7.4%) | (6.2%) | (6.5%) |
| | | | | | |
| Analyst Consensus | $31 million | $0.30 | $60.5 million | $0.60 | $131.6 million |
| Restated Results | $26.9 million | $0.27 | $52.8 million | $0.54 | $119.1 million |
| Beat/(Miss)— Restated | ($4.0 million) | ($0.03) | ($7.7 million) | ($0.06) | ($12.5 million) |
| % of Beat/(Miss) | (13.1%) | (10.9%) | (100.7%) | (9.6%) | (9.5%) |
| | | | | | |
| % Difference (Orig. & Restated Beat/(Miss)) | (143.8%) | (153.9%) | (1267.9%) | (54.1%) | (47.1%) |

### 10.   The SEC Orders and Complaint

107.   On September 8, 2015, the SEC issued the SEC Orders against Bankrate and Lerner and the SEC Complaint against DiMaria and Gamsey.  As alleged above, the documents memorialized and confirmed the SEC's findings of fraud and wrongdoing, the risk and relevant truth of which partially materialized through the Company's announcements on September 15, 2014 and October 9, 2014.

108.   According to the SEC Orders, the fraudulent conduct outlined therein justified the SEC's institution of cease-and-desist proceedings pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act against Bankrate and Lerner.

109.   The process leading up to the SEC's institution of a cease-and-desist proceeding is detailed.  First, the commencement of such a proceeding "must be authorized by the Commission" following a careful review of the SEC's investigative findings.  To obtain such authorization, the SEC staff submits an "action memorandum" to the Commission that sets forth its recommendation and "provides a comprehensive explanation of the recommendation's factual and legal foundation."  SEC Enforcement Manual § 2.5.1.

110.   Next, "the Commission will consider the recommendation and vote on whether to approve or reject the recommendation."  *Id*. at § 2.5.2.  Typically, recommendations to settle an enforcement action or to consider an offer of settlement are eligible for review in a "closed meeting," during which the SEC staff "orally presents a recommendation to the Commission and answers any questions before the Commission votes on the recommendation."  *Id*. at § 2.5.2.1.

111.   Under both Section 8A of the Securities Act and 21C of the Exchange Act – the statutes pursuant to which the SEC Orders were issued – the SEC is authorized to enter a cease-and-desist order if it "finds, after notice and opportunity for hearing, that any person is violating,

has violated, or is about to violate any provision of this subchapter, or any rule or regulation thereunder."

112.    In addition, under both statutory provisions, the SEC may impose monetary penalties in a cease-and-desist proceeding if it "finds, on the record, after notice and opportunity for hearing, that such person:  (i) is violating or has violated any provision of this subchapter, or any rule or regulation issued under this subchapter. . . or . . . is or was a cause of the violation of any provision of this subchapter, or any rule or regulation thereunder"; and (ii) "such penalty is in the public interest."   15 U.S.C. § 77h–1; 15 U.S.C. § 78u-2.  The factors that the SEC considers in deciding to impose the maximum penalty amount include whether:  (i) "the act or omission . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and (ii) "such act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission."  *Id.*

113.    As a result of the fraudulent conduct alleged herein and the findings outlined in the SEC Order against Bankrate, the SEC found that Bankrate committed the following securities "violations":

> Bankrate violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer or sale of securities, and ***Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities***.
>
> Bankrate violated Section 13(a) of the Exchange Act and Rules 13a-11, 13a-13, and 12b-20 thereunder, which require that every issuer of a security registered pursuant to Section 12 of the Exchange Act file with the Commission, among other things, information, documents, quarterly reports, and current reports as the Commission may require, and mandate that periodic reports contain such further material information as may be necessary to make the required statements not misleading.

Because Bankrate improperly recorded its revenue, expenses, and accruals, its books, records, and accounts did not, in reasonable detail, accurately and fairly reflect its transactions and dispositions of assets.

Bankrate failed to implement internal accounting controls relating to its revenue, expense, and accrual accounts which were sufficient to provide reasonable assurances that these accounts were accurately stated in accordance with GAAP.

Bankrate violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, which require reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets, and to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP.

114.    Likewise, as a result of the fraudulent conduct alleged herein and the findings outlined in the SEC's Order against Lerner, the SEC found that Lerner committed the following securities "violations":

Lerner willfully violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer or sale of securities, and **Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities**.

Lerner willfully violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, which prohibit persons from knowingly circumventing or knowingly failing to implement a system of internal accounting controls, knowingly falsifying any book, record or account, and directly or indirectly falsifying or causing to be falsified any book, record, or account.

Lerner willfully violated Rule 13b2-2 of the Exchange Act, which prohibits an officer or director of an issuer from, directly or indirectly: (1) making or causing to be made a materially false or misleading statement to an accountant or (2) omitting to state, or causing another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with, among other things, a required audit, review or examination of the issuer's financial statements or

the preparation or filing of any document or report required to be filed with the Commission.

Lerner willfully aided and abetted and caused Bankrate's violation of Section 13(a) of the Exchange Act and Rules 13a-11, 13a-13, and 12b-20 thereunder, which require that every issuer of a security registered pursuant to Section 12 of the Exchange Act file with the Commission, among other things, information, documents, quarterly reports, and current reports as the Commission may require, and mandate that periodic reports contain such further material information as may be necessary to make the required statements not misleading.

Lerner willfully aided and abetted and caused Bankrate's violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, which require reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets, and to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP.

As a result of the conduct described herein, Lerner willfully violated, and willfully aided and abetted the violation of, the aforementioned provisions of the Securities Act and Exchange Act within the meaning of Section 4C(a)(3) and Rule 102(e)(1)(iii). (Exchange Act Section 4C(a)(3) and Rule 102(e)(1)(iii) of the Commission's Rules of Practice provide, in pertinent part, that "[t]he Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found . . . [t]o have willfully violated, or willfully aided and abetted the violation of, any provision of the Federal securities laws or the rules and regulations thereunder." 17 C.F.R. § 201.102(e)(1)(iii)).

115.   As a result of the violations set forth in the SEC Order against Bankrate, the SEC

levied sanctions against Bankrate ordering, among other things, that:

Bankrate cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-11, and 13a-13 thereunder.

40

Bankrate pay a civil money penalty in the amount of ***$15,000,000***
to the Securities and Exchange Commission.

116.     Likewise, the SEC Order against Lerner levied sanctions against the former

Bankrate Vice President of Finance ordering, among other things, that:

> Lerner cease and desist from committing or causing any violations
> and any future violations of Section 17(a) of the Securities Act and
> Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the
> Exchange Act, and Rules 10b-5, 12b-20, 13a-11, 13a-13, 13b2-1,
> and 13b2-2 thereunder.
>
> Lerner is denied the privilege of appearing or practicing before the
> Commission as an accountant until such later date as determined
> by the Commission.
>
> Lerner is prohibited for a period of 5 years from the date of the
> SEC Order from acting as an officer or director of any issuer that
> has a class of securities registered pursuant to Section 12 of the
> Exchange Act or that is required to file reports pursuant to Section
> 15(d) of the Exchange Act.
>
> Lerner shall pay a civil money penalty in the amount of $150,000
> and disgorgement of $30,045 and prejudgment interest of $2,571
> to the Securities and Exchange Commission.

**B.     The Exchange Act Defendants' Materially False and Misleading Statements**

**Bankrate's 2Q12 Financial Results**

117.     On July 31, 2012, Bankrate issued a press release announcing the Company's

financial results for 2Q12 (the "July 31, 2012 Press Release").  The July 31, 2012 Press Release

was attached to the Company's current report on Form 8-K filed with the SEC on that same day.

In the heading of the July 31, 2012 Press Release, the Company highlighted, among other things:

"Q2 Adjusted EBITDA of $37.5 million, up 25%" and "Q2 Adjusted EPS of $0.18, up 50%."

118.     The July 31, 2012 Press Release further stated in pertinent part:

> ***Net income for the quarter was $16.3 million*** or $0.16 per fully
> diluted share, compared to a loss of $39.7 million, or $0.44 per
> fully diluted share in the second quarter of 2011.  Earnings per
> fully diluted share, excluding stock based compensation expense,

41

amortization, IPO and deal related expenses *("Adjusted EPS"), were $0.18 for the second quarter of 2012*, compared to Adjusted EPS of $0.12 for the second quarter of 2011, *representing an increase of 50%.*

Adjusted earnings before interest, taxes, depreciation, and amortization, excluding stock based compensation expense and IPO and deal related expenses *("Adjusted EBITDA"), were $37.5 million, with a margin of 30.7%, in the second quarter of 2012* compared to $30.0 million, with a margin of 30.5%, in the second quarter of 2011, *an increase of 25%.*

\*     \*     \*

*Net income was $26.4 million* or $0.26 per fully diluted share for the first half of 2012, compared to a loss of $34.6 million, or $0.39 per fully diluted share in the first half of 2011. *Adjusted EPS were $0.36 for the six months ended June 30, 2012*, compared to $0.25 for the same period in 2011, *representing an increase of 44%.*

*Adjusted EBITDA was $75.4 million for the first half of 2012*, compared to $60.9 million in the first half of 2011, *an increase of 24%.*

119.    Identifying Bankrate's "Second Quarter 2012 Financial Highlights," the July 31, 2012 Press Release reiterated that "Adjusted EBITDA of $37.5 million in the second quarter was 25% or $7.5 million higher compared to the second quarter of 2011."

120.    The July 31, 2012 Press Release also included the Company's 2Q12 financial statements, which reported GAAP Net Income, Adjusted Net Income, Adjusted EPS, and Adjusted EBITDA for 2Q12 as follows:

|  | Three months ended June 30, 2012 | Six months ended June 30, 2012 |
|---|---|---|
| GAAP Net Income | $16,276,000 | $26,427,000 |
| Adjusted Net Income | $18,180,000 | $36,929,000 |
| Adjusted EPS | $0.18 | $0.36 |
| Adjusted EBITDA | $37,518,000 | $75,363,000 |

121.    Also on July 31, 2012, the Company hosted a conference call with analysts and investors to discuss its 2Q12 financial results (the "July 31, 2012 Conference Call").  During the July 31, 2012 Conference Call, Defendant DiMaria stated, in part:

> ***Overall, Q2 came in line with our expectations***. . . .  Second-quarter adjusted EBITDA of $37.5 million increased by 35% versus the $30 million we posted in Q2, 2011.
>
> GAAP net income was $16.3 million for Q2 2012, . . . . versus a net loss of $39.7 million in Q2 2011 . . . .  Our adjusted net income, which excludes certain non-operating and non-cash items in Q2 was $18.2 million, representing EPS of $0.18 versus net income of $12.3 million or EPS of $0.12 in Q2 2011.  So adjusted EPS increased 50%.
>
> \*       \*       \*
>
> The adjusted EBITDA margin for the business was 30.7% in Q2 2012, compared to 30.5% for Q2 2011.

122.    On August 13, 2012, Bankrate filed with the SEC its quarterly report on Form 10-Q for 2Q12 (the "2Q12 Form 10-Q"), which was signed by Defendant DiMaria.  Attached to the 2Q12 Form 10-Q were certifications signed by Defendant DiMaria pursuant to SOX Sections 302 and 906, which falsely represented, among other things, that:  (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and (ii) "the financial statements, and other information in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as or, and for, the periods presented in this report."  In addition, the financial statements contained in the 2Q12 Form 10-Q repeated the Exchange Act Defendants' materially false and misleading GAAP Net Income presented in the July 31, 2012 Press Release and discussed on the July 31, 2012 Conference Call, as alleged above in ¶¶ 117-21.

123.    At the times they were made, the statements made in the July 31, 2012 Press Release, during the July 31 Conference Call, and in the August 13, 2012 Form 10-Q were

materially false and misleading and failed to disclose material facts, as discussed *supra* at Factual Background, for at least the following reasons:

- As alleged above in ¶¶ 7-8, 44, and 51-55, the Exchange Act Defendants, upon learning that Bankrate's preliminary financial results for 2Q12, including Adjusted EBITDA and Adjusted EPS fell short of analyst estimates, pursued a campaign to fabricate those metrics to meet or exceed analyst consensus estimates.

- As alleged above in ¶¶ 7-11, and 56-70, the Exchange Act Defendants, Lerner and Gamsey directed various divisions within Bankrate to fabricate approximately $800,000 in revenue in violation of GAAP.

- As alleged above in ¶¶ 12, 46-50, and 71-78, the Exchange Act Defendants, Lerner and Gamsey directed various divisions within Bankrate to use illegal "cushion" or "cookie jar" expense accruals to reduce 2Q12 expenses by approximately $400,000, and Lerner improperly decided not to book $99,000 in known accounting fees to 2Q12, but instead to book them improperly to 3Q12, as alleged above in ¶¶ 13, and 79-82.

124.    Moreover, Bankrate has ***admitted*** that its 2Q12 financial results highlighted in the July 31, 2012 Press Release, during the July 31 Conference Call, and in the August 13, 2012 Form 10-Q were materially false and misleading and failed to disclose material facts at the time they were issued.

125.    *First*, as alleged below in ¶¶ 202-07, because GAAP provides that restatements of historical financial statements are only required to correct past *material* misstatements, Bankrate's Restatement is an admission that the Company's financial statements were materially misleading at the time they were issued.

126.    *Second*, Bankrate's FY14 Form 10-K filed with the SEC on June 17, 2015 setting forth the Company's Restatement states that the Bankrate Audit Committee concluded, based upon its internal review of the Company's previously issued financial statements for FY11, FY12, and FY13, "that the accounting entries for certain historical business activities had been recorded in a manner that was not consistent with [GAAP]."  As a result, Bankrate's 2Q12

GAAP Net Income, Adjusted Net Income, Adjusted EPS, and Adjusted EBITDA were materially misstated at the time they were disseminated to the public, as follows:

|  | GAAP Net Income/(Loss) | Adj. Net Income/ (Loss) | Adj. EPS | Adj. EBITDA |
|---|---|---|---|---|
| Original Results | $16.3 million | $18.2 million | $0.18 | $37.5 million |
| Restated Results | $15.5 million | $17.1 million[4] | $0.17 | $35.3 million |
| % of Difference | -4.8% | -6.0% | -5.6% | -6.0% |

127.    In addition to admitting material falsity through the Restatement, Bankrate also admitted in the FY14 Form 10-K that its restated 2Q12 results included adjustments to correct the following accounting improprieties:  (i) "[c]ertain accruals of revenue related reserves were incorrectly recorded beginning in the quarter ended September 30, 2011 and continuing through the end of the quarter ended June 30, 2013;" (ii) "[a]ccruals for the management incentive plan ("MIP") expense were recorded incorrectly beginning in the quarter ended December 31, 2010 and continuing through the quarter ended June 30, 2012;" (iii) "reconciliations of the accrued cost of search engine marketing expenses were not properly prepared, causing these expenses to be accrued incorrectly" during the periods covered by the Restatement; (iv) "[s]ome service and maintenance costs were depreciated over periods that were longer than those supported by the underlying contracts" and "certain information technology expenses were incorrectly recorded as fixed assets" during the periods covered by the Restatement; and (v) "[c]ertain accruals and subsequent payments were incorrectly accounted for as consideration transferred and initially recognized as contingent liabilities in acquisition accounting related to the acquisition of certain entities."

---

[4] This was calculated by utilizing the restated amounts of the various amounts Bankrate used to calculate Adjusted Net Income during this period.  If there was no restated amount, as was the case for amortization, Lead Plaintiff utilized the originally reported amount to calculate restated Adjusted Net Income.

128.  *Third*, as alleged above in ¶¶ 25, 99, and 103, Bankrate further admitted in the FY14 Form 10-K that its materially misstated 2Q12 financial results were due to senior management's deliberate decision to override the Company's internal controls.

129.  In addition to the Company's admission that its 2Q12 financial results were materially misstated during the Class Period, the SEC found, based upon its investigation, which included reviewing Company records, *inter alia*, that:  (i) DiMaria, Lerner and Gamsey engaged in a scheme "that involved fraudulent manipulation of the company's financial results to meet analyst expectations"; (ii) DiMaria, Lerner and Gamsey "engaged in a scheme to fabricate revenues and avoid booking certain expenses to meet analyst estimates"; and (iii) "Bankrate consequently overstated its second quarter 2012 net income."

130.  Similarly, as set forth in the SEC Complaint, based upon the findings from its investigation, the SEC concluded, in part, that "***DiMaria and Gamsey intentionally manipulated Bankrate's financial results for the second quarter of 2012 in order to meet or exceed analyst consensus estimates for Bankrate's key financial metrics***".

131.  Finally, the SEC determined that but for the improper accounting entries described above, Bankrate's reported Adjusted EPS of $0.18, Net Income of approximately $16.3 million, and Adjusted EBITDA of $37.5 million for 2Q12 would have been only $0.17, approximately $15.5 million, and approximately $36.2 million, respectively, missing analyst consensus estimates.  In this regard, the SEC concluded that:  (i) Bankrate's misstatement of Adjusted EBITDA "was material because it allowed Bankrate to exceed analyst consensus estimates for this key financial metric"; (ii) Bankrate's misstatement of its Adjusted EPS "was material because it allowed Bankrate to meet analyst consensus estimates for this key financial metric"; and (iii) as a result of the conduct described in the SEC Orders, "Bankrate violated . . .

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities."

**Bankrate's FY12 Financial Results**

132.    On February 12, 2013, Bankrate issued the February 12, 2013 Press Release announcing the Company's financial results for FY12, which incorporated Bankrate's materially false and misleading financial results for 2Q12 (the "February 12, 2013 Press Release").  The February 12, 2013 Press Release was attached to the Company's current report on Form 8-K filed with the SEC on that same day and signed by Defendant DiMaria.  The February 12, 2013 Press Release stated in pertinent part as follows:

> For the full year 2012, net income was $29.3 million or $0.29 per fully diluted share, compared to a net loss of $13.4 million, or $0.14 per fully diluted share in 2011.
>
> . . . .  Adjusted EPS were $0.56 for the full year 2012, compared to $0.61 in 2011, representing a decrease of 8% . . . .  For the full year 2012, Adjusted EBITDA were $123.1 million.

133.    The February 12, 2013 Press Release also included the Company's materially false and misleading FY12 financial statements, which reported GAAP Net Income, Adjusted Net Income, Adjusted EPS, and Adjusted EBITDA for FY12 as follows:

|  | Year ended December 31, 2012 |
| --- | --- |
| GAAP Net Income | $29,331,000 |
| Adjusted Net Income | $56,030,000[5] |
| Adjusted EPS | $0.56 |
| Adjusted EBITDA | $123,137,000 |

134.    On March 1, 2013, Bankrate filed with the SEC its annual report on Form 10-K for FY12 (the "FY12 Form 10-K"), which was signed by Defendant DiMaria.  Attached to the

---

[5] This was calculated by utilizing the restated amounts of the various amounts Bankrate used to calculate Adjusted Net Income during this period.  If there was no restated amount, as was the case for amortization, Lead Plaintiff utilized the originally reported amount to calculate restated Adjusted Net Income.

FY12 Form 10-K were certifications signed by Defendant DiMaria pursuant to SOX Sections 302 and 906, which falsely represented, among other things, that:  (i) "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and (ii) "the financial statements, and other information in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as or, and for, the periods presented in this report."  The FY12 Form 10-K also repeated the Exchange Act Defendants' representations in the February 12, 2013 Press Release regarding the Company's GAAP Net Income and Adjusted EBITDA for FY12 that are set forth above in ¶¶ 132-33.  In addition, the FY12 Form 10-K repeated the Exchange Act Defendants' materially false and misleading representations regarding 2Q12 GAAP Net Income presented in the 2Q12 Form 10-Q and the July 31, 2012 Press Release, and discussed on the July 31, 2012 Conference Call, as alleged above in ¶¶ 117-22.

135.    Each of the foregoing statements set forth above in ¶¶ 132-34 addressing Bankrate's financial results for FY12 was materially false and misleading when made for reasons alleged above in ¶¶ 123-31.

136.    In addition, as Bankrate admitted in its FY14 Form 10-K filed with the SEC on June 17, 2015 setting forth the Company's Restatement of its previously issued financial results, the Bankrate Audit Committee concluded based upon its internal review of the Company's previously issued financial statements for FY11, FY12, and FY13 "that the accounting entries for certain historical business activities had been recorded in a manner that was not consistent with [GAAP]."  As a result, Bankrate's FY12 GAAP Net Income, Adjusted Net Income,

Adjusted EPS, and Adjusted EBITDA were materially misstated at the time they were disseminated to the public as follows:

|  | GAAP Net Income/(Loss) | Adj. Net Income/(Loss) | Adj. EPS | Adj. EBITDA |
|---|---|---|---|---|
| Original Results | $29.3 million | $56.0 million | $0.56 | $123.1 million |
| Restated Results | $26.9 million | $52.8 million | $0.54 | $119.1 million |
| % of Difference | -8.2% | -5.8% | -3.6% | -9.4% |

**Bankrate's March 2014 Offering Documents**

137.    In March 2014, the Company completed the March 2014 Offering of 16,100,000 shares of Bankrate common stock by means of the March 2014 Offering Documents.  The March 2014 Offering Documents omit material information and contain material misstatements that are false and misleading for the reasons set forth above in ¶¶ 123-31, and 135-36.  Specifically, the March 2014 Offering Documents:

- contain the materially false and misleading FY12 GAAP Net Income and Adjusted EBITDA figures presented in the FY12 Form 10-K that are set forth above in ¶ 134.

- incorporate by reference the Company's FY13 Form 10-K, which contained the Exchange Act Defendants' materially false and misleading 2Q12 GAAP Net Income presented in the 2Q12 Form 10-Q and the July 31, 2012 Press Release, and discussed on the July 31, 2012 Conference Call, as alleged above in ¶¶ 117-18, 120-22.

- incorporate by reference the certifications signed by Defendant DiMaria pursuant to SOX Sections 302 and 906, which falsely represented, among other things, that "the financial statements, and other information in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as or, and for, the periods presented in this report."

- contain DiMaria's signature on the February 27, 2014 Registration Statement assuring investors that, "[p]ursuant to the requirements of the Securities Act of 1933 the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3," while DiMaria knew that Bankrate's 2012 financial information incorporated in the Offering Documents was materially misstated and that he and Bankrate had violated Section 17 of the Securities Act, which prohibits fraudulent conduct in the offer or sale of securities.

## C. Summary of Scienter Allegations for Exchange Act Claims

138.    As alleged in detail above in the Factual Background Section, numerous facts give rise to a strong inference that, throughout the Class Period, the Exchange Act Defendants knew or recklessly disregarded that the statements identified above were materially false and misleading and/or omitted material facts when made.

139.    In fact, as alleged above in ¶¶ 7-13, 25, 44-86, 99, and 103, and as the SEC has now found, DiMaria engaged in a deliberate scheme to defraud Bankrate's investors by, among other things:

- Creating and using certain accrual accounts as "cushion" accounts or "cookie jar reserves," including determining when those accounts should be written off or used to "tune the numbers" (i.e. to inflate Bankrate's financials and/or meet or exceed analyst consensus estimates);

- Instructing Bankrate accounting personnel via email in 1Q12 to improperly charge auditor bills to accrued deal cost and to claim that it was a "mistake" if asked;

- After learning on July 6, 2012 that Bankrate's preliminary financial results for 2Q12 fell short of analyst estimates and noting that the preliminary results were "going the wrong direction," instructing Bankrate accounting personnel that Bankrate's Adjusted EBITDA for 2Q12 needed to be at least $37 million;

- Directing Bankrate accounting personnel via emails sent in July 2012 to make unsupported, round-dollar accounting entries in order to meet or exceed analyst consensus estimates;

- Further instructing that these unsupported accounting entries be kept "under the radar";

- Demanding that the Insurance division book $300,000 in unsupported 2Q12 revenues and that the Credit Cards division book $500,000 in unsupported 2Q12 revenues;

- When the Credit Cards division refused to book the entire $500,000 amount instructed, directing, via email in July 2012, that the $305,000 difference be booked instead to Bankrate Core;

- Knowing about the above-referenced improper and unsupported accounting entries and the manner in which they were booked, but failing to inform Bankrate's auditor that numerous entries for 2Q12 were unsupported and made only to meet or exceed analyst consensus estimates;

- Failing to disclose to investors Bankrate's true financial condition;

- Signing and certifying, pursuant to SOX Sections 302 and 906, Bankrate's 2Q12 Form 10-Q, which contained material misstatements and omissions regarding Bankrate's financial condition; and

- Profiting from this scheme by selling in August 2012, a substantial portion of his stock at artificially inflated prices just days after he certified Bankrate's materially false and misleading 2Q12 financial results.

**The SEC Has Found that Bankrate and DiMaria Violated the Federal Securities Laws**

140.   As discussed herein, the SEC Order, to which Bankrate consented pursuant to an Offer of Settlement and pursuant to which Bankrate agreed to pay a $15 million penalty, sets forth the results of the SEC's investigation:  Bankrate, through its CFO, Defendant DiMaria and other Bankrate accounting executives, "intentionally manipulate[ed] its financial results for the second quarter of 2012 in order to meet and/or exceed analyst consensus estimates for key financial metrics.  As a result of this manipulation, Bankrate materially overstated its financial

results for the second quarter of 2012." SEC Order at 2. Accordingly, the SEC Complaint

charges Defendant DiMaria with multiple violations of the Exchange Act and the Securities Act.

141. The October 9 Press Release announced, *inter alia*, that the DOJ likewise was

investigating Bankrate concerning the same issues that the SEC had been investigating.

142. While the existence of government investigations into the precise misconduct

alleged herein alone is sufficient indicia of scienter, the SEC findings of wrongdoing and fraud

demonstrate deliberate conduct on the part of Defendant DiMaria.

**Bankrate's Admission of Material Weaknesses in Its Internal Controls**

143. In the FY14 Form 10-K, Bankrate admitted that there was a material weakness in

its internal controls over financial reporting as of December 31, 2014 because of failures in its

"control environment" and "control activities." Because Bankrate has stated that its controls did

not change materially between FY11 and FY14, a material weakness in the Company's internal

controls over financial reporting existed throughout the Class Period.

144. Specifically, Bankrate has admitted that it failed "to maintain a corporate culture

that sufficiently instilled, prioritized or supported an adequate enterprise-wide attitude of control

consciousness, established, or supported sufficient focus on compliance with appropriate

accounting policies and procedures, or implemented adequately designed and effective operating

controls over accounting policies in accordance with GAAP." Otherwise known as "tone at the

top," meaning the tone set by the top executives, this concept is integral to having effective

internal controls. According to an October 1987 report by the Treadway Commission, one of the

foremost authorities on internal controls:

> [t]he tone set by top management—the corporate environment or
> culture within which financial reporting occurs—is the most
> important factor contributing to the integrity of the financial
> reporting process. Notwithstanding an impressive set of written

> rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.

145.    These control failures directly implicate Defendant DiMaria.  In fact, in the FY14 Form 10-K, the Company conceded that the accounting entries underlying the Restatement were the result of the material weakness in internal controls and ***senior management's deliberate override of such controls***.   In detailing efforts to remediate its Class Period material weakness in its internal controls, the Company confirmed that it had replaced its CFO, Defendant DiMaria, and "certain other persons formerly involved in [Bankrate's] financial reporting function have resigned or are no longer in that function."  The SEC has since pursued securities fraud claims against each of these individuals.

**The Resulting Restatement Is Further Indicia of Scienter**

146.    In the FY14 Form 10-K, Bankrate restated its financial results, including GAAP and Adjusted Net Income, GAAP and Adjusted EPS, and Adjusted EBITDA, for 3Q-4Q/FY11, 1Q-4Q/FY12, and 1Q-4Q/FY13.   Bankrate further admitted that these material misstatements were due, in part, to a material weakness in its internal controls over financial reporting during the Class Period.

147.    The Restatement also confirms that without the now-admitted accounting improprieties and senior management's decision to override the Company's internal controls, Bankrate would have reported results that were far below market expectations.  In the periods the SEC has been investigating—1Q12, 2Q12, and FY12—without the restated entries, Bankrate would either have missed consensus estimates or reported a materially greater miss.  Indeed, with respect to 2Q12 specifically, the SEC Complaint alleges that but for Defendant DiMaria's intentional manipulation of Bankrate's 2Q12 financial results in order to meet or exceed analyst consensus estimates for Bankrate's key financial metrics, Bankrate's reported Adjusted EBITDA

of approximately $37.5 million, Adjusted Net Income of approximately $18.2 million, and Adjusted EPS of $0.18 for 2Q12 would have been only $36.2 million, $17.1 million, and $0.17, respectively, which were $1.0 million, or 2.8% below, $1.2 million, or 6.6% below, and $0.01, or 5.6% below consensus estimates of $37.2 million in Adjusted EBITDA, $18.3 million in Adjusted Net Income, $0.18 in Adjusted EPS, respectively. *See* SEC Compl. ¶¶ 72, 73, 75, 77.

148.    For example, without the admitted accounting improprieties in 2Q12, the Company would not have met consensus estimates for Adjusted EPS and would have reported a greater miss of consensus estimates for Adjusted EPS:

| 2Q12 | | | | |
|---|---|---|---|---|
| | GAAP Net Income | Adj. Net Income | Adj. EPS | Adj. EBITDA |
| Original Results | $16.3 million | $18.2 million | $0.18 | $37.5 million |
| Restated Results | $15.5 million | $17.1 million | $0.17 | $35.3 million |
| % of Difference | (4.77%) | (6.0%) | (5.6%) | (6.1%) |
| | | | | |
| Analyst Consensus | $10.5 million | $18.3 million | $0.18 | $37.2 million |
| Original Results | $16.3 million | $18.2 million | $0.18 | $37.5 million |
| Beat/(Miss)—Original | $5.8 million | ($0.1 million) | -- | $0.3 million |
| % of Beat/(Miss) | 55.4% | (0.55%) | -- | .81% |
| | | | | |
| Analyst Consensus | $10.5 million | $18.3 million | $0.18 | $37.2 million |
| Restated Results | $15.5 million | $17.1 million | $0.17 | $35.3 million |
| Beat/(Miss)—Restated | $5.0 million | ($1.2 million) | ($0.01) | ($1.9 million) |
| % of Beat/(Miss) | 48.0% | (6.6%) | (4.5%) | (5.2%) |
| | | | | |
| % Difference (Orig. & Restated Beat/(Miss)) | (13.4%) | (1,100%) | (4,500%) | (743.3%) |

149.    The effect of Defendants' admitted accounting improprieties on the Company's FY12 financial results also was clear.  As noted in the below chart, by restating its results, Bankrate's miss of consensus estimates for GAAP Net Income and EPS grew by 153% and 126%, respectively.   Additionally, Bankrate's miss for Adjusted Net Income and EPS grew 65.4% and 37.9%, respectively.

| **FY12** | | | | | |
|---|---|---|---|---|---|
| | GAAP Net Income | GAAP EPS | Adj. Net Income | Adj. EPS | Adj. EBITDA |
| Original Results | $29.3 million | $0.29 | $56.0 million | $0.56 | $123.1 million |
| Restated Results | $26.9 million | $0.27 | $52.8 million | $0.54 | $119.1 million |
| % of Difference | (8.2%) | (6.9%) | (5.8%) | (3.6%) | (3.3%) |
| | | | | | |
| Analyst Consensus | $31.0 million | $0.30 | $60.5 million | $0.60 | $131.6 million |
| Original Results | $29.3 million | $0.29 | $56.0 million | $0.56 | $123.1 million |
| Beat/(Miss)—Original | ($1.7 million) | ($0.01) | ($4.4 million) | ($0.04) | ($8.5 million) |
| % of Beat/(Miss) | (5.4%) | (3.3%) | (7.4%) | (6.2%) | (6.5%) |
| | | | | | |
| Analyst Consensus | $31.0 million | $0.30 | $60.5 million | $0.60 | $131.6 million |
| Restated Results | $26.9 million | $0.27 | $52.8 million | $0.54 | $119.1 million |
| Beat/(Miss)—Restated | ($4.0 million) | ($0.03) | ($7.7 million) | ($0.06) | ($12.5 million) |
| % of Beat/(Miss) | (13.3%) | (10.9%) | (100.7%) | (9.6%) | (9.5%) |
| | | | | | |
| % Difference (Orig. & Restated Beat/(Miss)) | (143.8%) | (153.9%) | (1,267.9%) | (54.1%) | (47.1%) |

**The False SOX Certifications Are Also Indicia of Scienter**

150. Further supporting an inference of scienter with respect to Defendant DiMaria is his signed SOX certifications, as set forth in pertinent part above in ¶¶ 16, 122, and 134, in which Defendant DiMaria attested that, *inter alia*, based upon his personal evaluation of the Company's disclosure controls and procedures designed by him or under his supervision to ensure that he and the other certifying officer were timely apprised of material information concerning the Company, he had concluded that such controls were effective.

151. Because SOX requires Defendant DiMaria to certify that the Company has designed, established, and maintained effective internal controls, he knew or was reckless in not knowing that Bankrate's control environment was materially deficient during the Class Period. This is particularly true where Bankrate has admitted that the Class Period accounting entries

underlying the Restatement were the result of, among other things, the material weakness in internal controls and senior management's (i.e. DiMaria's) deliberate override of such controls.

**Defendant DiMaria's Resignation and Termination from the Company Support and Inference of Scienter**

152.    The September 15 Press Release announced concurrently:  (i) the Bankrate Audit Committee's conclusion that investors could no longer rely upon the Company's publicly reported financial results for FY11, FY12, and FY13 during the time it would take Bankrate to conduct and complete a full internal review by outside counsel and a forensic auditor that Bankrate had retained; (ii) the SEC's formal investigation into the Company's 2012 financial reporting and (iii) that Defendant DiMaria had resigned as CFO.

153.    Weeks later, the October 9 Form 8-K disclosed that the Company had ***terminated Defendant DiMaria for cause***, and that the DOJ had launched an investigation into the same issues concerning Bankrate's financial reporting that were under investigation by the SEC.  The October 9 Form 8-K further revealed that the cause for Defendant DiMaria's termination was his ***refusal to cooperate with the SEC's investigation***, thus supporting the strong inference that Defendant DiMaria would implicate himself in the illicit scheme by cooperating because he knew that the financial statements at issue were materially false and misleading when he attested to their accuracy upon release to the market and when he made the suspiciously-timed insider stock trades, as alleged above in ¶¶ 16, 83-86, 122, and 134..

154.    The Company has since confirmed that DiMaria resigned and was terminated for the accounting improprieties alleged herein.  In fact, to remediate its Class Period material weakness in its internal controls, the Company confirmed that it replaced its CFO, Defendant DiMaria, and "certain other persons formerly involved in [Bankrate's] financial reporting function have resigned or are no longer in that function."

**Defendant DiMaria's Insider Sales Also Support an Inference of Scienter**

155. In addition, Defendant DiMaria had a motive to issue the Company's false financial statements alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales of his Bankrate common stock that were highly suspicious in both amount and timing. Indeed, Defendant DiMaria sold substantial amounts of his Bankrate shares shortly after he directed the accounting improprieties detailed herein and the Company reported its materially false and misleading financial results designed to meet market expectations, as set forth in the following table:

| Date of Sale | Number of Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 08/09/2012 | 79,848 | $19.3399 | $1,544,252.34 |
| 08/10/2012 | 26,729 | $19.0537 | $509,286.35 |
| 08/13/2012 | 600 | $19.149 | $11,489.40 |
| TOTAL | | | $2,065,028.09 |

156. The proceeds that Defendant DiMaria received from the sale of 107,177 shares of Bankrate common stock, over $2 million, was approximately 5 times greater than the $400,000 base salary DiMaria earned as CFO in FY12. Moreover, each of Defendant DiMaria's sales occurred shortly after the Company's issuance of the DiMaria-orchestrated false financial statements alleged herein. Based upon Defendant DiMaria's improper stock sales while he was in possession of material non-public information, the SEC Complaint brings insider trading claims, among others, against Defendant DiMaria. *See* SEC Compl. ¶¶ 81-83; 118-20.

157. Moreover, as alleged in ¶¶ 14 and 197, Defendant DiMaria's bonus compensation was tied to the Company meeting the annual target for Adjusted EBITDA set by Bankrate's Board of Directors.

**Defendant DiMaria's Violation of Bankrate's Internal Policies Is Further Indicia of his Scienter**

158.     The Company's Code of Business Conduct and Ethics applicable to all officers, directors and employees, which is available on Bankrate's website (www.bankrate.com) and incorporated by reference in the Company's annual proxy statements filed on Form DEF 14A with the SEC on April 30, 2012, April 30, 2013, and April 30, 2014, respectively, prohibits employees from engaging in insider trading based upon non-public information about the Company as follows:

> Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business.  All non-public information about the Company should be considered confidential information.   To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

159.     In addition, the Company's Code of Business Conduct and Ethics provides with respect to record-keeping:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions . . . .
>
> *          *          *
>
> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

160.     Based upon the conduct alleged herein, DiMaria violated each of the foregoing internal Bankrate policies.

**Defendant DiMaria's Position in the Company Supports an Inference of His and Bankrate's Scienter**

161.    In addition to the specific acts enumerated above, Defendant DiMaria, because of his high-level position at Bankrate, controlled the contents of the Company's public statements during the Class Period.  Defendant DiMaria was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information concerning the Company, he knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and incomplete.  As a result, Defendant DiMaria is responsible for the accuracy of Bankrate's corporate statements, and is therefore responsible and liable for the representations contained therein or omitted therefrom.

162.    As the Company's CFO, DiMaria's scienter is imputed to Bankrate.

163.    Based upon the forgoing, Defendants Bankrate and DiMaria acted with scienter in that they:  (i) knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  Defendants Bankrate and DiMaria, by virtue of their receipt of information reflecting the true facts regarding Bankrate's financial results, and their control over, and receipt or modification of Bankrate's materially false and misleading statements, actively participated in the fraudulent scheme alleged herein.

### D.  Exchange Act Defendants' Accounting Violations

164.  As alleged herein, the Exchange Act Defendants knowingly accounted for certain historical business activities, including recognizing revenue and recognizing and reversing accrued expenses and allowances, in violation of GAAP.  Specifically, Bankrate materially overstated several key financial performance measures in its Class Period financial statements, including Net Income, Adjusted Net Income, Adjusted EBITDA, GAAP EPS, and Adjusted EPS, in order to ensure that those financial measures were as close as possible to, in line with, or better than, consensus expectations for quarterly and annual reporting periods in the Class Period.  In doing so, the Exchange Act Defendants materially misstated information in the Company's financial statements applicable to those quarterly and annual reporting periods during the Class Period in violation of GAAP.  These misstated financial statements were amended and restated on June 17, 2015 in Bankrate's financial statements included in its FY14 Form 10-K.  As discussed herein, the Restatement serves as an express acknowledgment that the Class Period financial statements were materially misleading upon issuance.

165.  As alleged in detail above, the identified and purportedly corrected misstatements, as set forth in the Restatement, indicated that originally reported Net Income, Adjusted Net Income, Adjusted EBITDA, GAAP EPS, and Adjusted EPS had each been overstated for the year ended December 31 2012.

166.  GAAP includes those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  The Financial Accounting Standards Board ("FASB"), the entity authorized to promulgate GAAP, has codified GAAP into a

numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers.  In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts to be used in the development of GAAP and therefore reflect the underlying basis and framework for the promulgation of GAAP.

**Characteristics of Financial Reporting**

167.    A fundamental objective underlying GAAP is that financial reporting should present information to current and potential investors, creditors, and other users that is both useful to their rational decision-making and comprehensible to persons with a reasonable understanding of business and economic activities and an inclination to study the information with reasonable diligence.  *See* FASCON No. 1, *Objectives of Financial Reporting by Business Enterprises* ("FASCON 1"), para. 34.

168.    To this end, FASCON 1 provides that financial statements should include information about the company's economic resources, its obligations, and the events that would change any of those resources or any claims to those resources.  *Id.*, para. 40.

169.    In addition, FASCON 1 states, in relevant part:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

*Id.*, para. 42 (footnote omitted).

170.    A primary quality that renders accounting information useful to investors, creditors, and other users in their decision-making is its reliability.  To be reliable, information must have representational faithfulness, verifiability, and neutrality.  *See* FASCON No. 2,

*Qualitative Characteristics of Accounting Information* ("FASCON 2"), paras. 58-59, 62.   In other words, reliability is: "[t]he quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent."   *Id.*, Glossary of Terms.

171.    Accordingly, reliability implies "completeness" of information, such that "nothing material is left out of the information that may be necessary to ensure that it validly represents the underlying events and conditions."   *Id.*, para. 79.

**The Matching Principle**

172.    Critical to the inclusion of certain financial elements in the financial statements is their "recognition," which is "the process of formally recording or incorporating an item in the financial statements of an entity.   Thus, an asset, liability, revenue, expense, gain, or loss may be recognized (recorded) or unrecognized (unrecorded)."   FASCON No. 6, *Elements of Financial Statements* ("FASCON 6"), para. 143.

173.    Within the accounting framework underlying GAAP, and for purposes of accounting for business activities and results in accordance with GAAP, recognized items are recorded pursuant to the "accrual" method of accounting.   Such method is discussed in FASCON 6 in the following manner:

> Items that qualify under the definitions of elements of financial statements and that meet criteria for recognition and measurement (paragraph 23) are accounted for and included in financial statements by the use of accrual accounting procedures.   Accrual accounting and related concepts are therefore significant not only for defining elements of financial statements but also for understanding and considering other aspects of the conceptual framework for financial accounting and reporting.

*Id.*, para. 134.

174.    FASCON 6 also provides that the objective of accrual accounting is to reflect transactions within the financial reporting periods to which their component costs and associated revenues relate, stating:

> Accrual accounting uses accrual, deferral, and allocation procedures whose goal is to relate revenues, expenses, gains, and losses to periods to reflect an entity's performance during a period instead of merely listing its cash receipts and outlays.  Thus, recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities--including matching of costs and revenues, allocation, and amortization--is the essence of using accrual accounting to measure performance of entities.   The goal of accrual accounting is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances, to the extent that those financial effects are recognizable and measurable.

*Id.*, para. 145.

175.    Thus, at the core of accrual accounting is its application of the "matching principle," which FASCON 6 describes, in relevant part, as follows:

> ***Matching of costs and revenues is simultaneous*** or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events.  In most entities, some transactions or events result simultaneously in both a revenue and one or more expenses.   The revenue and expense(s) are directly related to each other and require recognition at the same time.

*Id.*, para. 146.

**Expense Recognition and Accounting for Contingencies**

176.    FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"),[6] requires the recognition of expenses as follows:

> Expenses and losses are generally recognized when an entity's economic benefits are used up in delivering or producing goods, rendering services, or other activities that constitute its ongoing

---

[6] FASCON 5 is incorporated into ASC 605, *Revenue Recognition.*

major or central operations or when previously recognized assets are expected to provide reduced or no further benefits.

Consumption of economic benefits during a period may be recognized either directly or by relating it to revenues recognized during the period.

Some expenses, such as cost of goods sold, are matched with revenues–they are recognized upon recognition of revenues that result directly and jointly from the same transactions or other events as the expenses.

Many expenses, such as selling and administrative salaries, are recognized during the period in which cash is spent or liabilities are incurred for goods and services that are used up either simultaneously with acquisition or soon after.

Some expenses, such as depreciation and insurance, are allocated by systematic and rational procedures to the periods during which the related assets are expected to provide benefits.

FASCON 5, paras. 85-86 (footnote omitted).

177.   Because of the foregoing, GAAP requires that entities record expenses and associated revenue in a manner that gives periodic effect to the benefits associated with, or use of, economic resources and claims, without regard to the disbursement or receipt of cash. Indeed, expenses (and related revenue) can be, and often are, recorded during, or with respect to, reporting periods well before cash is received or disbursed.

178.   ASC 450, *Contingencies* ("ASC 450"), provides specific guidance regarding the accrual for, and recognition of, losses in financial statements for purposes of complying with the matching principle.  Among other things, ASC 450 reflects that the purpose of recording a loss contingency is to effectuate recognition of losses in financial statements in the period during which they are reasonably estimable, or become or are probable, and relate to the current or a prior period, regardless of when cash may be disbursed (if ever), in connection with such loss.

179.    Accordingly, based upon the requirement to utilize accrual accounting and the matching principle discussed above, it is improper under GAAP to create (*i.e.*, record) or maintain accrued losses (such as contingencies) that do not satisfy such criteria.  Similarly, it is improper under GAAP to eliminate allowances relating to purportedly known, probable, or estimable losses at a later date without sufficient basis and/or a supportable analysis demonstrating why such allowance or reserve is no longer needed, lest the concepts of accrual-based accounting be compromised.

180.    The establishment and/or manipulation of so-called "cushion" or "cookie jar" reserves at issue here has been identified as an accounting practice whereby entities improperly use portions of the results from prior periods of stronger financial performance to set aside amounts (*e.g.*, through the creation of accruals or reserves) that can be reversed in future periods, when profits may be lower than management or market expectations.  In such instances, the reversal of cushion or cookie jar accruals, improperly established in the first place, serves to reduce expenses and, ultimately, allow the entity to report improved (albeit misstated) financial results in the period of reversal.

181.    In a well-known speech given on September 28, 1998 to the New York University Center for Law and Business, then SEC Chairman Arthur Levitt described five common "gimmicks" used by public companies to meet investor earnings expectations.  According to Chairman Levitt, the use of such gimmicks ultimately results in financial reports that reflect the desires of management rather than the true underlying financial performance of a company.

182.    One of the gimmicks discussed by Chairman Levitt was the use of "cookie jar reserves."  Chairman Levitt stated the following regarding this gimmick:

> A third illusion played by some companies is using unrealistic assumptions to estimate liabilities for such items as sales returns,

loan losses or warranty costs. ***In doing so, they stash accruals in cookie jars during the good times and reach into them when needed in the bad times***.

Levitt, Arthur. (1998) *The "Numbers Game."* Retrieved from https://www.sec.gov/news/speech/speecharchive/1998/spch220.txt

183.   As noted above, almost a year after Bankrate's announcement in the September 15 Press Release of the SEC's investigation into specific journal entries and/or adjustments to the Company's financial statements that related to whether Bankrate had properly recognized expenses and contingencies during certain reporting periods within the Class Period, the SEC issued its September 8, 2015 Orders and filed the SEC Complaint.  According to the SEC Order, the SEC's investigation revealed that Bankrate had "intentionally manipulat[ed] its financial results…in order to meet and/or exceed analyst consensus estimates for key financial metrics," SEC Order at 2, by employing improper practices, including "cushion" accounts similar to those addressed above in ¶¶ 12, 27, 43, 46-50, 71-78, 130, and 140.

184.   In the SEC Order, the Commission also identified and focused on, among other things, two specific instances of accounting manipulation that it found from its investigation of concerning the Company's expenses and contingencies for 2Q12, both of which were restated as part of the Restatement.  First, as alleged above in ¶¶ 12, 46-50, and 71-78, the SEC found that Bankrate, through DiMaria and Lerner, had been using an SEM marketing accrual account as a "cushion" account for more than a year, and then selectively decided to dip into this account to improperly reverse $400,000 of the accrual amount in 2Q12 in order to improve the Company's financial results and meet analyst estimates for that quarter.  *See* SEC Order at ¶¶ 20-25.

185.   Bankrate's use of such "cushion" accounts violated GAAP because, among other reasons, "GAAP requires over-accrued expenses to be written off in the period the over-accrual

becomes known."  It was further inappropriate under GAAP for Bankrate to have reduced this accrual without a proper basis, especially if such was done in order to meet financial targets.

186.    Second, as alleged above in ¶¶ 13, 79-82, the SEC found that on July 6, 2012, Lerner instructed Bankrate Core to reverse $99,000 in 2Q12 accounting fees associated with Bankrate's SOX compliance provider without any basis.  In addition, the SEC found that after realizing such fees had not yet been recorded, Lerner decided not to record the proper amount of fees to 2Q12 and instead to improperly book such fees to 3Q12.  *See* SEC Order ¶¶ 26-27. Lerner's baseless instruction and Bankrate's deliberate failure to book at least $99,000 in known accounting fees that were incurred during 2Q12 each violated the GAAP principles discussed herein.

**Revenue Recognition**

187.    ASC 605, *Revenue Recognition*, which incorporates certain concepts relating to revenue recognition originally set forth in FASCON 5, states that in order for revenue to be recognized, it must be "earned" and "realized or realizable."  FASCON 5, para. 83.  Revenue is "realized" or "realizable" when assets related to the revenue-earning activity are readily convertible to known amounts of cash or claims to cash.  *Id*.  Revenue is considered "earned" from delivering or producing goods, rendering services, or performing other activities that constitute an entity's ongoing major or central operations "when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  *Id*.

188.    ASC 605 also references the SEC's Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* ("SAB 104"), which similarly provides:

. . . [R]evenue generally is realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectability is reasonably assured.

*Id.*, §A(1) (footnotes omitted)

189.    With regard to revenue recognition, the SEC Complaint and the SEC Order set forth the SEC's findings from its investigation into Bankrate's improper accounting practices, including with respect to revenue accruals and adjustments made in the second quarter of 2012. In particular and as alleged above in ¶¶ 7-11, and 56-70, the SEC determined that Defendant DiMaria "improperly directed two Bankrate divisions…to book additional revenue of $300,000 and $500,000, respectively, without any support or analysis" because "Bankrate's preliminary financial results for the second quarter 2012…fell short of analyst estimates for certain key metrics."  SEC Order at 2.  Specifically, the SEC determined that DiMaria directed Bankrate's Insurance division to book $300,000 of additional revenue to a dormant customer account.  *See* SEC Order ¶ 9; SEC Compl. ¶¶ 4, 29.  In addition, the SEC found that Bankrate's Credit Cards division, at DiMaria's direction, booked approximately $176,000 in additional revenue based upon accounting personnel's conclusion that "it could possibl[y] expect to get in June" this additional amount.  SEC Compl. ¶ 46.  Further, following instructions from Lerner, Bankrate Core accounting personnel recorded, without any basis, an additional $305,000 in revenue by doubling the revenue attributable to two customers.  *See* SEC Order ¶ 15; SEC Compl. ¶¶ 5, 47.

190.    Such actions were improper and violated the GAAP principles set forth above because the collectability of such revenue was not reasonably assured.  Moreover, the booking of such additional revenue in Bankrate's Insurance and Credit Cards divisions caused, among other things, Bankrate's 2Q12 financial statements to be materially misstated.  Indeed, these revenue adjustments were reversed as part of the Company's Restatement, establishing their materiality.

**Importance of Reporting Financial Performance Within an Entity's Financial Statements**

191.    FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), describes the value of an entity's financial reporting to users[7] of the entity's financial statements, including reporting on its financial performance during a period.  FASCON 8 describes the importance of an entity's reported financial performance to users of its financial statements as follows:

> Accrual accounting depicts the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period. This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period.

FASCON 8, para. OB17.

192.    FASCON 8 further emphasizes the importance of an entity's past financial performance in assessing the entity's ability to generate cash inflows.  Specifically, FASCON 8 states:

> Information about a reporting entity's financial performance during a period, reflected by changes in its economic resources and claims other than by obtaining additional resources directly from investors and creditors [sic], is useful in assessing the entity's past and future ability to generate net cash inflows. That information indicates the extent to which the reporting entity has increased its available economic resources, and thus its capacity for generating net cash inflows through its operations rather than by obtaining additional resources directly from investors and creditors.

*Id.*, para. OB18.

---

[7] FASCON 8 concluded that the primary users of a reporting entity's financial statements are existing and potential investors, lenders, and other creditors.

193.    While users of financial statements may rely on several financial performance indicators arrived at within GAAP (i.e., net income or EPS) to assess the ability of an entity to generate net cash inflows, those users may also rely on several financial measures that are presented independent of GAAP.  Entities present non-GAAP financial measures because they believe them to be important supplemental measures of performance that are commonly used by securities analysts, investors and other interested parties in evaluating companies.

194.    One critical non-GAAP measure of financial performance that is widely used is earnings before income, taxes, depreciation and amortization, commonly known as "EBITDA". EBITDA, and Adjusted EBITDA (which typically excludes the effects of nonrecurring items of revenue and expenses), are important measures of operating performance in many industries because they allow management, investors and others to evaluate and benchmark an entity's production with regard to its net cash inflows.

195.    In addition, EBITDA and Adjusted EBITDA are commonly used in the valuation of entities, including during mergers and acquisitions.  Sellers and buyers regularly determine the purchase price of an entity based on "multiples" of either 1) earnings, *i.e.*, EPS or Adjusted EPS, and including an entity's ratio of stock price to earnings ("P/E ratio"), or 2) EBITDA, (or Adjusted EBITDA).  The starting point for both earnings (including EPS and Adjusted EPS) and EBITDA (and Adjusted EBITDA) is the reported GAAP net income within an entity's financial statements.

196.    In its FY12 Form 10-K, which the Company subsequently restated, Bankrate described the importance of EBITDA to the Company and its users stating that "[m]anagement believes that the presentation of Adjusted EBITDA provides useful information to investors

regarding our results of our operations because it assists in analyzing and benchmarking the performance and value of our business."[8]

197.    Additionally, Adjusted EBITDA was critical to Bankrate's executive management as the incentive cash bonus to be paid to its executive management was based on meeting certain Adjusted EBITDA targets.  In the 2012 Proxy, Bankrate disclosed the following regarding its incentive cash bonus for the 2012 fiscal year:

> ***Incentive Cash Bonuses.***  Our named executive officers are expected to lead and grow our organization and as such we believe that a significant portion of our named executive officer's compensation should be tied to our overall performance. We maintain an incentive cash bonus program, the Management Incentive Program, which emphasizes pay-for-performance by providing our named executive officers with the opportunity to earn bonuses ***only if we achieve or exceed certain targets relating to our EBITDA***.
>
> The EBITDA goal is established at the beginning of each fiscal year by the Chief Executive Officer in consultation with each named executive officer and was approved by the Board of Directors in 2012. Based on this performance objective and the business plan and budget approved by the Board of Directors, in 2012 the Board of Directors established threshold minimum and target financial performance goals, for the purposes of paying incentive bonuses. ***For awards to be payable under the program, the minimum EBITDA performance threshold, which is based on year-over-year EBITDA growth, must be achieved, higher amounts are payable if we meet or exceed the established target***.

198.    The SEC specifically discussed DiMaria's focus on Bankrate's Adjusted EBITDA during 2Q12.  In relevant part, the SEC stated the following, which indicates that a shortfall in the measure of Adjusted EBITDA was an impetus for the aforementioned manipulation of the Company's reported revenue and expense figures by DiMaria for the second quarter of 2012:

---

[8] Bankrate's June 17, 2015 filed 10-K, which included the Restatement, included similar statements regarding the importance of Adjusted EBITDA, including reference to the use of Adjusted EBITDA for the determination of short and long term incentive plans.

> On July 6, 2012, after being provided with preliminary second quarter financial results for Bankrate Core and Credit Cards (the Insurance division's financial results had not yet been added to the consolidated numbers), DiMaria, unwilling to accept the company's second quarter 2012 financial results, informed Lerner that Adjusted EBITDA needed to be $37 million for the quarter.

SEC Order ¶ 6.

199.    The SEC also addressed the significance of the $37 million Adjusted EBITDA threshold for 2Q12 when describing the manipulation of Bankrate's expenses during the period, stating:

> On July 13, 2012, [days after DiMaria instructed several divisions within Bankrate to record fictitious revenue], a revised version of Bankrate's consolidated financial results for the second quarter 2012 was circulated to DiMaria, Lerner, and Gamsey that reflected Adjusted EBITDA of $36,656,000.
>
> Shortly after the circulation of the revised financial results, results that continued to fall short of the $37 million in Adjusted EBITDA dictated by DiMaria one week earlier, DiMaria directed a Core accountant to reduce a marketing accrual account for Search Engine Marketing (known as "SEM") by $400,000.  Reducing the SEM accrual (a balance sheet account) led to a corresponding reduction in the SEM expense (an income statement account), thereby artificially increasing Bankrate's quarterly earnings [, including Adjusted EBITDA].

*Id*. ¶¶ 20-21.

200.    The SEC found that once the SEM accrual was reduced by $400,000, "a revised version of Bankrate's 2Q12 financial results was circulated to DiMaria, Lerner, and Gamsey, reflecting Adjusted EBITDA of $37,056,000 [the threshold set by DiMaria]." *Id*. ¶ 25. Therefore, a significant portion of Bankrate's manipulation of its 2Q12 revenues and expenses, as described herein, was to directly impact the Adjusted EBITDA reported to the users of Bankrate's financial statements.

201.     Ultimately, Bankrate reported Adjusted EBITDA of approximately $37.5 million and Adjusted EPS of $0.18 for 2Q12.  Both of these figures were false and misleading, as they were inflated by the improper accounting entries described herein.  The SEC determined that Bankrate's Adjusted EBITDA and Adjusted EPS should have been approximately $36.2 million and $0.17, respectively, for 2Q12.  If properly reported, both of these financial performance measures would have been below analyst consensus estimates of "$37.2 million for Adjusted EBITDA and $0.18 for Adjusted EPS."  SEC Compl. ¶¶ 72-76.

**GAAP Materiality and Amending Previously Issued Financial Statements**

202.     GAAP provides that, when misstatements in previously issued financial statements are identified, they must be assessed to determine whether the affected financial statements are ***materially*** misstated.  The determination of whether a financial reporting item is material to a reporting entity's financial statements depends upon whether its omission or misstatement would impact the decision-making of a user of such financial statements.  *See* FASCON 8, para. QC11.

203.     In addition to FASCON 8, SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99"), memorializes the SEC Staff's guidance on applying materiality thresholds to the preparation of financial statements filed with the SEC.  Deviance from such guidance violates GAAP.[9]  SAB 99 similarly defines materiality of an item based on the significance placed on the item by the user of a registrant's financial statements.

204.     If previously issued financial statements are found to be materially misstated, GAAP requires prompt correction, *e.g*., restatement.  Such corrective measures include an

---

[9] ASC 105-10-05 establishes authoritative sources of accounting guidance that are in accordance with GAAP to be applied by nongovernmental agencies.  ASC 105-10-05-1 states that Staff Accounting Bulletins issued by the SEC staff "represent practices followed by the staff in administering SEC disclosure requirements."

entity's need to determine the appropriate steps and timing for providing notice that the materially-misstated financial statements should no longer be relied upon.

205.    GAAP governing the circumstances under which an entity should or must correct and/or amend previously issued financial statements, reflected primarily in ASC 250, *Accounting Changes and Error Corrections*, governed Bankrate's decision to withdraw, and subsequently restate, its historical financial statements as of and for the years ended December 31, 2011, 2012, and 2013.  ASC 250 defines an error in previously-issued financial statements as:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared.

ASC 250-10-20.

206.    SAB No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* ("SAB 108") also provides guidance on this topic as it reflects the SEC's position regarding how to address and account for the impact of errors identified in previously issued financial statements.  It states, in pertinent part:  "***Correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended.***  Such correction may be made the next time the registrant files the prior year financial statements."

207.    The Associate Chief Accountant in the SEC's Office of the Chief Accountant advised with respect to the application of SAB 108, that, if the effect of a correction would not materially affect the previously issued financial statements, then those financial statements may still be relied upon, and the correction may be made in future filings (i.e., without requiring an amendment to prior filings).  ***In other words, restatements are made only to correct material misstatements.***

**Restatement**

208.    As noted above, after its Audit Committee concluded its internal investigation, Bankrate issued the June 17 Press Release conceding that "accounting for certain historical business activities had been recorded in a manner that was not consistent with generally accepted accounting principles in the United States (GAAP)."   The June 17 Press Release further disclosed the Restatement.

209.    That same day, Bankrate filed its FY 14 Form 10-K, disclosing that the following types of adjustments had been made in connection with the restatement:

1. Revenue recognition: Certain accruals of revenue or related reserves were incorrectly recorded beginning in the quarter ended September 30, 2011 and continuing through the end of the quarter ended June 30, 2013.

2. Management incentive plan expense: Accruals for the management incentive plan ("MIP") expense were recorded incorrectly beginning in the quarter ended December 31, 2010 and continuing through the quarter ended June 30, 2012.

3. Search engine marketing expense: During the Restated Periods, reconciliations of the accrued cost of search engine marketing expenses were not properly prepared, causing these expenses to be accrued incorrectly in those periods.

4. Information technology: Some service and maintenance costs were depreciated over periods that were longer than those supported by the underlying contracts. In addition, during the Restated Periods, certain information technology expenses were incorrectly recorded as fixed assets.

5. Contingent consideration: Certain accruals and subsequent payments were incorrectly accounted for as consideration transferred and initially recognized as contingent liabilities in acquisition accounting related to the acquisition of certain entities. We determined that these payments should be recognized as compensation expense.

6. Professional fees: Certain accruals for professional fees were not recorded in the proper periods. There was no net adjustment to professional fee expense for the restated periods, because the adjustments to the periods offset.

7. Restructuring: From the fourth quarter of 2010 through the third quarter of 2012, certain payments to employees were recorded as restructuring charges. We determined that such payments should have been recorded as compensation expense due to the terms of the employment contracts in force.

8. Income tax expense: Certain income tax provisions were not properly prepared during the Restated Periods, causing these expenses to be accrued incorrectly in those periods.

9. Other: In addition to making the adjustments described above, the Company also recorded other adjustments related to capitalized labor, expense accruals, allowances against accounts receivable, amortization expense, compensation expense, revenue, and other items identified during the Restatement process. These included adjustments related to certain items that had been previously identified but not recorded because they had been deemed at the time in the aggregate not to be material to the financial statements.

210.   As alleged above in ¶¶ 202-07 Bankrate's decision to restate the Company's financial statements for three fiscal years constitutes an admission that the previously issued financial statements contained material misstatements.

**Quantitative and Qualitative Material Misstatements of Bankrate's Financial Statements**

211.   While the Restatement of Bankrate's Class Period financials establishes the materiality of the misstatements contained therein, applicable GAAP and SEC guidance establishes their quantitative and qualitative materiality.  Indeed, Bankrate's restated financial statements reflect material changes to reported GAAP Net Income (a significant measure itself, as well as the starting point to calculate EPS and EBITDA).  As the table below shows,[10] these adjustments resulted in decreases in previously reported GAAP Net Income of 7.8% for the year ended December 31, 2012.

| FY12 | |
|---|---|
| GAAP Net Income (as previously reported) | $29,331 |
| Restatement Adjustments | ($2,286) |
| GAAP Net Income (as restated) | $27,045 |
| Impact of Restatement on previously reported | (7.8%) |

---

[10] The amounts reflected in the table are based upon the Company's restated FY12 financial statements set forth on page 75 of the FY14 Form 10-K filed by Bankrate on June 17, 2015.

| GAAP Net Income | |
|---|---|

212.     The table above indicates that the Restatement Adjustments for the FY12 had a material impact on GAAP Net Income (and, as stated above, Adjusted EBITDA and Adjusted EPS), all of which were pertinent to then-current and potential investors, creditors, and other users of Bankrate's financial statements.

213.     Additionally, SAB 99 (as introduced above) establishes the materiality of the financial misstatements.  SAB 99 specifically states that materiality should be based on both quantitative and qualitative measures.  The SEC regards the exclusive use of quantitative benchmarks to assess materiality in preparing financial measures to be "inappropriate" and SAB 99 continues to state that "misstatements are not immaterial simply because they fall beneath a numerical threshold."  SAB 99 summary.  The bulletin goes on to describe the assessment of materiality that should be made by registrants in greater detail, stating in relevant part:

> Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality. Court decisions, Commission rules and enforcement actions, and accounting and auditing literature have all considered "qualitative" factors in various contexts.
>
> *         *         *
>
> [T]he staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial. ***While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be***

> *particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.* The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

SAB 99 (footnotes omitted).

214.    In addition to quantitative measures used to determine materiality, SAB 99 lists many circumstances that qualitatively make a financial statement material.   One such circumstance is "***whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise***."   *Id*.   The SEC's finding that Bankrate "intentionally manipulat[ed] its financial results…in order to meet and/or exceed analyst consensus estimates for key financial metrics," demonstrates that this manipulation was also material based on the qualitative considerations set forth in SAB 99.  SEC Order at 2.

215.    The accounting treatment directed by DiMaria and reflected in the Company's previously issued financial statements was both improper under GAAP and material to such financial statements in view of:  (i) the accounting literature discussed herein; (ii) the SEC's findings from its investigation into Bankrate's financial reporting in FY12, which included, among other things, that the accounting manipulations allowed Bankrate to meet consensus estimates for 2Q12 Adjusted EBITDA and Adjusted EPS; and, ultimately, (iii) Bankrate's Restatement along with the conclusion reached by the Audit Committee of Bankrate that "the accounting for certain historical business activities had been recorded in a manner that was not consistent with [U.S. GAAP]."

**Internal Controls Framework**

216.    After a series of high profile financial scandals relating to large public companies (and their auditors) that occurred in the early 2000s, SOX was enacted to protect the investments of shareholders and the general public from potentially improper actions or misrepresentations by public companies.  One of the key provisions of Section 404 of SOX reiterated the need for management at public companies to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal control over financial reporting on at least an annual basis. SEC General Rules and Regulations (17 C.F.R. § 240.13a-15(f)) defines the term "internal control over financial reporting" (or "ICFR") as:

> a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

217.   SEC Regulation S-K (17 C.F.R. § 229.308 [Item 308] (a)) describes what information should be included in management's report on ICFR, including the following:

> (1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;
>
> (2) A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or §240.15d-15 of this chapter;
>
> (3) Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting.

218.   Many U.S. public companies, including Bankrate (as expressly stated in the financial statements it issued during, and prior to, the Class Period), have adopted the integrated framework for establishing and maintaining a system of internal controls established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in 1992 (the "COSO Integrated Framework").   The integrated framework assists management, boards of directors, external stakeholders, and others interacting with the entity in their respective duties as they relate to the establishment and maintenance of internal controls, without being overly prescriptive (recognizing that the size and operations of subject entities may differ).   It does so by providing both an understanding of what constitutes a system of internal controls and insight into when internal controls are being applied effectively.

219.   COSO's integrated framework stipulates that:

an effective system of internal control reduces, to an acceptable level, the risk of not achieving an objective relating to one, two, or all three categories of objectives – that is, operations, reporting, and compliance. It requires that (i) each of the five components of internal control and relevant principles is present and functioning, and that (ii) the five components are operating together in an integrated manner.

COSO Internal Control-Integrated Framework Frequently Asked Questions (May 2013)

220. The five integrated components of internal control outlined in the Integrated Framework are:

- Control Environment

- Risk Assessment

- Control Activities

- Information and Communication

- Monitoring

221. In view of the requirements for public companies to establish, maintain, and report on their systems of internal controls (including as such controls relate to financial reporting), a material weakness in a system of internal controls is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. (17 C.F.R. § 210.13a-15(f)).

222. If a Company identifies a material weakness, it must disclose such in the company's ICFR report.  In addition, management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting. COSO's framework for internal controls concurs with this assertion.  Management also cannot conclude that the

company's internal control over financial reporting is effective if such management is contemporaneously intentionally overriding such controls.

**Bankrate's Internal Control Failures**

223.   Throughout the Class Period, Bankrate reported that its internal control over financial reporting was effective based on consideration of COSO's Integrated Framework.

224.   With the filing of the Restatement, the Company similarly performed an evaluation of the effectiveness of the design and operation of Bankrate's disclosure controls and procedures.  Based on that evaluation, ***management identified a material weakness in such purported controls as a result of deficiencies in two of the five integrated components of internal control*** set forth in the COSO Integrated Framework set forth above in ¶¶ 25, 101, and 143-45, including for FY12.

225.   As a result of the identified material weakness, management concluded in its report on ICFR that Bankrate did not have effective internal control over financial reporting and that, by virtue of such, its FY11, FY12, and FY13 financial statements (as well as for all the quarters therein and in 1Q14 and 2Q14) were materially misstated.

226.   Further, as a result of the identified material weakness, management concluded in its ICFR report that Bankrate did not have effective internal control over financial reporting as of December 31, 2014.  As a result of such conditions, management undertook a remediation plan relative to its system of internal control which included those steps identified herein in ¶¶ 25 and 100.

227.   Ultimately, management's conclusions in the ICFR reports filed during the Class Period were improper and misleading in view of:  (i) the accounting literature discussed herein; (ii) the investigations by the SEC, the DOJ, and by the Company internally; (iii) the conclusion reached and communicated by the Bankrate Audit Committee "that the Company's previously

issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer be relied upon," (iv) Bankrate's conclusion that its "disclosure controls and procedures were not effective at a reasonable assurance level as of December 31, 2014 as a result of the material weakness in the operating effectiveness of our internal control over financial reporting"; and (v) management's deliberate override of the Company's inadequate internal controls.

228.    Similarly, the SEC identified several specific instances of known deficiencies in Bankrate's internal control environment and control activities in connection with its investigation.  *See* SEC Order at ¶¶ 16, 33; SEC Compl. ¶¶ 48, 98-101.

229.    The control deficiencies identified by the SEC, which were known or should have been known by Bankrate management, should have led Bankrate to conclude and, more specifically, disclose during the Class Period that its system of internal control over financial reporting was not effective.

### E.    Loss Causation for Exchange Act Claims

230.    As alleged herein, the Exchange Act Defendants engaged in a scheme to deceive investors by reporting materially false and misleading financial results for 2Q12 that artificially inflated the price of Bankrate common stock and operated as a fraud or deceit upon Class Period purchasers of Bankrate common stock.  During the Class Period, the Exchange Act Defendants concealed their deliberate manipulation of accounting entries and their improper override of the Company's internal controls to inflate reported revenue and understate expenses in order to meet or exceed analyst consensus estimates for financial metrics that were important to investors, including net income, EPS, and Adjusted EBITDA.

231.    As a direct result of the Exchange Act Defendants' misrepresentations and omissions of material fact alleged above in Section IV.B, the price of Bankrate common stock was artificially inflated during the Class Period.   Lead Plaintiff and other Class members

suffered actual economic loss and were damaged when the foreseeable risks of adverse regulatory actions and the need to restate Bankrate's financial results created and concealed by the Exchange Act Defendants' intentional falsification of Bankrate's 2Q12 financial results materialized through the disclosure of new information in the September 15 Press Release and in the October 9 Form 8-K.  These partial corrective disclosures and/or materializations of the foreseeable risks concealed by the Exchange Act Defendants' fraud caused foreseeable declines in the price of Bankrate common stock by removing portions of the artificial inflation in the price of Bankrate common stock created by the Exchange Act Defendants' fraud.

232.    The fact that the corrective disclosures and/or materializations of the concealed risks contained in the September 15 Press Release and in the October 9 Form 8-K revealed to investors new information directly pertaining to the fraud alleged herein is confirmed by the later findings of wrongdoing and fraud disclosed to investors in:  (i) Bankrate's June 17, 2015 Press Release and FY14 Form 10-K, which made clear that the Company was forced to restate its incorrect 2Q12 and other previously issued financial results, in part, because of deliberate "override of controls by certain former members of management" and that the Company had offered to resolve the SEC investigation by paying a $15 million penalty; and (ii) the September 8, 2015 SEC Order, SEC Complaint, and SEC Press Release, which announced, among other things, that the SEC's investigation into Bankrate's financial reporting had culminated in findings of fraud leading to:  (a) Bankrate's agreement "to pay $15 million to settle accounting fraud charges"; and (b) accounting fraud charges against DiMaria and two other former Company accounting executives.

233.    Specifically, the Company's September 15 Press Release announced that the SEC was and would be investigating "the Company's financial reporting during 2012, with the

principal focus on the quarters ending March 31, 2012 and June 30, 2012." The September 15 Press Release further revealed, among other things, the SEC was investigating the following issues relating to the "close process for the second quarter of 2012": (i) "three accruals of revenue totaling approximately $781,000 in the aggregate"; and (ii) "two adjustments to reduced accrued expenses totaling approximately $850,000 in the aggregate." Moreover, the September 15 Press Release disclosed that the SEC was also investigating: (i) "the timing and classification of additional entries relating to certain expenses, expense accruals and credits in the second quarter and other periods in 2012"; (ii) "an entry originally made in the third quarter of 2011 establishing an allowance of $460,000 for anticipated customer credits in the Insurance business that was ultimately reversed in the first quarter of 2012"; and (iii) "revenue and expense adjustments totaling $225,000 in May 2012 that were reversed in June 2012." The September 15 Press Release also reported that the SEC is investigating whether accounting entries during FY12 "*improperly impacted the Company's reported results, including relative to market expectations at such time*."

234. The Company's September 15 Press Release further disclosed that "[i]n connection with" the SEC investigation and based on "developments" from that investigation, Bankrate's Audit Committee "concluded that the Company's previously issued financial statements for each of fiscal years 2011, 2012 and 2013 should no longer be relied upon pending the conclusion of a full internal review of these matters" and that the Audit Committee had retained additional counsel and independent forensic accountants in connection with such internal review. The September 15 Press Release also disclosed that, effective immediately, Defendant DiMaria had resigned from his position as CFO but would remain at Bankrate as a senior vice president.

235.   The SEC and Audit Committee investigations announced in the September 15 Press Release were foreseeable consequences of, and within the zone of risk concealed by, the Exchange Act Defendants' fraudulent falsification of Bankrate's 2Q12 financial results alleged herein.  Moreover, the September 15 Press Release revealed new information that was previously concealed by the Exchange Act Defendants' fraud.  As a direct result of these partial corrective disclosures and/or materializations of the risk concealed by the Exchange Act Defendants' fraud, the price of Bankrate common stock declined by $1.90 per share, or 13.75%, from a close of $13.82 on the prior trading day, September 12, 2014, to close at $11.92 per share on September 15, 2014, on extremely heavy trading volume of 3,924,200 shares.

236.   Numerous analysts issued reports expressing surprise over the new information revealed in the September 15 Press Release.  These reports confirmed that the negative investor inferences drawn from the previously concealed information that the September 15 Press Release disclosed, resulting in the 13.75% decline in the price of Bankrate common stock on extremely heavy trading volume on September 15, 2012, were caused by disclosure of this new information and/or a foreseeable materialization of the risk concealed by Defendants' falsification of Bankrate's financial results for 2Q12 in an effort to mislead the market into believing that the Company met analyst consensus estimates for 2Q12.  For example:

- SunTrust's September 15, 2014 report noted that, "[t]he market is apparently reacting to the risk that Bankrate's historical financials were fraudulently presented or otherwise misrepresented."

- Topeka issued a report on September 16, 2014 downgrading Bankrate common stock from hold "to sell on [the] SEC investigation, unreliable financials, [and] CFO transition."  Topeka also noted that "what concerns us is the implication that the SEC is looking to see whether these figures were used to manage market expectations."

- On September 16, 2014, Moody's Investors Service ("Moody's") placed Bankrate's ratings on review for downgrade pending the outcome of the Audit

Committee's investigation, noting that "Moody's is concerned that these matters may indicate material weaknesses in the company's disclosures and internal controls, which could lead to further accounting discrepancies that are bigger in scope."

237.    Less than one month later, the Company filed the October 9 Form 8-K with the SEC after the markets closed that day.  In its October 9 Form 8-K, the Company announced that it had "terminated Edward J. DiMaria's employment with the Company for cause, effective immediately, as a result of his notifying the Company and the [SEC] of his decision not to cooperate in the previously announced investigation by the SEC."  The October 9 Form 8-K further announced that the DOJ was now investigating Bankrate concerning the same issues that the SEC had been investigating.

238.    The termination of DiMaria and the DOJ investigation into the same accounting issues that the SEC was investigating announced in the October 9 Form 8-K were foreseeable consequences of, and within the zone of risk concealed by, the Exchange Act Defendants' fraudulent falsification of Bankrate's 2Q12 financial results alleged herein.  Moreover, the October 9 Form 8-K revealed new information that was previously concealed by the Exchange Act Defendants' fraud.  As a direct result of these partial corrective disclosures and/or materializations of the risk concealed by the Exchange Act Defendants' fraud, the price of Bankrate's common stock declined by an additional 11.20%, from a closing price of $10.98 per share on October 9, 2014, to $9.75 per share on October 10, 2014, a $1.23 decline on very heavy trading volume of 2,824,000 shares.  Based on these revelations, Stephens issued an analyst report on October 13, 2014 downgrading Bankrate's common stock and noting that "[w]hile the SEC investigation was known, we believe the emergence of the DOJ review creates an additional layer of risk" because it "could open the door for more dire consequences for those involved."

239.    On June 17, 2015, a full nine months after the Company's Audit Committee advised investors that they should no longer rely upon Bankrate's previously issued financial statements for fiscal years 2011, 2012, and 2013, the Company issued the June 17 Press Release. Moreover, before the market opened on June 18, 2015, Bankrate filed the FY14 Form 10-K with the SEC.  Both of the foregoing documents contained the results of and details concerning the Bankrate Audit Committee's review of the Company's historical financial results and the resulting required Restatement based upon incorrectly reported financial results arising, in part, because former members of management deliberately overrode the Company's internal controls, as alleged in detail above in ¶¶ 25, 99, 103, 128, 145, and 147.

240.    For example, the June 17, 2015 Press Release disclosed that:

> As previously announced, Bankrate's Audit Committee, with the assistance of independent counsel and independent forensic accountants, conducted an internal review of years 2011, 2012 and 2013.   During the course of that review, ***Bankrate's Audit Committee concluded that the accounting for certain historical business activities had been recorded in a manner that was not consistent with generally accepted accounting principles in the United States (GAAP)***.
>
> \*          \*          \*
>
> As previously announced, the Securities and Exchange Commission (SEC) is conducting a non-public formal investigation of Bankrate's financial reporting with the principal focus on the quarters ending March 31 and June 30, 2012.  The investigation is examining whether accounting entries may have improperly impacted the Company's reported results, including relative to market expectations at such time.  ***The Company has agreed to the terms of a potential settlement of the SEC investigation that the SEC enforcement staff has indicated it is prepared to recommend to the Commission.   The proposed settlement is subject to acceptance and authorization by the Commission, and would, among other things, require the Company to pay a $15.0 million penalty.   As a result, the Company has recorded an accrual in the amount of $15.0 as of September 30, 2014***.

241.    Moreover, as alleged above in ¶¶ 96-102, Bankrate's FY14 Form 10-K reported that Bankrate had materially misstated certain of its prior financial results, including those reported in 2Q12, and these material misstatements were due, in part, to a material weakness in its internal controls over financial reporting during the Class Period.  According to the FY14 Form 10-K, this material weakness resulted from a defective control environment, as well as controls rendered ineffective by senior management's deliberate decision to override them.

242.    Bankrate's Restatement of its 2Q12 financial results – the very same reporting period that was announced on September 15, 2014 to be the primary focus of the SEC's investigation – coupled with: (i) Bankrate's admission that the need to restate these results was based, at least in part, upon former members of Company management deliberately overriding the Company's internal controls; and (ii) Bankrate's agreement to pay a $15.0 million penalty to settle the SEC investigation, constitutes a later finding of wrongdoing in connection with the SEC and Bankrate Audit Committee investigations announced on September 15, 2014.  Both of these investigations and the resulting Restatement relate directly to the fraudulently misrepresented financial results for 2Q12 alleged herein.  On June 18, 2015, the first trading day after the Company announced the Restatement and the proposed settlement of the SEC investigation, the price of Bankrate common stock declined by an additional 23.11%, from a closing price of $13.85 per share on June 17, 2015, to a closing price of $11.25 per share on June 18, 2015, a $22.60 decline on very heavy trading volume of 4,634,700 shares.

243.    On September 8, 2015, the SEC issued a press release concerning its investigation announced on September 15, 2014 entitled:  "***SEC Charges Bankrate and Former Executives With Accounting Fraud***."   In the September 8, 2015 Press Release, the SEC announced that:  (i) "Bankrate has agreed to pay $15 million to settle accounting fraud charges";

and (ii) "[t]hree former executives[,]" including Defendant DiMaria, "also are charged in ***the case that involves fraudulent manipulation of the company's financial results to meet analyst expectations***."  According to the September 8, 2015 Press Release, the SEC concluded from its investigation that Defendant DiMaria, along with Gamsey and Lerner "***engaged in a scheme to fabricate revenues and avoid booking certain expenses to meet analyst estimates[,]" and "Bankrate consequently overstated its second quarter 2012 net income***."

244.  As alleged above in ¶¶ 3, 26, and 140, pursuant to the SEC Order released on September 8, 2015, Bankrate agreed to settle the SEC's accounting fraud charges against the Company by, among other things, paying a $15 million penalty for its misconduct.  According to the SEC's findings set forth in the SEC Order, Bankrate, through Defendant DiMaria, Gamsey, and Lerner "intentionally manipulat[ed] its financial results for the second quarter of 2012 in order to meet and/or exceed analyst consensus estimates for key financial metrics" and, ***"[a]s a result of this manipulation, . . . materially overstated its financial results for the second quarter of 2012***."

245.  Similarly, as set forth in the SEC Complaint, based upon the findings from its investigation, the SEC concluded, in pertinent part:

> This case involves a scheme to artificially inflate revenues and understate expenses in order to meet Bankrate['s] . . . financial targets – a scheme orchestrated and executed by Bankrate's senior-most financial officials, including ***DiMaria . . . and Gamsey . . . . DiMaria and Gamsey intentionally manipulated Bankrate's financial results for the second quarter of 2012 in order to meet or exceed analyst consensus estimates for Bankrate's key financial metrics***.  As a result of this fraudulent scheme, Bankrate materially overstated its financial results for the second quarter of 2012.

246.  The SEC Complaint also includes detailed facts that the SEC uncovered in its investigation that confirm the link between the material deficiencies in Bankrate's internal

controls and the Restatement. In particular, the SEC Complaint alleges that from at least 2Q11, Defendant DiMaria "established a corporate culture that condoned using improper accounting techniques to hit the [C]ompany's financial targets." For example, according to the SEC Complaint, Bankrate maintained "cushion" account spreadsheets identifying over-accrued expense accounts that the Company carried on its books and indicating whether such accounts were known to Bankrate's auditor. Defendant DiMaria would use these cushion accounts at times to "tune" Bankrate's numbers. In addition, Defendant DiMaria instructed senior finance executives and other Bankrate accounting personnel to keep certain unsupported accounting entries "under the radar."

247. The SEC Complaint further charges Defendant DiMaria with insider trading violations, alleging in pertinent part that "[d]uring the two week period following the issuance of Bankrate's second quarter 2012 earnings release," and while "he was in possession of material, nonpublic information about Bankrate's false financial statements and, specifically that Bankrate had used improper accounting entries to meet its financial targets," "DiMaria sold Bankrate stock, profiting from a stock price that had been artificially inflated by the [C]ompany's materially overstated financial results."

248. The federal securities fraud and other violations that the SEC alleges based upon the findings from its investigation of Bankrate's 2Q12 financial results – the very same reporting period that Bankrate announced on September 15, 2014 was the primary focus of the SEC's investigation – coupled with: (i) The SEC's determination that Bankrate's financial statements for 2Q12 were materially overstated as a result of a deliberate fraud "orchestrated and engineered by Bankrate's senior-most accounting officials, including DiMaria, the company's chief financial officer, and Gamsey, the company's vice president and director of accounting"; (ii) the SEC's

determination that DiMaria received approximately $2 million in proceeds by selling his shares of Bankrate common stock at prices that were artificially inflated by Bankrate's deliberate falsification of its financial results for 2Q12 while in possession of material nonpublic information; and (iii) Bankrate's agreement to pay a $15.0 million penalty to settle the SEC investigation, constitutes a later finding of wrongdoing and fraud in connection with the SEC investigation announced on September 15, 2014 and with the disclosure in the October 9 Form 8-K announcing that DiMaria was terminated for cause based upon his refusal to cooperate in the SEC's investigation.

249.    As alleged herein, Bankrate disclosed on September 15, 2014 that the "principal focus" of the SEC investigation was the Company's financial reporting for "the quarters ending March 31, 2012 and June 30, 2012." Accordingly, the fraud findings and charges announced in the September 8, 2015 SEC Order and SEC Complaint relate directly to the fraudulently misrepresented financial results for 2Q12 alleged herein. On September 8, 2015, the price of Bankrate common stock rose slightly, by 2.75%, from a closing price of $10.27 per share on September 4, 2015, to a closing price of $10.56 per share on September 8, 2015, an increase of $0.29 per share. The modest movement in Bankrate's common stock price on September 8, 2015 is attributable to the fact that investors had already incorporated the likelihood of the SEC's fraud charges into their purchase decisions and, therefore, Bankrate's stock price, based upon the information previously disclosed in: (i) the September 15, 2014 Press Release; (ii) the October 9 Form 8-K; (iii) the Restatement; and (iv) the June 17, 2015 disclosure that Bankrate had agreed to pay the SEC a $15 million penalty to resolve the SEC investigation, for which the Company had already taken a $15 million accrual, and that "the SEC enforcement staff has indicated it is prepared to recommend to the Commission."

250.    The material misrepresentations and omissions detailed above had the effect of creating and maintaining artificially inflated prices for Bankrate common stock throughout the Class Period.  Lead Plaintiff and other Class members purchased or otherwise acquired Bankrate common stock at prices that were artificially inflated by the Exchange Act Defendants' misrepresentations and omissions of material fact alleged herein.

251.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Throughout the Class Period, the Exchange Act Defendants made materially false and misleading statements and omissions of material fact concerning, among other things the reliability and accuracy of Bankrate's 2Q12 financial results.  Had the Exchange Act Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Bankrate common stock, or would not have purchased or otherwise acquired their shares at the artificially inflated prices that they paid.  It was entirely foreseeable to the Exchange Act Defendants that misrepresenting and concealing these material facts and risks from the public would artificially inflate the price of Bankrate common stock.  It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by the Exchange Act Defendants' material misstatements and omissions, would cause the price of Bankrate common stock to decline, as the inflation caused by the Exchange Act Defendants' earlier materially false and misleading statements and omissions of material fact was removed from the stock price.

252.    Accordingly, the Exchange Act Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Bankrate common stock during the Class Period.

253.    The economic losses, i.e., damages, suffered by Lead Plaintiff and other Class members are direct and foreseeable results of:  (i) the Exchange Act Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock; and (ii) the subsequent significant decline in the price of Bankrate's common stock when the truth was revealed and/or the risks previously concealed by the Exchange Act Defendants' fraud materialized and removed portions of the artificial inflation in the price of Bankrate common stock.

254.    As confirmed by the later findings of wrongdoing and fraud announced in (i) the June 17, 2015 Press Release; (ii) the FY14 Form 10-K; (iii) the September 8, 2015 Press Release; (iv) the SEC Orders; and (v) the SEC Complaint, Lead Plaintiff and other Class members suffered economic loss as a result of the previously misrepresented and concealed material information and risks that were disclosed and/or materialized on September 15, 2014 and on October 9, 2014, and the corresponding substantial declines in the price of Bankrate common stock when investors learned of this information and drew negative inferences which caused the loss and were a foreseeable materialization of the risk concealed by the Exchange Act Defendants' fraud.

### F.    The Fraud-on-the-Market Doctrine Applies

255.    At all relevant times, the market for Bankrate common stock was open and efficient for the following reasons, among others:

   a)    Bankrate common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market;

    b)  As a registered and regulated issuer of securities, Bankrate filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

    c)  Bankrate regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    d)  Bankrate was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

    e)  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Bankrate common stock; and

    f)  Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Bankrate stock between the time that the Exchange Act Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Bankrate stock was artificially inflated by the Exchange Act Defendants' misrepresentations and omissions.

256.    As a result of the foregoing, the market for Bankrate common stock promptly digested current information regarding Bankrate from all publicly available sources, and the prices of Bankrate common stock reflected such information. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Bankrate common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased Bankrate common stock relying upon the integrity of the market price of Bankrate common stock and other market information relating to Bankrate.

257.    Under these circumstances, all purchasers of Bankrate common stock during the Class Period suffered similar injuries through their purchases of Bankrate common stock at artificially inflated prices, and a presumption of reliance applies.

258.    Further, at all relevant times, Lead Plaintiff and the other members of the Class reasonably relied upon the Exchange Act Defendants to disclose material information as required by law in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Bankrate common stock at artificially inflated prices if the Exchange Act Defendants had disclosed all material information as required.  Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Lead Plaintiff and the other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

### G.    The Statutory Safe Harbor and Bespeaks Caution Doctrine Are Inapplicable

259.    The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine provided for forward-looking statements under certain circumstances do not apply to any of the materially false and misleading statements alleged in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.  To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

260.    Alternatively, to the extent the statutory safe harbor does apply to any materially false and/or misleading statement alleged herein, the Exchange Act Defendants are liable for any such false and/or misleading statement because at the time such statement was made, the speaker actually knew that the statement was false, and/or the statement was authorized and/or approved by an executive officer of Bankrate who actually knew that such statement was false when made.

261.    Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## V.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

262.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all other persons and entities that purchased Bankrate common stock during the Class Period, including shares of common stock sold in the March 2014 Offering.   Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has or had a controlling interest, or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

263.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  At the end of the Class Period, approximately 104.43 million shares of Bankrate common stock were outstanding and actively traded on the New York Stock Exchange ("NYSE").  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of Class members can be ascertained from the books and records of Bankrate and/or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

264. Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and Lead Plaintiff intends to prosecute this action vigorously.

265. Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all other Class members' claims arise from, and their losses were caused by, the same false and misleading representations and omissions made by, or chargeable to, the Exchange Act Defendants and/or to the untrue statements and omissions of material fact made by, or chargeable to, the Securities Act Defendants. Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the interests of the Class.

266. A class action is superior to any other available method for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek individual redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

267. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to members of the Class are:

a) whether the federal securities laws were violated by the acts of the Exchange Act Defendants and the Securities Act Defendants as alleged herein;

b) whether the Exchange Act Defendants and the Securities Act Defendants' respective statements issued during the Class Period were materially false and misleading; and

c) the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## VI.   CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Bankrate and DiMaria

268.   Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, is asserted by Lead Plaintiff on behalf of itself and all other Class members against Defendants Bankrate and DiMaria (collectively, the "Section 10(b) Defendants").

269.   During the Class Period, the Section 10(b) Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bankrate common stock; and (iii) cause Lead Plaintiff and the other members of the Class to purchase Bankrate common stock at artificially inflated prices that did not reflect their true value.  In furtherance of their unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants took the actions set forth herein.

270.    While in possession of material adverse, non-public information, the Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange:    (i) employed devices, schemes, and artifices to defraud; (ii) made false and misleading statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Bankrate common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Section 10(b) Defendants are sued as primary participants in the wrongful conduct alleged herein.

271.    By virtue of his high-level position at the Company during the Class Period, Defendant DiMaria was authorized to make public statements, and made public statements during the Class Period on Bankrate's behalf.  Defendant DiMaria was privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or was aware of his and the Company's dissemination of information to the investing public that he recklessly disregarded was materially false and misleading.

272.    In addition to the duties of full disclosure imposed on the Section 10(b) Defendants as a result of their making of affirmative statements and reports to the investing public, the Section 10(b) Defendants had a duty to disclose information required to update and/or correct their prior statements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Further, the Section 10(b) Defendants had a duty to promptly disseminate truthful information that would be material to

investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and Regulation S-K (17 C.F.R. § 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.  Defendant DiMaria also had duties under SOX to ensure that Bankrate's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

273.    The Section 10(b) Defendants acted with knowledge of or a reckless disregard for the truth of the misrepresented and omitted material facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them.  The Section 10(b) Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Bankrate's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

274.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Bankrate's common stock during the Class Period.  In ignorance of the fact that the market prices of Bankrate's common stock were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by the Section 10(b) Defendants, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by the Section 10(b) Defendants but not disclosed in public statements by the Section 10(b) Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Bankrate's common stock during the

Class Period at artificially inflated prices.  As the truth eventually emerged and/or the risks concealed by the Section 10(b) Defendants materialized, the price of Bankrate's common stock substantially declined.

275.    At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class known the truth with respect to Bankrate's publicly reported financial results, which was misrepresented and concealed by the Section 10(b) Defendants, Lead Plaintiff and the other members of the Class would not have purchased Bankrate's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

276.    By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

277.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Defendant DiMaria

278.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against Defendant DiMaria pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by Lead Plaintiff on behalf of itself and all other Class members.

279.    During the Class Period, Defendant DiMaria was a senior executive officer and/or director of the Company.  As such, Defendant DiMaria was privy to confidential and proprietary

information concerning Bankrate, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

280.    By reason of the foregoing, Defendant DiMaria had regular access to non-public information about Bankrate's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

281.    Defendant DiMaria acted as a controlling person of Bankrate within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of his high-level position, participation in, and/or awareness of the Company's day-to-day operations, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, Defendant DiMaria had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Lead Plaintiff alleges were materially false and misleading. Defendant DiMaria was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

282.    In particular, Defendant DiMaria had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or is presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

283.     As set forth above, Defendant Bankrate violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of Defendant DiMaria's status as a controlling person of Bankrate, and his participation in the underlying violation of Section 10(b) and Rule 10b-5, Defendant DiMaria is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendant DiMaria's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## VII.     VIOLATIONS OF THE SECURITIES ACT

### A.     Additional Defendants

284.     As specified in Counts III-VI below, Lead Plaintiff asserts claims under the Securities Act against the Defendants Bankrate, DiMaria, and Esterow.  In addition, as specified in Counts III-VI below, Lead Plaintiff asserts certain of these non-fraud claims under the Securities Act against the Defendants identified below in ¶¶ 285-88.

285.     Defendant Merrill Lynch was an underwriter of and seller in the March 2014 Offering.  As an underwriter of the March 2014 Offering, Defendant Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.  Defendant Merrill Lynch sold 3,542,000 shares of Bankrate common stock in the March 2014 Offering at the offering price of $18.25 per share pursuant to the Underwriting Agreement.

286.     Defendant Goldman was an underwriter of and seller in the March 2014 Offering.  As an underwriter of the March 2014 Offering, Defendant Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.  Defendant Goldman sold 6,440,000 shares of Bankrate common stock in the March 2014 Offering at the offering price of $18.25 per share

pursuant to the Underwriting Agreement, which Defendant Goldman signed as the representative underwriter on behalf of the other underwriters of the March 2014 Offering.  Lead Plaintiff purchased 190,819 shares of Bankrate common stock at the offering price of $18.25 per share in the March 2014 Offering from Defendant Goldman.  Lead Plaintiff purchased these 190,819 shares of Bankrate common stock on the March 5, 2014 offering date using its own funds.  Lead Plaintiff did not pay a commission to Defendant Goldman in connection with its purchase of 190,819 shares of Bankrate common stock in the March 2014 Offering.

287.    Defendant RBC was an underwriter of and seller in the March 2014 Offering.  As an underwriter of the March 2014 Offering, Defendant RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.  Defendant RBC sold 3,542,000 shares of Bankrate common stock at the offering price of $18.25 per share in the March 2014 Offering pursuant to the Underwriting Agreement.

288.    Defendant Stephens was an underwriter of and seller in the March 2014 Offering.  As an underwriter of the March 2014 Offering, Defendant Stephens was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the March 2014 Offering Documents.  Defendant Stephens sold 2,576,000 shares of Bankrate common stock at the offering price of $18.25 per share in the March 2014 Offering pursuant to the Underwriting Agreement.

289.    Defendants Merrill Lynch, Goldman, RBC, and Stephens are collectively referred to herein as the "Underwriter Defendants."  Each of the Underwriter Defendants was a seller in the March 2014 Offering, and each Underwriter Defendant passed title to or other interest in the shares of Bankrate common stock that they sold, respectively, to Class members.

**B.    The March 2014 Offering**

290.    In March 2014, the Company completed the March 2014 Offering of 16,100,000 shares of Bankrate common stock.  The March 2014 Offering was made pursuant to the February 27, 2014 Registration Statement, the preliminary prospectus supplement on Form 424B7 filed with the SEC on the same day (the "February 27, 2014 Preliminary Prospectus Supplement"), and the prospectus supplement on Form 424B7 dated March 4, 2014 and filed with the SEC on March 6, 2014 (the "March 2014 Prospectus Supplement," and, together with the February 27, 2014 Preliminary Prospectus Supplement, the "March 2014 Offering Prospectus") (collectively, the "March 2014 Offering Documents").

291.    The February 27, 2014 Registration Statement was signed by Defendants Esterow and DiMaria.  As set forth above in ¶¶ 285-88, Bankrate and the Underwriter Defendants offered, sold, and/or solicited sales of the shares of Bankrate common stock in the March 2014 Offering.

292.    As set forth above at ¶¶ 285-88, the Underwriter Defendants acted as the underwriters of the March 2014 Offering.  Pursuant to the Underwriting Agreement, which Defendant Goldman signed on behalf of each of the Underwriter Defendants, Defendant Goldman sold 6,440,000 shares of Bankrate common stock in the March 2014 Offering.  Lead Plaintiff used its own funds to purchase from Defendant Goldman 190,819 shares of Bankrate common stock in the March 2014 Offering on the March 5, 2014 offering date at the offering price of $18.25 per share and pursuant to the March 2014 Offering Prospectus.  Lead Plaintiff did not pay a commission to Defendant Goldman in connection with its purchase of 190,819 shares of Bankrate common stock in the March 2014 Offering.

293.    The March 2014 Offering Documents contain materially untrue statements and omit material facts.  Specifically, the March 2014 Offering Documents:

- contain DiMaria's signature on the February 27, 2014 Registration Statement assuring investors that "[p]ursuant to the requirements of the Securities Act of 1933 the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3," while DiMaria knew that Bankrate's 2012 financial information incorporated in the March 2014 Offering Document was materially misstated and that he and Bankrate had violated Section 17 of the Securities Act, which prohibits fraudulent conduct in the offer or sale of securities.

- contain the Company's materially false and misleading FY12 financial metrics, including Adjusted EBITDA of $123.14 million, GAAP Net Income of $29.33 million, and GAAP EPS of $0.29 for FY12.

- incorporate by reference Bankrate's FY13 Form 10-K, which contains:

  o the certifications signed by Defendant DiMaria pursuant to SOX Sections 302 and 906, which falsely represented, among other things, that (i) "the financial statements, and other information in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as or, and for, the periods presented in this report," and

  o Bankrate's GAAP Net Income and GAAP EPS for each of 1Q12, 2Q12, and 3Q12 as follows:

|  | 1Q12 | 2Q12 | 3Q12 |
|---|---|---|---|
| GAAP Net Income | $10.15 million | $16.28 million | $2.56 million |
| GAAP EPS | $0.10 | $0.16 | $0.03 |

294.    Each of the foregoing statements was untrue and omitted material facts because Bankrate has *admitted* that its 1Q12, 2Q12, 3Q12 and FY12 financial results presented in the March 2014 Offering Documents were untrue and failed to disclose material facts at the time they were issued for the reasons stated in ¶¶ 126-28, 202-07, and 296.

295.    Indeed, as alleged above in ¶¶ 202-07, because GAAP provides that restatements of historical financial statements are only required to correct past *material* misstatements,

Bankrate's Restatement is an admission that the Company's financial statements were materially misleading at the time they were issued.

296.    Additionally, Bankrate's FY14 Form 10-K filed with the SEC on June 17, 2015 setting forth the Company's Restatement states that the Bankrate Audit Committee concluded, based upon its internal review of the Company's previously issued financial statements for FY11, FY12, and FY13, "that the accounting entries for certain historical business activities had been recorded in a manner that was not consistent with [GAAP]."  As a result, Bankrate's 1Q12, 2Q12, 3Q12, and FY12 GAAP Net Income, GAAP EPS, and Adjusted EBITDA were materially misstated at the time they were disseminated to the public, necessitating the following restatement of those results:

| | GAAP Net Income/(Loss) | GAAP EPS | Adjusted EBITDA |
|---|---|---|---|
| **1Q12** | | | |
| Original Results | $10.2 million | $0.10 | $37.8 million |
| Restated Results | $8.6 million | $0.09 | $35.3 million |
| % of Difference | (15.3%) | (10.0%) | (6.6%) |
| **2Q12** | | | |
| Original Results | $16.3 million | $0.16 | $37.5 million |
| Restated Results | $15.5 million | $0.16 | $35.2 million |
| % of Difference | (4.8%) | -- | (6.1%) |
| **3Q12** | | | |
| Original Results | $2.6 million | $0.03 | $29.8 million |
| Restated Results | $1.8 million | $0.02 | $29.7 million |
| % of Difference | (29.7%) | (33.3%) | (0.3%) |
| **FY12** | | | |
| Original Results | $29.3 million | $0.29 | $123.1 million |
| Restated Results | $26.9 million | $0.27 | $119.1 million |
| % of Difference | (5.1%) | (5.2%) | (6.3%) |

297.     Moreover, the SOX certifications by Defendant DiMaria were untrue and omitted material facts for the reasons set forth above in ¶¶ 100-03, 123-31, and 136.

298.     Additionally, Lead Plaintiff incorporates by reference ¶¶ 164-229, which set forth in detail allegations concerning the relevant accounting violations.

## VIII.    CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III

**For Violations of Section 11 of the Securities Act**
**Against Defendants Bankrate, Esterow, DiMaria, and the Underwriter Defendants**

299.     Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

300.     This claim is brought against the Company, Defendant Esterow, Defendant DiMaria, and the Underwriter Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and all other Class members who purchased shares of Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement that the Company issued in connection with the March 2014 Offering.

301.     The February 27, 2014 Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above in ¶ 293.

302.     Bankrate was the issuer of the common stock pursuant to the February 27, 2014 Registration Statement.  As the issuer of the common stock, Bankrate is strictly liable to the members of the Class who purchased Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement, which contained the untrue statements and omissions of material fact alleged herein.

303.    Defendants Esterow and DiMaria signed the February 27, 2014 Registration Statement.  Defendants Esterow and DiMaria acted negligently and are therefore liable to the members of the Class who purchased shares of Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement.

304.    The Underwriter Defendants were the underwriters of the March 2014 Offering.  The Underwriter Defendants acted negligently and are therefore liable to the members of the Class who purchased shares of Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement.

305.    Lead Plaintiff and other members of the Class purchased Bankrate common stock issued pursuant or traceable to the February 27, 2014 Registration Statement, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

306.    Lead Plaintiff and the other members of the Class who purchased the Bankrate common stock pursuant or traceable to the February 27, 2014 Registration Statement suffered damages as a result of the untrue statements and omissions of material fact in the February 27, 2014 Registration Statement, as they either:  (i) sold these shares at prices below the March 2014 Offering price of $18.25 per share; or (ii) still held shares as of the filing date of this Complaint, when the price of Bankrate common stock was lower than the March 2014 Offering price of $18.25 per share.  This Complaint is the first complaint to allege that the Defendants named in this Count violated Section 11 of the Securities Act in connection with the March 2014 Offering.

307.    The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

308.     This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Lead Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based and the time that this claim was first brought.  Less than three years have elapsed from the time that the shares of Bankrate common stock were sold to Lead Plaintiff and to other Class members in the March 2014 Offering pursuant to the February 27, 2014 Registration Statement.

309.     By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

### COUNT IV

### For Violations of Section 15 of the Securities Act
### Against Defendants Esterow and DiMaria

310.     Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

311.     This Count is asserted against Defendants Esterow and DiMaria for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all other members of the Class who purchased Bankrate common stock in the March 2014 Offering issued pursuant to the February 27, 2014 Registration Statement, and this Count is premised upon Bankrate's primary violation of Section 11 of the Securities Act alleged above in Count III.

312.     At all relevant times, the Defendants named in this Count were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Esterow, at the time of the filing of the March 2014 Offering Documents and the March 2014 Offering, served as CEO and President of Bankrate.  Defendant DiMaria was CFO of Bankrate at the time of the filing of the March 2014 Offering Documents and the March 2014 Offering.

313.   Defendants Esterow and DiMaria, prior to and at the time of the March 2014 Offering, participated in the day to day operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Bankrate's business affairs, including the registration of its securities.   As officers and/or controlling shareholders of a publicly owned company, Defendants Esterow and DiMaria had a duty to disseminate accurate and truthful information with respect to Bankrate's business, financial condition and results of operations, including its proposed sale of common shares.   Defendants Esterow and DiMaria participated in the preparation and dissemination of the February 27, 2014 Registration Statement, and otherwise participated in the process necessary to conduct the March 2014 Offering.   Among other things, Defendant DiMaria signed the Underwriting Agreement on behalf of the Company.   In addition, Defendant DiMaria and Defendant Esterow signed the February 27, 2014 Registration Statement.

314.   Because of their respective positions of control and authority as senior officers and/or controlling shareholders of Bankrate, Defendants Esterow and DiMaria were able to, and did, control the contents of the February 27, 2014 Registration Statement, which contained untrue statements and omissions of material fact.

315.   By reason of the aforementioned conduct, Defendants Esterow and DiMaria are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Bankrate is liable under Section 11 of the Securities Act, to Lead Plaintiff and the other members of the Class who purchased Bankrate common stock in the March 2014 Offering pursuant or traceable to the February 27, 2014 Registration Statement.

**COUNT V**

**For Violations of Section 12(a)(2) of the Securities Act
Against Bankrate and Defendant Goldman**

316.    Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

317.    This claim is brought against Bankrate and Defendant Goldman pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77(a)(2), on behalf Lead Plaintiff and all other members of the Class who purchased Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus.  Lead Plaintiff used its own funds to purchase 190,819 shares of Bankrate common stock from Defendant Goldman in the March 2014 Offering on the March 5, 2014 offering date at the offering price of $18.25 per share and pursuant to the March 2014 Offering Prospectus.   Lead Plaintiff did not pay a commission to Defendant Goldman in connection with its purchase of 190,819 shares of Bankrate common stock in the March 2014 Offering.

318.    Bankrate was an offeror, and/or a solicitor of sales of the 16,100,000 shares of Bankrate common stock offered and sold in the March 2014 Offering pursuant to the March 2014 Offering Prospectus, which contained untrue statements of material fact or failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above in ¶ 293. Specifically, Bankrate solicited purchases of Bankrate common shares to be sold by means of the March 2014 Offering Prospectus by, among other things:   (i) conducting the March 2014 Offering; (ii) announcing the proposed March 2014 Offering in a Company press release issued on February 27, 2014 (the "February 27, 2014 Press Release"); (iii) announcing the pricing of the March 2014 Offering in a Company press release issued on March 4, 2014 (the "March 4,

2014 Press Release"); and (iv) actively drafting, revising, and/or submitting for approval the March 2014 Offering Prospectus, pursuant to which the March 2014 Offering was made to the investing public.  Moreover, in the Underwriting Agreement, Bankrate also agreed with each of the Underwriter Defendants to, among other things:  (i) prepare and file the March 2014 Offering Prospectus; (ii) prepare and file an amended prospectus or prospectus supplement to correct any misstatement or omission contained in the March 2014 Offering Prospectus; and (iii) with respect to the Company shares being sold pursuant to the March 2014 Offering Prospectus, (a) take such action as necessary to qualify them for offering and sale under applicable securities laws, (b) pay required filing fees relating to them, and (c) use its best efforts to list them on the NYSE.

319.    Defendant Goldman was a seller, offeror, and/or solicitor of sales of shares of Bankrate common stock offered and sold in the March 2014 Offering pursuant to the March 2014 Offering Prospectus, which contained untrue statements of material fact or failed to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above in ¶ 293.

320.    Lead Plaintiff and other members of the Class purchased shares of Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus, and did not know, or in the exercise of reasonable care could not have known, of the untrue statements and omissions of material fact contained therein.

321.    Members of the Class who purchased the shares of Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus are entitled to rescissory damages on any shares so purchased, but no longer held.  Members of the Class who purchased the shares of Bankrate common stock in the March 2014 Offering pursuant to the March 2014

Offering Prospectus, and who still hold any such shares, have sustained damages as a result of the untrue statements and omissions of material fact in the March 2014 Offering Prospectus, for which they hereby elect to rescind and tender all such shares of Bankrate common stock to the Defendants sued in this Count in return for the consideration paid for such shares, together with interest thereon pursuant to Section 12(a)(2) of the Securities Act.

322.   The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

323.   This claim is brought within the applicable statute of limitations because less than one year elapsed from the time that Lead Plaintiff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based and the time that this claim was first brought.  Less than three years have elapsed from the time that the shares of Bankrate common stock were sold to Lead Plaintiff and to other Class members in the March 2014 Offering pursuant to the March 2014 Offering Prospectus.

324.   By virtue of the foregoing, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.

## COUNT VI

### For Violations of Section 15 of the Securities Act
### Against Defendants Esterow and DiMaria

325.   Lead Plaintiff repeats and realleges the allegations above as if fully set forth herein.  This claim is based solely on negligence and/or strict liability.

326.   This Count is asserted against Defendants Esterow and DiMaria for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and all other members of the Class who purchased Bankrate common stock in the March 2014 Offering issued

pursuant to the March 2014 Offering Prospectus, and this Count is premised upon Bankrate's primary violation of Section 12(a)(2) of the Securities Act.

327.    At all relevant times, the Defendants named in this Count were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Esterow, at the time of the filing of the March 2014 Offering Documents and the March 2014 Offering, served as CEO and President of Bankrate.  Defendant DiMaria was CFO of Bankrate at the time of the filing of the March 2014 Offering Documents and the March 2014 Offering.

328.    Defendants Esterow and DiMaria, prior to and at the time of the March 2014 Offering, participated in the day to day operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Bankrate's business affairs, including the registration of its securities.  As officers and/or controlling shareholders of a publicly owned company, Defendants Esterow and DiMaria had a duty to disseminate accurate and truthful information with respect to Bankrate's business, financial condition and results of operations, including its proposed sale of common shares.  Defendants Esterow and DiMaria participated in the preparation and dissemination of the March 2014 Offering Prospectus, and otherwise participated in the process necessary to conduct the March 2014 Offering.  Among other things, Defendant DiMaria signed the Underwriting Agreement on behalf of the Company.  Defendant DiMaria also authorized the Company's issuance of the February 27, 2014 Press Release and the March 4, 2014 Press Release.  In addition, Defendant DiMaria and Defendant Esterow signed the February 27, 2014 Registration Statement.

329.    Because of their respective positions of control and authority as senior officers and/or controlling shareholders of Bankrate, Defendants Esterow and DiMaria were able to, and

did, control the contents of the March 2014 Offering Prospectus, which contained materially untrue information.

330.     By reason of the aforementioned conduct, Defendants Esterow and DiMaria are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Bankrate is liable under Section 12(a)(2) of the Securities Act, to Lead Plaintiff and other members of the Class who purchased Bankrate common stock in the March 2014 Offering pursuant to the March 2014 Offering Prospectus.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A.     Determining this action to be a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D.     Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E.     Awarding such other and further relief as may be just and proper.

## X.  JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.


Dated: December 8, 2015                     _____

                                            **SAXENA WHITE P.A.**

                                            /s/ Lester Hooker
                                            Lester Hooker
                                            (Florida Bar No. 32242)
                                            Joseph E. White
                                            (Florida Bar No. 0621064)
                                            Boca Center, 5200 Town Center Circle
                                            Suite 601
                                            Boca Raton, FL 33486
                                            Telephone: (561) 394-3399
                                            Facsimile: (561) 394-3382
                                            lhooker@saxenawhite.com
                                            jwhite@saxenawhite.com

                                            *Liaison Counsel for the Class*

                                            **KESSLER TOPAZ**
                                            **MELTZER & CHECK LLP**
                                            Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
                                            jwhitman@ktmc.com
                                            Kimberly A. Justice (admitted *pro hac vice*)
                                            kjustice@ktmc.com
                                            280 King of Prussia Road
                                            Radnor, PA 19087
                                            Telephone: (610) 667-7706
                                            Facsimile: (610) 667-7056

                                            -and-

Jennifer L. Joost (admitted *pro hac vice*)
jjoost@ktmc.com
1 Sansome Street, Suite 1850
San Francisco, CA 94109
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Counsel for Lead Plaintiff The City of Los Angeles,*
*Acting Through its Fire and Police Pension System,*
*Acting by Order of and Through its Board of*
*Fire and Police Pension Commissioners,*
*and Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

As to any Defendants named herein whose counsel has not yet entered appearances in this action, I further certify that a true and correct copy of the foregoing was served with the Summons issued to each such Defendants or, to the extent counsel on behalf of such Defendants has agreed to waive service of the Summons, via electronic mail on this same date.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


*/s/ Lester Hooker*