# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE No. 9:14-cv-81323-DMM

THE CITY OF LOS ANGELES, ACTING
THROUGH ITS FIRE AND POLICE
PENSION SYSTEM, ACTING BY ORDER
OF AND THROUGH ITS BOARD OF FIRE
AND POLICE PENSION
COMMISSIONERS, Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

vs.

BANKRATE, INC., EDWARD J.
DIMARIA, KENNETH S. ESTEROW,
GOLDMAN SACHS & CO., MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED, RBC CAPITAL
MARKETS, LLC, and STEPHENS, INC.,

                        Defendants.

## LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE ..............................5

     A.    Lead Counsel Is Entitled to an Award of Attorneys' Fees from the Common Fund .....................................................................................................5

     B.    The Requested Attorneys' Fees Are Reasonable as a Percentage of the Common Fund .....................................................................................................5

     C.    The Circumstances of the Litigation Examined in Light of the Relevant *Johnson* Factors Justify the Fee Award ......................................................................7

          1.    The Amount Involved and the Results Obtained..........................................8

          2.    The Novelty and Difficulty of the Legal and Factual Issues.......................9

          3.    The Skill Requisite to Perform the Legal Service Properly and the Experience, Reputation and Ability of Counsel ........................................11

          4.    The Time and Labor Expended by Plaintiffs' Counsel .............................11

          5.    The Contingent Nature of the Fee Weighs in Favor of the Requested Award.........................................................................................12

          6.    The "Undesirability" of the Case ...............................................................14

III.   THE REQUESTED EXPENSES ARE REASONABLE..................................................14

IV.   CONCLUSION ...................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  __ U.S. __, 133 S. Ct. 1184 (2013) ...................................................................5

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ........................................................................10

*In re Apple Computer. Sec. Litig.*,
  1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) .....................................10

*In re BankAtlantic Bancorp, Sec. Litig.*,
  2011 U.S. Dist. LEXIS 48057 (S.D. Fla. Apr. 25, 2011) .....................................14

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988) .......................................................................4

*Blum v. Stenson*,
  465 U.S. 886 (1984) ........................................................................................5

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ........................................................................................5

*Bonner v. City of Prichard, Alabama*,
  661 F.2d 1206 (11th Cir. 1981) (en banc) ........................................................4

*Camden I Condo. Ass'n v. Dunkle*,
  946 F.2d 768 (11th Cir. 1991) ......................................................................5, 6

*In re Checking Account*,
  830 F. Supp. 2d 1330 (S.D. Fla. 2011) ........................................................11, 14

*In re Checking Account Overdraft Litig.*,
  2013 U.S. Dist. LEXIS 187627 (S.D. Fla. Mar. 18, 2013) ..................................13

*Comcast Corp. v. Behrend*,
  __ U.S. __, 133 S. Ct. 1426 (2013) ................................................................13

*Dowdell v. Apopka*,
  698 F.2d 1181 (11th Cir. 1983) ......................................................................14

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007) ......................................6

*Faught v. Am. Home Shield Corp.*,
    668 F.3d 1233 (11th Cir. 2011) ...................................................................................4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 119702 (S.D.N.Y. Nov. 8, 2010)...................................................4, 6

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ...................................................................................10

*Gutter v. E.I. Dupont De Nemours & Co.*,
    2003 U.S. Dist. LEXIS 27238 (S.D. Fla. May 30, 2003) .......................................................6

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ...................................................................................8

*Hicks v. Morgan Stanley*,
    2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 24, 2005)........................................................9

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000) ...................................................................................6

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ...................................................................3-4, 7, 9

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) ...................................................................................6

*McKinley v. Great Western Bank*,
    2013 U.S. Dist. LEXIS 190559 (S.D. Fla. Aug. 2, 2013) .......................................................5

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007) .........................................................8

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013)...................................................................................10

*In re Mills Corp. Sec. Litig.*,
    265 F.R.D. 246 (E.D. Va. 2009)...................................................................................9

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ...................................................................................4

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ...................................................................................13

*Norman v. Hous. Auth. of Montgomery*,
    836 F.2d 1292 (11th Cir. 1988) ...................................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    __ U.S. __, 135 S. Ct. 1318 (2015) .............................................................................. 13

*In re Oracle Corp. Sec. Litig.*,
    2009 U.S. Dist. LEXIS 50995 (N.D. Cal. June 16, 2009) ...................................... 10

*Pinto v. Princess Cruise Lines*,
    513 F. Supp. 2d 1334 (S.D. Fla. 2007) ............................................................. 7, 13

*Ressler v. Jacobson*,
    149 F.R.D. 651 (M.D. Fla. 1992) ...............................................................*passim*

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ................................................................... 10

*In re Sunbeam Sec. Litig.*,
    176 F. Supp. 2d 1323 (S.D. Fla. 2001) ...................................................... 11

*In re Terazosin Hydrochloride Antitrust Litig.*,
    2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) ............................. 6

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 U.S. Dist. LEXIS 144133 (S.D. Fla. Oct. 14, 2016) ...........................*passim*

*US Airways, Inc. v. McCutchen*,
    133 S. Ct. 1537 (2013) ............................................................................. 5

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................................................... 13-14

*Waters v. Cook's Pest Control, Inc.*,
    2012 U.S. Dist. LEXIS 99129 (N.D. Ala. July 17, 2012) ............................ 6-7

*Waters v. Int'l Precious Metals Corp.*,
    190 F.3d 1291 (11th Cir. 1999) .............................................................. 4, 6

**Statutes**

15 U.S.C. § 78u-4(a)(6) ........................................................................................ 5

**Other Authorities**

Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action*
    *Settlements: 2015 Review and Analysis* ............................................................ 1

Court-appointed Lead Counsel, Kessler Topaz Meltzer & Check, LLP ("Lead Counsel"), respectfully submits this motion for (i) an award of attorneys' fees in the amount of 10% of the Settlement Fund and (ii) reimbursement of expenses that Plaintiffs' Counsel reasonably and necessarily incurred in prosecuting the above-captioned Action.[1]

## MEMORANDUM OF LAW

## I.    INTRODUCTION

After two years of vigorous litigation efforts and with Defendants' motion to dismiss Lead Plaintiff's Second Amended Class Action Complaint ("SAC") fully briefed and pending, Lead Counsel successfully negotiated a settlement of this Action with Bankrate, Inc. ("Bankrate" or the "Company"), Edward J. DiMaria, Kenneth S. Esterow, Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBC Capital Markets, LLC, and Stephens, Inc. (collectively, "Defendants") for $20 million in cash.  The Settlement − achieved through the diligent efforts of Lead Plaintiff and Lead Counsel − represents a very favorable result for the Settlement Class.  Indeed, the Settlement provides a recovery of approximately 12.4% of the Settlement Class' maximum recoverable aggregate damages as estimated by Lead Plaintiff's damages consultant − a percentage recovery that is more than *four times* greater than the percentage of maximum damages recovered in recent similar securities class action settlements where damages ranged from $125-$249 million.[2]  The Settlement Amount is also substantially greater than the median securities class action settlement in the Eleventh Circuit for years 2006

---

[1]    Lead Counsel respectfully refers the Court to the accompanying Declaration of Andrew L. Zivitz and Johnston de F. Whitman, Jr. in Support of: (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Zivitz/Whitman Declaration" or "Zivitz/Whitman Decl.") for a detailed description of Lead Plaintiff's allegations, the procedural history of the Action, efforts of Lead Counsel, risks of proceeding with the Action, and the terms of the Settlement.  Unless otherwise noted, any capitalized terms used herein have the meanings set forth in the Stipulation and Agreement of Settlement, dated as of July 18, 2016 (the "Stipulation") (DE 154), and in the Zivitz/Whitman Declaration.  Citations and internal footnotes are omitted and emphasis is added throughout this memorandum unless otherwise indicated.

[2]    *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2015 Review and Analysis*, at 9 ("Cornerstone Research 2016") (finding median securities settlement in years 2006-2014 recovered 2.8% of estimated damages where damages ranged from $125-$249 million, and only 1.7% of estimated damaged in the same range in 2015), a copy of which is attached as Exhibit B to the Zivitz/Whitman Declaration.

through 2015 ($5.2 million) and the median securities class action settlement as a percentage of estimated damages in the Eleventh Circuit for the same years (2.6%).[3]

In addition, the Settlement is particularly favorable when considered in light of the significant risks confronted in the Action.  At the time the Settlement was reached, the Court had already dismissed (without prejudice) Lead Plaintiff's claims in their entirety.  Although Lead Plaintiff was permitted to amend its claims, the Court, in ruling on Defendants' first round of motions to dismiss, noted that there were "many pleading hurdles Plaintiff must overcome should it wish to file an amended complaint."  DE 125 at 13.  But for the Settlement, the outcome of Defendants' pending motion to dismiss the SAC − and, ultimately, the Settlement Class' ability to recovery anything from Defendants (let alone the $20 million Settlement) − was far from certain.

Throughout the Action, Defendants raised substantial challenges to Lead Plaintiff's ability to establish liability and the Settlement Class' full amount of damages.  For example, Defendants contended that none of the statements alleged by Lead Plaintiff as materially false or misleading were *materially* misstated – an element necessary to establish a claim under both the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act").  Zivitz/Whitman Decl., ¶ 92.  Defendants also asserted that Lead Plaintiff would not be able to establish that any of the alleged misstatements were made with the requisite intent (for the Exchange Act claims) and that the evidence would ultimately show that Defendants had no intent to comment what they categorized as a "miniscule" fraud.  *Id.*, ¶¶ 95-96.  Moreover, even if Lead Plaintiff established liability, proving loss causation and resulting damages was equally risky.  Whether Defendants' alleged misrepresentations impacted the price of Bankrate's common stock during the Settlement Class Period and whether the revelations of the alleged fraud proximately caused the Company's stock price to decline were vigorously disputed by Defendants.  *Id.*, ¶¶ 98-100.  As for damages, Defendants argued that Lead Plaintiff would be unable to show that the price declines in Bankrate common stock were attributable to information revealing the alleged fraud.  *Id.*  If the SAC survived the pending motions to dismiss, Defendants would have continued to pursue these defenses, and others.

---

[3]     *See* Cornerstone Research 2016, at 22, Fig.21.

Notwithstanding these obstacles, Lead Counsel devoted the necessary resources – in terms of their time and expenses – to this matter in order to achieve a favorable result for the Settlement Class.   Among other work, Lead Counsel: (i) conducted a thorough factual investigation into the Settlement Class' claims, including reviewing and analyzing publicly available information concerning Defendants, as well as the findings by the United States Securities and Exchange Commission ("SEC") from its investigation into Bankrate's historical financial reporting for fiscal years 2011, 2012 and 2013; (ii) drafted two detailed complaints based on this investigation and its consultation with accounting professionals in order to develop Lead Plaintiff's allegations pertaining to Defendants' alleged violations of Generally Accepted Accounting Principles ("GAAP"); (iii) conducted extensive research regarding the law applicable to the claims asserted in the Action and Defendants' potential defenses thereto; (iv) opposed two rounds of motions to dismiss filed by multiple Defendants; (v) briefed a motion to partially modify the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"); (vi) moved for class certification; (vii) worked extensively with loss causation and damages consultants in connection with class certification and mediation; and (viii) engaged in hard-fought settlement negotiations, including an 11 hour in-person mediation session, with the assistance of an experienced and highly respected neutral mediator.   *See generally* Zivitz/Whitman Decl., ¶¶ 26-78.   In addition, pursuant to the parties' agreement in principle to resolve the Action, Bankrate produced discovery related to its accounting practices during the relevant time period, consisting of more than 307,000 pages of documents (including internal e-mails and memoranda and sworn testimony before the SEC) that Lead Counsel reviewed and analyzed to confirm the reasonableness, fairness, and adequacy of the Settlement.  *Id.*, ¶¶ 79-83.

The result of Lead Counsel's efforts is an all-cash Settlement of $20 million, which has been on deposit for the benefit of the Settlement Class since September 22, 2016.  It is against this backdrop that Lead Counsel respectfully submits its request for a fee award of 10% of the Settlement Fund – an award that would be well below those typically awarded in this Circuit. *See* Section II.B, below.  Importantly, as discussed below, the relevant factors articulated in the Fifth Circuit's decision in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.

1974) also support the requested fee.[4]  *See also Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242-43 (11th Cir. 2011) (citing *Johnson* factors).  Lead Counsel's request for fees and expenses is also fully supported by Lead Plaintiff.

Further, although not required, a lodestar cross-check confirms that the requested fee is fair and reasonable.  *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999). Under the lodestar method, the court "consider[s] the number of hours worked by counsel and their customary hourly rates, and appl[ies] a 'multiplier' to those hours in order to compensate attorneys for the risk undertaken and the quality of work done."  *Thorpe v. Walter Inv. Mgmt. Corp.*, Case No. 1:14-cv-20880-UU, 2016 U.S. Dist. LEXIS 144133, at *20-21 (S.D. Fla. Oct. 14, 2016); *see also Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). Here, Plaintiffs' Counsel expended over 4,803 hours with a resulting lodestar of $2,506,611.75 at counsel's current billing rates, in the investigation, prosecution, and resolution of the Action.[5]  Unlike most cases in which counsel seek a fee which exceeds their lodestar, the requested fee here is substantially less than the total lodestar value of the time that Plaintiffs' Counsel dedicated to the Action.  Accordingly, the requested fee represents a "negative" multiplier of approximately 0.80 on Plaintiffs' Counsel's total lodestar.[6]  This fact further supports the reasonableness of the fee request.  *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM), 2010 U.S. Dist. LEXIS 119702, at *77 (S.D.N.Y. Nov. 8, 2010) ("Lead Counsel's request for a percentage fee representing a significant discount from their lodestar provides additional support for the reasonableness of the fee request.").

---

[4]     Unless subsequently abrogated or modified, opinions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

[5]     The Supreme Court has indicated that the use of current rates rather than historical rates is appropriate in examining the lodestar because current rates compensate for inflation and loss of use of funds.  *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).  The $2,506,611.75 lodestar figure reflects Plaintiffs' Counsel's time through September 30, 2016.  Plaintiffs' Counsel have expended additional time working on the Action since September 30, 2016, and Lead Counsel expects to continue to incur additional time assisting Settlement Class Members and supervising the administration of this Settlement.

[6]     *See Behrens*, 118 F.R.D. at 549 (Courts in this Circuit have found lodestar multipliers "in large and complicated class actions run[] from a low of 2.26 . . . to a high of 4.5" while "three appears to be average."); *see also Thorpe*, 2016 U.S. Dist. LEXIS 144133, at *21 (noting "there is no basis to conclude that a 3.58 lodestar multiplier is excessive . . . [s]uch a multiplier is well within the range previously accepted in this district").

For all the reasons set forth above and discussed further below, Lead Counsel respectfully requests that the Court approve their request for an award of attorneys' fees and expenses.

## II.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE

### A.    Lead Counsel Is Entitled to an Award of Attorneys' Fees from the Common Fund

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1550 (2013). The purpose of this common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to prevent unjust enrichment of persons who benefit from a lawsuit without bearing its cost. *See Boeing*, 444 U.S. at 478. The Eleventh Circuit has also determined that attorneys who create a common fund are entitled to be compensated for their efforts with a percentage of that fund. *See Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991). "Congress, the Executive Branch, and [the Supreme] Court, moreover, have 'recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, __ U.S. __, 133 S. Ct. 1184, 1201 (2013).

### B.    The Requested Attorneys' Fees Are Reasonable as a Percentage of the Common Fund

The Eleventh Circuit has found that an attorney's fee in a common fund case should be calculated as a reasonable percentage of the recovery received by the class. *Thorpe*, 2016 U.S. Dist. LEXIS 144133, at *22.[7] The Court has "substantial discretion in determining the appropriate fee percentage awarded to counsel," *McKinley v. Great Western Bank*, Case No. 1:10-cv-22770-JLK, 2013 U.S. Dist. LEXIS 190559, at *33 (S.D. Fla. Aug. 2, 2013), and, in this Circuit, "[t]here is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of

---

[7]    The percentage method is also consistent with arrangements in the private marketplace for contingency cases, in which individual clients typically agree to a fee based on the amount recovered. *See Blum v. Stenson*, 465 U.S. 886, 903 (1984). Additionally, the text of the PSLRA supports awarding attorneys' fees in securities cases using the percentage method, providing that "[t]otal attorneys' fees and expenses awarded by the court for the plaintiff class shall not exceed *a reasonable percentage of the amount . . . actually paid to the class.*" 15 U.S.C. § 78u-4(a)(6).

each case." *Camden*, 946 F.2d at 774.  The Eleventh Circuit has observed that "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," and "an upper limit of 50% of the fund may be stated as a general rule, even though larger percentages have been awarded." *Camden*, 946 F.2d at 774-75; *see also Waters*, 190 F.3d 1291, at 1294 (approving the selection of 30% as an appropriate benchmark in a complex securities class action).

Here, Lead Counsel is requesting a modest fee of 10% of the Settlement Fund – an amount well below the fee percentages awarded within the Eleventh Circuit in other common fund cases.  *See Ressler v. Jacobson*, 149 F.R.D. 651, 655-56 (M.D. Fla. 1992) (awarding 30% or more of a settlement fund for attorneys' fees is "not uncommon in §10(b) common fund cases").  *See also Waters*, 190 F.3d 1291 (affirming fee award of 33-1/3% of settlement of $40 million); *Thorpe*, 2016 U.S. Dist. LEXIS 144133, at *35 (awarding 33.3% of settlement of $24 million); *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-1317-MDL-SEITZ/KLEIN, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) (awarding 33-1/3% of $72.5 million settlement); *Gutter v. E.I. Dupont De Nemours & Co.*, No. 95-2152-CIV-GOLD, 2003 U.S. Dist. LEXIS 27238 (S.D. Fla. May 30, 2003) (awarding fees of 33-1/3% of settlement of $77.5 million).  Lead Counsel's fee request is made in accordance with a retainer agreement entered into with Lead Plaintiff at the outset of the litigation.[8]  The fee request is reasonable given the favorable recovery obtained for the Settlement Class, the significant risks and complexity of this case,[9] and the fact that Lead Counsel prosecuted this Action for two years without any compensation.  *See, e.g., Waters v. Cook's Pest Control, Inc.*, No. 2:07-cv-00394-LSC, 2012 U.S. Dist. LEXIS 99129, at *47 (N.D. Ala. July 17, 2012) ("Class Counsel accepted

---

[8]     In enacting the PSLRA, Congress intended to encourage investors with substantial financial stakes in the litigation to serve as lead plaintiffs and to play an active role in supervising and directing the litigation, including selecting and monitoring class counsel.  *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014).  Accordingly, fees negotiated between a court-appointed PSLRA lead plaintiff and its counsel should be accorded a presumption of reasonableness.  *See In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *50 (S.D.N.Y. July 27, 2007) (public policy considerations support fee awards in cases in which large public pension funds, serving as lead plaintiffs, "conscientiously" supervise the work of lead counsel and give their endorsement to the fee request).

[9]     Courts have long recognized that securities class actions are "notably difficult and notoriously uncertain."  *Flag Telecom*, 2010 U.S. Dist. LEXIS 119702, at *43; *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (noting the "inherently complicated nature of large class actions alleging securities fraud").

this matter on a contingent basis. . . .  ***Throughout the years, there has been a real possibility that Class Counsel would not recover anything for the Class***.").

To date, there have been no objections to the fee request.[10]  Pursuant to the Court's Order Granting Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement dated August 24, 2016 (DE 156)[11] (the "Preliminary Approval Order"), more than 32,900 copies of the Notice – which advises recipients that Lead Counsel will apply for an award of attorneys' fees in an amount not to exceed 10% of the Settlement Fund – have been mailed to potential Settlement Class Members and nominees and the Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire*.[12]  The lack of any objection is evidence that the requested fee is fair.  *See Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1343 (S.D. Fla. 2007); *Ressler*, 149 F.R.D. at 656 (noting that the lack of objections is "strong evidence of the propriety and acceptability" of the fee request).

The requested fee is also reasonable in light of the additional *Johnson* factors discussed below in Section II.C.

**C.      The Circumstances of the Litigation Examined in Light of the Relevant *Johnson* Factors Justify the Fee Award**

The following *Johnson* factors (488 F.2d at 717-19) are relevant to this Action and fully support the requested fee.[13]

---

[10]      The deadline for filing an objection to the fee request is January 17, 2017.  Should any objections to the fee, or the expense request, be filed after this submission, Lead Counsel will address them in its reply papers, which will be filed with the Court on or before January 30, 2017.  DE 156.

[11]      This Order was amended on August 25, 2016 (DE 157) to revise the date of the Settlement Fairness Hearing.

[12]      *See* Affidavit of Jennifer M. Keough Regarding (A) Mailing of the Notice and Proof of Claim Form; (B) Publication of the Summary Notice; (C) Establishment of the Telephone Hotline; (D) Establishment of the Settlement Website; and (E) Report on Requests for Exclusion Received to Date, dated December 29, 2016, at ¶¶ 11-12, submitted on behalf of the Court-authorized Claims Administrator for the Settlement, JND Legal Administration (the "JND Affidavit" or "JND Aff.") (attached as Ex. A to the Zivitz/Whitman Declaration).

[13]      *Johnson* factors 5 and 12, the customary fee and awards in similar cases, are addressed *supra* in Section B.  *Johnson* factors 7 and 11 do not apply to the instant case, i.e., the time limitations imposed by the client or the circumstances and the nature and the length of the professional relationship with the client, and thus are "neutral."  *See generally Thorpe*, 2016 U.S. Dist. LEXIS 144133, at *33.  Additionally, with respect to *Johnson* factor 4, i.e., the preclusion

### 1.    The Amount Involved and the Results Obtained

The result achieved, *Johnson* factor 8, is one of the most important factors considered in determining an appropriate fee award.   In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court confirmed that, in assessing the reasonableness of a fee, the "most critical factor is the degree of success obtained."   *Id.* at 436; *see also Ressler*, 149 F.R.D. at 655 ("It is well-settled that one of the primary determinants of the quality of the work performed is the result obtained.").

Through its efforts in prosecuting and resolving this Action, Lead Counsel has obtained a recovery of $20 million for the Settlement Class.   This Settlement confers a substantial and immediate benefit on the Settlement Class in contrast to the additional delays, costs, and risks of continued litigation – most notably, the uncertainty of how the Court would rule on Defendants' motion to dismiss the SAC that was *sub judice* at the time the Settlement was reached.

The Settlement Amount also represents a significant percentage of the Settlement Class' estimated damages.   Based on Lead Plaintiff's damages consultant's analyses, under a best-case scenario which does not take into account any of Defendants' arguments to liability, scienter, loss causation, and damages, the Settlement Amount represents approximately 12.4% of the Settlement Class' estimated likely maximum aggregate recoverable damages of $161 million. Zivitz/Whitman Decl., ¶ 102.   This percentage recovery is more than *four times* greater than recoveries obtained in other recent similar securities class actions.   *See supra* n.2.   Under a scenario where Defendants prevailed on any of their arguments at trial, the Settlement Class' maximum damages would likely be reduced, and, as such, the percentage of damages the Settlement Amount represents could be viewed as even greater.   In evaluating proposed settlements, other courts have found similar, or smaller, percentage recoveries to be reasonable.[14]

---

of other employment due to acceptance of the case at hand, while "this litigation doubtless did require Co-Class Counsel to forego other work, this is true of most complex securities litigation" and this factor is "neutral." *Id.* at 30.

[14]     *See, e.g.*, *Thorpe*, 2016 U.S. Dist. LEXIS 144133, at *9 (approving settlement representing 5.5% of the maximum damages and noting that the settlement is "an excellent recovery, returning more than triple the average settlement in cases of this size); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484, 2007 U.S. Dist. LEXIS 9450, at *33 (S.D.N.Y. Feb. 1, 2007) ("The [$40.3] settlement . . . represents a recovery of approximately 6.25% of estimated damages.   This is at the *higher end of the range* of reasonableness of recovery in class action securities litigations."); *Hicks v. Morgan Stanley*, No. 01 Civ.

### 2.    The Novelty and Difficulty of the Legal and Factual Issues

Courts have recognized that the novelty and difficulty of the issues in a case are significant factors to be considered in making a fee award.  *See Johnson*, 488 F.2d at 718; *see also In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 263 (E.D. Va. 2009) ("The very nature of a securities fraud case demands a difficult level of proof to establish liability.  Elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish."); *Thorpe*, 2016 U.S. Dist. LEXIS 144133, at *26 (noting that "Class Representatives faced all the "multi-faceted and complex legal questions endemic" to cases based on alleged violations of federal securities law.").   As discussed in the accompanying Zivitz/Whitman Declaration and Settlement Brief, substantial risks and uncertainties in this type of litigation under the PSLRA, and in this case in particular, made it far from certain that any recovery, let alone $20 million, would ultimately be obtained.

First, in addition to the complexities of securities cases generally, this Action involved the intricacies of Bankrate's accounting practices and financial reporting, including the complexities of GAAP.  Zivitz/Whitman Decl., ¶¶ 5-7.  In drafting the Complaints, Lead Counsel consulted with accounting professionals to develop Lead Plaintiff's allegations pertaining to Defendants' alleged violations of GAAP, and if the Action continued, Lead Counsel would likely require additional consultation with these accounting professionals, and others, to navigate through the accounting documents that would be produced during the course of discovery.

Second, nuanced legal and factual issues existed concerning whether Lead Plaintiff could establish that the alleged misstatements and omissions were material, actionable and made with the requisite intent.  For example, with respect to materiality, Defendants contended that (i) Lead Plaintiff incorrectly presented the restated revenue and expense amounts from 2Q12 as a percentage of income, rather than as a percentage of total revenues or total assets; (ii) the restated amounts of revenues and expenses for 2Q12 were "tiny" and, therefore, immaterial as a matter of law, particularly in light of the presumption set forth in SEC Staff Accounting Bulletin No. 99 ("SAB No. 99") that misstatements of less than 5% of a given financial metric are immaterial; and (iii) none of the qualitative factors set forth in SAB No. 99 pushed the otherwise immaterial

---

10071(RJH), 2005 U.S. Dist. LEXIS 24890, at *19 (S.D.N.Y. Oct. 24, 2005) (finding settlement representing 3.8% of plaintiffs' estimated damages to be within range of reasonableness).

misstatements over the materiality threshold. Zivitz/Whitman Decl., ¶ 92. Defendants further asserted that there was no direct evidence to prove that Defendants' alleged misstatements were recklessly made and, in particular, pointed to Defendant DiMaria's own transactions in Bankrate common stock in support. *Id.*, ¶¶ 95-96.

Third, Defendants argued, among other things, that Lead Plaintiff could not establish that the alleged price drops were causally related to a correction of the alleged misstatements, and instead maintained that the price drops were caused by investigations that merely raised a risk that a false statement may later be revealed. *Id.*, ¶¶ 98-99. More specifically, at the pleading stage, Lead Plaintiff faced significant uncertainty that it could prove loss causation given the uncertainty within the Eleventh Circuit as to whether regulatory investigations, such as those announced on September 15, 2014 and October 9, 2014, can serve as corrective disclosures when coupled with later findings of wrongdoing. *Id.*, ¶ 99 n.10. *See also Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013). Assuming that either this Court or the Eleventh Circuit determined that the SAC adequately alleged loss causation, Lead Plaintiff would have faced arguments suggesting that it was required to identify the portions of the price declines in Bankrate common stock following the partial corrective disclosures made on September 15, 2014 and on October 9, 2014 that were caused by the revelation of the alleged fraud (as opposed to other information released and absorbed by the market on those days). *Id.*, ¶ 98. Accordingly, defeating Defendants' arguments regarding loss causation and damages at summary judgment, trial, and possibly on appeal would have been time-consuming and risky.

Finally, the risks and delays inherent in securities litigation, even after a jury verdict in favor of the class, justify this fee request. *See, e.g., Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after 19-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.,* 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Apple Computer. Sec. Litig.*, No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions); *In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 U.S. Dist. LEXIS 50995 (N.D. Cal. June 16, 2009) (granting summary judgment to defendants after eight years of litigation), *aff'd*, 627 F.3d 376 (9th Cir. 2010).

### 3.     The Skill Requisite to Perform the Legal Service Properly and the Experience, Reputation and Ability of Counsel

Lead Counsel and Court-appointed Liaison Counsel, Saxena White, P.A., have extensive experience prosecuting securities class actions and other complex litigation.  Zivitz/Whitman Decl., ¶ 138; *see also* firm resumes attached as Exhibit 3 to the Declaration of Andrew L. Zivitz (attached as Exhibit C to the Zivitz/Whitman Declaration) and Exhibit 3 to the Declaration of Joseph E. White, III (attached as Exhibit D to the Zivitz/Whitman Declaration).  That experience and skill was demonstrated by the efficient and effective prosecution of this Action for almost two years, culminating in the Settlement.  *See In re Checking Account*, 830 F. Supp. 2d 1330, 1359 (S.D. Fla. 2011) ("Class Counsel took on a great deal of risk in bringing this case, and turned a potentially empty well into a significant judgment.  ***That kind of initiative and skill must be adequately compensated to insure that counsel of this caliber is available to undertake these kinds of risky but important cases in the future***.").

The quality of opposing counsel is also important in evaluating the quality of services rendered by Lead Counsel.  *See In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1334 (S.D. Fla. 2001) ("[I]n assessing the quality of representation, courts have also looked to the quality of the opposition the plaintiffs' attorneys faced.").  Defendants in this case were represented by very skilled counsel, including from Wachtell, Lipton, Rosen & Katz, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Cleary Gottlieb Steen & Hamilton LLP, and Holland & Knight LLP.  Zivitz/Whitman Decl., ¶ 139.  These firms have considerable experience in litigating complex class actions, and spared no effort in vigorously defending their respective clients.  *Id*.  Notwithstanding this formidable opposition, Lead Counsel's ability to present a strong case and to demonstrate its willingness and ability to continue to vigorously prosecute the Action through trial and inevitable appeals helped secure the Settlement.

### 4.     The Time and Labor Expended by Plaintiffs' Counsel

For two years, Plaintiffs' Counsel dedicated substantial time and financial resources to litigating this case.  Lead Counsel conducted a thorough investigation prior to filing each of the Complaints, including the review and analysis of:  (i) publicly available news articles, documents and reports regarding Bankrate; (ii) the Company's public filings with the SEC; (iii) securities analysts' reports and advisories about Bankrate; (iv) press releases and other public statements issued by the Company, including during conference calls with analysts and investors; and

11

(v) media reports about the Company.  Lead Counsel also monitored developments pertaining to the investigations into Bankrate's accounting practices being conducted by the SEC, the United States Department of Justice, and the Company's Audit Committee, and worked with accounting consultants at Schectman Marks and Devor PC (which later became part of Friedman LLP) to develop the allegations in the Complaints pertaining to Defendants' alleged violations of GAAP. Zivitz/Whitman Decl., ¶¶ 33-35.

In additional to its thorough investigation, Lead Counsel also (i) opposed two rounds of motions to dismiss by multiple Defendants, requiring extensive research and briefing; (ii) briefed a motion to partially modify the discovery stay imposed by the PSLRA; and (iii) filed a motion for class certification, requiring extensive consultation with loss causation and damages consultants.  *Id.*, ¶¶ 38-65.  Lead Counsel also engaged in a hard-fought mediation process with Defendants, including the submission of a detailed confidential mediation statement, further consultation with loss causation and damages consultants, and an 11-hour, in-person mediation session, followed by further negotiations through the assistance of Jed Melnick, an experienced and highly respected neutral mediator.  *Id.*, ¶¶ 66-75.  In addition, pursuant to the parties' agreement in principle to resolve the Action, Bankrate produced discovery related to its accounting practices during the relevant time period, consisting of more than 307,000 pages of documents (including internal e-mails and memoranda and sworn testimony before the SEC) that Lead Counsel reviewed and analyzed to confirm the reasonableness, fairness, and adequacy of the Settlement.  *Id.*, ¶¶ 79-83.

In sum, Plaintiffs' Counsel devoted substantial time and resources to prosecuting this litigation over the past two years.  As set forth in their respective declarations, Plaintiffs' Counsel expended over 4,803 hours prosecuting this Action.  *See* Zivitz Decl., ¶ 5 and Ex. 1; White Decl., ¶ 4 and Ex. 1.

### 5.      The Contingent Nature of the Fee Weighs in Favor of the Requested Award

The "customary fee" in a class action lawsuit of this nature is a contingency fee because virtually no individual possesses a sufficiently large stake in the litigation to justify paying his attorneys on an hourly basis.  *See Ressler*, 149 F.R.D. at 654; *see also Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988).  A determination of a fair fee must include consideration of the contingent nature of the fee and the significant risks of non-recovery.  *See*

*Thorpe*, 2016 U.S. Dist. LEXIS 144133, at \*30 ("The Court should give substantial weight to the contingent nature of Class Counsel's fees when assessing the fee request."); *In re Checking Account Overdraft Litig.*, No. MDL 2036, 2013 U.S. Dist. LEXIS 187627, at \*107-108 (S.D. Fla. Mar. 18, 2013) (contingency retainment must be promoted to ensure representation of a person who could not otherwise afford a lawyer); *see also Pinto*, 513 F. Supp. 2d at 1339 ("attorneys' risk is '"perhaps the foremost" factor' in determining an appropriate fee award").

Lead Counsel prosecuted this Action on a wholly contingent basis and bore all the risks of litigating the case through trial and likely appeals. This risk was heightened when the Court dismissed (without prejudice) all of the claims alleged in Lead Plaintiff's AC, finding that the AC did not adequately allege material misrepresentations or omissions to support Lead Plaintiff's claims under either the Exchange Act or the Securities Act and did not adequately plead the scienter or loss causation elements of Lead Plaintiff's claims under Section 10(b) of the Exchange Act. In granting leave to amend the AC, the Court noted that there were "many pleading hurdles Plaintiff must overcome should it wish to file an amended complaint." DE 125 at 13. Moreover, Lead Counsel understood from the outset that it was embarking on a complex, expensive and potentially lengthy litigation, which could (and did) require the investment of hundreds of thousands of dollars and many thousands of hours of attorney time, with no guarantee of ever being compensated for the investment of such time and resources. In undertaking this risk, Lead Counsel was obligated to, and did, ensure that sufficient resources were dedicated to prosecuting this Action.

The risks of contingent litigation are highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and effort has been expended on the case. Recently, the Supreme Court has shown great interest in securities cases. *See, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318 (2015); *Halliburton II*, 134 S. Ct. 2398; *Comcast Corp. v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). As a result of these and other developments, many cases are lost after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery. Indeed, recent cases demonstrate the real risks associated with such developments. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011) (after a verdict for class plaintiffs finding Vivendi acted recklessly with respect to 57 statements, granting defendants' motion for judgment as a matter of

law following change of law in *Morrison*).

Even lawyers who defeat summary judgment and succeed at trial may find their client's judgment overturned on appeal or on a post-trial motion.  *See, e.g.*, *In re BankAtlantic Bancorp, Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057 (S.D. Fla. Apr. 25, 2011) (granting defendants' judgment as a matter of law on the basis of loss causation, overturning jury verdict and award in plaintiff's favor), *aff'd*, 688 F.3d 713 (11th Cir. 2012). Thus, the risk that Lead Counsel would invest substantial financial resources and receive nothing militates in favor of approving the fee request.

### 6.      The "Undesirability" of the Case

This was a complex case that presented difficult issues.  When Lead Counsel undertook the representation of Lead Plaintiff and the Settlement Class, it was with the knowledge that it would have to spend substantial time and resources and face significant risks without any assurance of compensation.  These risks must be assessed as they existed at the time counsel undertook the case and not in light of the settlement ultimately achieved.  *See, e.g.*, *Checking Account*, 830 F. Supp. 2d at 1364 (undesirability and relevant risks to be judged as of the time the suit was commenced).  This factor supports approval of Lead Counsel's fee request.

## III.   THE REQUESTED EXPENSES ARE REASONABLE

In addition to a reasonable attorneys' fee, Lead Counsel respectfully seeks reimbursement of $175,044.41 for litigation expenses Plaintiffs' Counsel reasonably and necessarily paid or incurred in connection with investigating, prosecuting and resolving the claims against Defendants.  Zivitz/Whitman Decl., ¶¶ 147-151.  These expenses are itemized in the declarations of Plaintiffs' Counsel submitted herewith and are properly sought.[15]  Both expenses and certain in-house charges are properly recovered by Plaintiffs' Counsel.  *See, e.g.*, *Ressler*, 149 F.R.D. at 657; *Dowdell v. Apopka*, 698 F.2d 1181, 1192 (11th Cir. 1983) ("all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case" may be recovered).

The expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. Specifically, the expenses sought include charges for:  (i) investigating the facts underlying the

---

[15]      *See* Zivitz Decl., ¶ 7 and Ex. 2; White Decl., ¶¶ 6-7 and Ex. 2.

claims alleged in the Complaints; (ii) online factual and legal research; (iii) retaining expert consultants on accounting issues as well as on the issues of market efficiency, loss causation, and damages in connection with drafting the Complaints, class certification proceedings and the Mediation; (iv) the Mediation; and (v) managing a database of more than 307,000 pages of Confirmatory Discovery documents that Bankrate produced in connection with the Settlement. Zivitz/Whitman Decl., ¶ 148.  These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the firms' billing rates.  *See* Zivitz Decl., ¶ 6; White Decl., ¶ 5.

The Notice informed potential Settlement Class Members that Lead Counsel would apply for reimbursement of expenses in an amount not to exceed $250,000.  The total amount of expenses requested is below the amount listed in the Notice and, to date, there have been no objections to the request for expenses.  Zivitz/Whitman Decl., ¶¶ 23-24.

## IV.    CONCLUSION

The Settlement of this Action is the culmination of diligent work and skillful litigation by Plaintiffs' Counsel.   For these efforts, Lead Counsel, on behalf of Plaintiffs' Counsel, respectfully requests that the Court grant this motion.  A proposed order in connection with Lead Counsel's motion for an award of attorneys' fees and expenses will be submitted with Lead Plaintiff's reply papers after the January 17, 2017 deadline for objecting has passed.

Dated: December 30, 2016                          Respectfully submitted,


                                        /s/ *Lester Hooker*
                                        Lester Hooker
                                        Florida Bar No. 32242
                                        lhooker@saxenawhite.com
                                        Joseph E. White
                                        Florida Bar No. 0621064
                                        jwhite@saxenawhite.com
                                        SAXENA WHITE P.A.
                                        Boca Center, 5200 Town Center Circle, Suite 601
                                        Boca Raton, FL 33486
                                        Ph: (561) 394-3399

                                        *Liaison Counsel for the Settlement Class*

                                        Johnston de F. Whitman, Jr. (admitted *pro hac vice*)

jwhitman@ktmc.com
Andrew L. Zivitz (admitted *pro hac vice*)
azivitz@ktmc.com
Kimberly A. Justice (admitted *pro hac vice*)
kjustice@ktmc.com
KESSLER TOPAZ
MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Ph: (610) 667-7706

-and-

Jennifer L. Joost (admitted *pro hac vice*)
jjoost@ktmc.com
1 Sansome Street, Suite 1850
San Francisco, CA 94109
Ph: (415) 400-3000

*Counsel for Lead Plaintiff The City of Los Angeles,
Acting Through its Fire and Police Pension
System, Acting by Order of and Through its Board
of Fire and Police Pension Commissioners, and
Lead Counsel for the Settlement Class*

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 30, 2016.

*/s/Lester R. Hooker*
Lester R. Hooker